**CARLSON LYNCH SWEET
KILPELA & CARPENTER, LLP**
Todd D. Carpenter (CA 234464)
Brittany C. Casola (CA 3016561)
1350 Columbia St., Ste. 603
San Diego, California 92101
Telephone: (619) 762-1900
Facsimile: (619) 756-6991
tcarpenter@carlsonlynch.com

**KALIEL PLLC**
Jeffrey D. Kaliel (CA Bar No. 238293)
Sophia Gold (CA Bar No. 307971)
1875 Connecticut Ave., NW, 10th Floor
Washington, D.C.  20009
(202) 350-4783
jkaliel@kalielpllc.com
sgold@kalielpllc.com

*Attorneys for Plaintiff
and Proposed Class Counsel*

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KRISTEN SCHERTZER, MEAGAN HICKS, BRITTANY COVELL, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>BANK OF AMERICA, N.A, CARDTRONICS, INC., ATM NATIONAL, LLC, FCTI, INC., CASH DEPOT LTD, and DOES 1-50, inclusive,<br><br>Defendants. | Case No:  3:19-cv-00264-JM-MSB<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT**<br><br>**[DEMAND FOR  JURY TRIAL]** |

## SECOND AMENDED CLASS ACTION COMPLAINT

Plaintiffs KRISTEN SCHERTZER, BRITTANY COVELL, and MEAGAN HICKS ("Plaintiffs") bring this action on behalf of themselves and all others similarly situated against Defendants Cardtronics, Inc. ("Cardtronics"), ATM National, LLC ("ATM National")[1], FCTI, Inc. ("FCTI"), Cash Depot, Ltd, Bank of America, N.A. ("BofA"), and state:

## I.    INTRODUCTION

1.     This Second Amended Complaint challenges a) a multifaceted scheme by BofA to charge unwarranted fees to their accountholders for supposedly undertaking checking account "balance inquiries" during out-of-network[2] ATM transactions; b) deceptive and misleading representations regarding balance inquiries and fees for balance inquiries made by the independent ATM operators Cardtronics, Cash Depot and FCTI (collectively, the "ATM Defendants") on screens and signs at the ATMs they operate; and c) BofA's practice of charging International Transaction fees in excess of its permissible contract rate of 3.00% per foreign transaction.

2.     American consumers are being pummeled with three to four discrete fees of $2-$4 each for cash withdrawals from so-called "out of network" ATM machines in lightning-fast transactions that occur in under a minute.  The few consumers who have learned of this gouging are shocked, since they were never informed by the ATM owners or their own banks that three or four fees would be assessed during a **single** ATM visit.

3.     Plaintiffs' ATM claims result from a scheme wherein Bank of America knowingly exploits deceptive representations and processes at ATMs they do not operate in order to increase their own ATM fee revenue resulting from out-of-network ATM usage

---

[1] ATM National, LLC is a wholly owned subsidiary of Cardtronics, Inc., and for all intents and purposes relating to the allegations set forth in this [Proposed] Second Amended Class Action Complaint, is considered to be the same entity as Cardtronics.
[2] ATM transactions that occur at independent, third-party ATMs that are not owned or branded by Bank of America.

by their accountholders. The ATM Defendants, in turn, design deceptive on-screen and on-ATM disclosures to trick consumers into engaging into supposed "balance inquiries" they never intended or agreed to pay for; and BofA drafts and enforces accountholder agreements that never alert consumers, or authorizes it, to charge multiple Out of Network ("OON") ATM fees (sometimes two or three on the same ATM use) on the same cash withdrawal transaction.

4. A simple example reveals the extent of the scheme. Plaintiff Brittany Covell, a BofA customer, walked into a 7-Eleven store to withdraw $20 in cash at an ATM operated by FCTI. Shockingly, Plaintiff Covell was charged **$10.50 in ATM transaction fees** for the privilege of walking out of 7-Eleven with a $20 dollar bill in her pocket: the ATM owner charged her a usage fee of $2.00 and BofA charged her **three** out-of-network ATM Fees ("OON Fees") of $3.00 each—one for the cash withdrawal; a second one for a supposed balance inquiry that Plaintiff Covell **never** consented to; and a third "phantom" balance inquiry fee for printing her receipt. Plaintiffs' lawsuit challenges abhorrent and deceptive practices like these.

5. Because, in short, no reasonable consumer would agree to pay over $10.00 in ATM Fees to make a small cash withdrawal, BofA and the ATM Operators have built deception into every step of the process—from ATM screens to Bank account disclosures—in order to protect and expand what has become a multi-billion dollar source of revenue.

6. The ATM Defendants, Cardtronics, Inc., FCTI, Inc., and Cash Depot Ltd are independent deployers of ATM machines. Cardtronics, the self-described "World's Largest ATM Operator," deploys over 200,000 ATM machines worldwide and domestically provides thousands of stand-alone ATMs (unaffiliated with any bank or financial institution) to some of the nation's largest retailers, including CVS, Walgreens, Safeway, Costco, Kroger, Target and Circle K. Defendant FCTI has deployed over 30,000 independent ATM machines to its retail clients, including: 7-11, Albertson's, Flying J

convenience stores and Kroger's grocery stores. And Cash Depot has over 30,000 ATMs, including at most Wal-Mart stores throughout the country.

7. The ATM Defendants earn revenue primarily from three sources: 1) charging consumers "surcharges" for use of their machines when they make cash withdrawals—usually between $3-$5; 2) collecting an "interchange fee" from those consumers' financial institutions, including BofA, for the cash withdrawal transactions themselves, which is a small percentage of each cash withdrawal amount; and, most relevant for this litigation, 3) collecting payments from their customers' financial institutions, including BofA, for each balance inquiry[3] that one of their accountholders undertakes on one of their machines, usually in the amount of $.50. In sum, the ATM Defendants have a direct financial incentive to ensure—by whatever means possible—that consumers undertake balance inquiries, because they get paid for each one.

8. BofA also earns significant revenue when its accountholders use of Out-of-Network ATMs. ATM Fee revenue for BofA has risen dramatically in recent years and has become one of the primary drivers of all bank fee income overall. BofA charges OON Fees of $2.50 when an accountholder makes a cash withdrawal at an Out of Network ATM, including at the ATMs owned by the ATM Defendants, plus—without disclosing this fact to their customers—*also* charges a separate fee when they determine a customer has performed a balance inquiry as part of a cash withdrawal. In sum, BofA, like all financial institutions, collects OON Fees (including for balance inquiries) from their own customers and then they are contractually bound to pay a portion of these fees back to the ATM Defendants.

---

[3] A balance inquiry occurs when a retail bank or credit union customer utilizes their debit card at an ATM machine to check the available balance in their checking or savings account.

SECOND AMENDED CLASS ACTION COMPLAINT

9. The major problem with these practices is that consumers are deceived and lured into undertaking and paying OON Fees for balance inquiries ("Balance Inquiry Fees") that are not disclosed, deceptive, and in many cases redundant:

a) First, the BofA account agreement fails to authorize both an Out of Network Fee **and** a Balance Inquiry Fees on the same ATM **use**; and it grants the bank total discretion to determine when a Balance Inquiry Fee will apply—discretion they use unfairly. BofA relies solely on information and confirmation from the ATM Defendants as to when an Out of Network ATM Transaction has occurred, even where they know full well the accountholder has failed to ask for a balance inquiry, failed to authorize a fee for one, or been tricked into doing so. And in the case of FCTI, the customers are being double billed – assessed phantom charges for inquiries that were **never** made. Because the financial incentive is so great, BofA issues deceptive account disclosures, and turns a blind eye to the trickery used by the ATM Defendants.

b) Second, the *ATM Defendants* intentionally design deceptive, entrapping on-screen prompts and disclosures that lure consumers into undertaking balance inquires and never once disclose that such balance inquiries may cause an Out of Network Balance Inquiry Fee from their bank.

10. BofA misled its customers as to what it means to engage in an "Out of Network" ATM transaction—and never told their accountholders the truth, that they can and will be charged multiple OON Fees on a single out of network ATM use. BofA reserved sole discretion as to how an Out of Network ATM transaction will be defined and the circumstances under which their customers will be deemed to have engaged in an Out of Network ATM Transaction that causes them to incur an OON Fee. Most retail banks, including BofA, uniformly charge "Out of Network" ATM transaction fees, but they also mislead their customers as to what circumstances will give rise to such fees or how many fees the customer will be charged at one ATM "use" or a single ATM visit.

11.     Plaintiffs' lawsuit challenges  BofA's right to collect multiple "Out of Network" ATM fees on a single ATM visit, given its misrepresentations regarding the aggregate number of fees their customers will be charged during a single ATM visit, for blindly permitting the ATM Defendants to determine for them when and how an Out of Network ATM transaction has occurred, and their failure to adequately explain to their customers how their discretion in assessing the fees will be exercised.

12.     Plaintiffs' class action also challenges the ATM Defendants' fraudulent scheme of misleading Plaintiffs and other unsuspecting customers into engaging in checking account balance-inquiry transactions at the ATM Defendants' independent, non-bank affiliated ATM machines.  Defendants' ATM machines utilize deceptive screen prompts to trick customers into engaging in balance inquiries that the consumers would not otherwise undertake.

13.     For example, in the case of Ms. Covell and FCTI; she made a **single** supposed balance inquiry, but was charged **two** Out of Network ATM Balance Inquiry Fees by her own bank. Upon information and belief, Plaintiff alleges that FCTI communicates to BofA that a request for a receipt, at the end of the cash withdrawal transaction, is an additional "balance inquiry". This is the height of deceptive conduct; no consumer, after checking their account balance, and then withdrawing $20.00, would reasonably pay to check their account balance AGAIN.    Yet, FCTI has been routinely **double-billing** retail bank customers, including Plaintiff Covell for one-time balance inquiries (and even the first balance inquiries are deceptively represented). Retail banks, including BofA, are collecting **double** the amount of Out-Of-Network Balance Inquiry Fees that they would otherwise be entitled to and FTCI profits from this scheme by receiving kickbacks from every retail bank engaged in this practice, in the form of interchange payments for the phantom balance inquiries.

14.     In the case of Cardtronics, Plaintiff Schertzer was unwittingly lured into making an balance inquiry through the use of deceptive screen prompts. Rather than providing consumers with a standard menu from which they would affirmatively "opt-in"

to make a balance inquiry, Cardtronics forces consumers to "opt out" of a benign screen prompt asking if the customer would like their balance **printed** on a receipt. The request doesn't adequately notify consumers that they are engaging in a transaction that will cost them money; and the screen prompt doesn't permit customers to explicitly decline the transaction. Simply stated, it very purposefully creates confusion. This confusion causes consumers to pay for a balance inquiry they do not require and would have never agreed to pay for absent Cardtronics' misleading screen prompts. These types of "Out of Network" events are well known to BofA and other banks,, yet completely undisclosed. BofA profits from this confusion and returns the kickbacks to the ATM Defendants.

15.     In the case of Cash Depot, it is prominently advertising and encouraging its customers to make balance inquiries at Cash Depot ATM machines, representing, "**CHECK YOUR BALANCE FOR FREE**," despite knowing customers, including Plaintiff Hicks, would be charged a Balance Inquiry Fee by her Bank for doing so, and despite receiving enormous kickbacks from retail banks, including BofA for their share of the Balance Inquiry Fees.

16.     Lastly, this consumer class action also challenges BofA's systematic practice of charging more than its promised rate of 3.00% when it assesses International Transaction Fees on its customers' international payment card transactions. International Transaction Fees are assessed by certain retail banks, including BofA, when a customer makes a purchase with his or her payment card at an international retailer or when a withdrawal is made at an international ATM.  Retail banks, including BofA, charge a flat percentage of the transaction amount.

17.     BofA's standard account agreement, the "Deposit Agreement and Disclosures" (*See* Exhibit No. 1, BofA "Account Agreement") and its accompanying fee disclosures, the "Personal Schedule of Fees," (*See* Exhibit No. 2, BofA "Fee Schedule") govern all of their consumer deposit accounts in the United States, including Plaintiff Schertzer's checking account.

18.     As set forth in the Fee Schedule, BofA charges accountholders International Transaction Fees of exactly 3.00% of the purchase amount on: 1) payment card purchases made at international vendors; 2) ATM withdrawals made at International ATM machines; and 3) internet purchases using a payment card made on websites of international merchants. *See* Exhibit No. 2, BofA Fee Schedule, P.9, November, 2018.

19.     BofA's Account Agreement and Fee Schedule do not permit BofA to charge International Transaction Fees in excess of 3.00%. However, BofA engages in a systematic, routine process of "rounding up," to the nearest penny, in the assessment of its International Transaction Fees, which in turn, permits the Bank to assess International Transaction Fees as high as 5.2% of the total value of the transaction.

20.     BofA undertakes to maximize International Transaction Fees with a deceptive practice which also violates its contracts. As discussed more fully below, it is a breach of the Bank's contract and of reasonable consumers' expectations for the Bank to charge International Exchange Fees in excess of 3.00%.

21.     This rounding up is improper. Other banks refuse to engage in this practice. For example, one of BofA's primary market competitors in California, Union Bank, N.A., has a policy of "rounding down" to stay beneath Union Bank's disclosed International Transaction Fee of 2.00%.

22.     Plaintiff, and other BofA customers, have been injured by BofA's improper practices. On behalf of herself and the Class, Plaintiff seeks damages, restitution and injunctive relief for BofA's breach of contract and violation of California consumer protection laws.

## I.     JURISDICTION AND VENUE

23.     This Court has original jurisdiction of this action under the Class Action Fairness Act of 2005. Pursuant to 28 U.S.C. §§ 1332(d)(2) and (6), this Court has original jurisdiction because the aggregate claims of the putative class members exceed $5 million,

exclusive of interest and costs, and at least one of the members of the proposed classes is a citizen of a different state than Defendants.

24.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because each of the Defendants is subject to personal jurisdiction here and regularly conducts business in this District, and because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this district.

25.     Plaintiffs are citizens and residents of San Diego, California.

26.     Cardtronics, Inc. regularly operates ATM machines throughout the State of California, including in this judicial district, and provides all ATM related services to its customers, including members of the putative Class.  As such, it is subject to the personal jurisdiction of this Court.

27.     Cash Depot, Ltd. regularly operates ATM machines throughout the State of California, including in this judicial district, and provides all ATM related services to its customers, including members of the putative Class.  As such, it is subject to the personal jurisdiction of this Court.

28.     ATM National, LLC is a wholly owned subsidiary of Cardtronics and regularly operates ATMs throughout the State of California, including in this judicial district, and provides all ATM related services to its customers, including members of the putative Class. As such, it is subject to the personal jurisdiction of this Court.

29.     FCTI, Inc. is a California corporation with its principle place of business in Los Angeles, California. FCTI regularly and systematically operates ATM machines throughout the State of California and the country, including in this judicial district, and provides all ATM related services to its customers, including members of the putative Class.  As such, it is subject to the personal jurisdiction of this Court.

30.     BofA regularly and systematically operates retail banking branch locations throughout the State of California, including in this judicial district, and provide banking services to its customers, including members of the putative Class.

## II.    FACTUAL BACKGROUND AS TO THE ATM DEFENDANTS

31.    In recent years, there has been significant consumer and political outcry over the business practices of the ATM industry.  Consumer advocates, commentators and politicians have railed against "usurious" fees charged by ATM operators.  Almost all of the focus has concerned the high cost of surcharge fees, or the fees that an ATM operator charges directly to consumers for engaging in cash withdrawal transactions, which range from $3-$5 per transaction.  This litigation does not concern those fees.

32.    There is also a second fee that consumers using out-of-network ATMs are hit with—the OON Fee, which is charged by their own bank for using an ATM not owned by their bank.  This fee, ranging from $2-$3 is charged to the consumer in addition to the surcharges assessed by the ATM owners, which means that Americans are now paying between $5-$8 for every out of network ATM withdrawal they undertake.  This litigation does not concern this second type of fee either.

33.    Rather, there is a <u>third</u> fee that has gone unnoticed, and it involves so-called "balance inquiries" undertaken at out-of-network ATMs.  In addition to collecting surcharges on ATM cash withdrawals, the ATM Defendants profit by receiving kickbacks, in the form of "interchange fees," from their customers' banks for providing so-called "balance inquiries" at their ATMs. Unbeknownst to consumers, they can be charged one or two fees by their banks for supposedly performing balance inquiries <u>in addition</u> to the surcharge from the ATM owner <u>and</u> the first OON Fee from their own bank for the cash withdrawal.

34.    An accountholder who unsuspectingly checks his available balance as part of a cash withdrawal transaction at a Cardtronics, FCTI or Cash Depot ATM machine can expect to pay the following fees: 1) the customer will pay the ATM defendants a surcharge for the <u>withdrawal</u>; 2) the customer also pays his/her own bank a OON Fee for making an <u>out of network cash withdrawal</u>; 3) the customer will also pay his/her bank another OON Fee for supposedly undertaking one or more balance inquiries during the cash withdrawal (and in the case of a withdrawal at a FCTI ATM machine, the customer will pay an

additional, "phantom" fee for yet another balance inquiry). A single $20.00 withdrawal can generate between $7.00 and $10.50 in fees, which BofA and the ATM Defendants hungrily divide up.

35. Because the provision of balance inquiries are essentially cost-free to ATM owners, and because they are hugely profitable, ATM owners have placed a great emphasis in recent years on increasing the number of supposed balance inquiries undertaken at their machines—by any means necessary.

36. In the last decade, the revolution of mobile banking applications and increasing legislative scrutiny on the punitive nature of independent ATM machine withdrawal surcharges has forced the ATM Defendants to seek other sources of revenue. The 2015 Independent ATM deployer survey sponsored by Kahuna ATM Solutions and the ATM Industry Association found that declining interchange rates were one of the top concerns for Independent ATM operators[4]. The ATM Defendants shared this concern. For example, Cardtronics repeatedly voiced this concern in its financial disclosures, most recently stating:

> "In addition to the impact of the net interchange rate decrease, we saw certain financial institutions migrate their volume away from some networks to take advantage of the lower pricing offered by other networks, resulting in lower net interchange rates per transaction to us. If financial institutions move to take further advantage of lower interchange rates, or if networks reduce the interchange rates they currently pay to ATM deployers or increase their network fees, our future revenues and gross profits could be negatively impacted." *See* Cardtronics, Inc. SEC Form 10-Q, April 30, 2018. Available at: http://ir.cardtronics.com/node/18341/html (Last Viewed July 11, 2018).

37. Feeling the financial pressure of declining interchange rates, the ATM Defendants sought to increase revenue in other ways.

---

[4] *See* 2015 IAD Poll at https://www.atmmarketplace.com/news/2015-iad-poll-reveals-growing-attention-on-emv-shrinking-focus-on-mobile/ Last Viewed June 11, 2018.

38.    They turned to balance inquiries to drive revenue. But they had a problem: very few consumers seek them out and are willing to pay for them.

39.    Americans, in short, use ATMs for the service of withdrawing cash, not to perform balance inquiries and transfers that are now commonly performed online or on mobile devices for free.

40.    The ATM Defendants have known for years that the vast majority of customers who come to use their ATM machines are there to perform **only** a cash withdrawal.

41.    This makes perfect sense. Due to the availability of cost-free alternatives, like checking a balance on a mobile app, phone banking, or online access, paying for a balance inquiry at an ATM is not a rational act for the vast majority of consumers. Moreover, the shelf-life of the information obtained through a balance inquiry is extremely short. With checking accounts having numerous transactions that post throughout the day, as well as scheduled withdrawals that occur overnight, the viability of the information received through a balance inquiry at an ATM is only even arguably beneficial for the immediate business at hand, *i.e. the cash withdrawal*.

42.    Moreover, because consumers are entitled to receive, as part of their cash withdrawal, a printed receipt at the conclusion of their transaction, they already have free access to their account balances without having to engage in a separate balance inquiry.

43.    Therefore, when a consumer uses an ATM for a balance inquiry, it is almost always *in conjunction* with a cash withdrawal transaction.

44.    For all these reasons, historically only a tiny percentage of ATM transactions were for balance inquiries. Very few consumers need this information badly enough to pay for it.

45.    But the ATM Defendants had a solution: lure consumers into balance inquiries via trickery and deception in order to increase balance inquiries from those customers who otherwise do not need them or would not be willing to pay for them as part

of a cash withdrawal. The ATM Defendants have embraced a number of tactics to increase the number of balance inquiries supposedly performed at their ATM machines.

### A. Balance Inquiry At Start

46. The first and most widespread of those tactics is commonly referred to in the independent ATM operator segment as "Balance Inquiry At Start."

47. "Balance Inquiry At Start" refers to the reordering of ATM machine screen prompts so that the first screen a customer encounters, following PIN entry, is an immediate prompt to view their available account balance.

48. Prior to the adoption of "Balance Inquiry at Start" by certain ATM owners, the first screen prompt after PIN entry would show a menu of available options. These options typically include: 1) Fast Cash; 2) Withdrawal; 3) Transfer; and 4) Balance Inquiry – among others. In the typical scenario, a customer who wished to perform a "Balance Inquiry," would have to affirmatively seek out and select that option. But as discussed above, very few consumers did that.

49. The adoption of "Balance Inquiry at Start" resulted in a significant increase in balance inquiries made at the beginning of every transaction, prior to the actual cash withdrawal. Indeed, consumers began to understand such balance inquiries were part and parcel of the cash withdrawal they intended to make when they walked up to the ATM.

50. The new approach was adopted by ATM operators for one reason: to increase revenue. The increase in balance inquiries would mean an increase in their payments from the banks in the form of interchange fees. Several industry forums have touted the financial benefits to Independent ATM deployers (IADs) of utilizing Balance Inquiry at Start. For example:

> "Many IADs do not include balance inquiries as an option during a transaction. Although the ATM doesn't charge the customer, **IADs can derive significant interchange revenue from these transactions. ATMs that are set to suggest balance inquiries at the start of transactions can expect a significant increase in the number of balance inquiries** performed by the machine". *See* ATM Atom, at

13

http://www.atmatom.com/5-ways-to-boost-atm-portfolio-profitability/ (last viewed July 11, 2018) (emphasis added).

"Enable "balance inquiry at start" on Every ATM—an easy step to make, **'Balance Inquiry at Start' can increase your balance inquiries 20 to 30 percent**—at minimal cost. By making this slight adjustment in programming, the incremental revenue it produces can make quite a difference. *See* ATM Marketplace at https://www.atmmarketplace.com/blogs/five-ways-to-increase-atm-profitability/ (last viewed July 11, 2018) (emphasis added).

"Once Balance Inquiry At Start is enabled, **deployers can expect between 20-30 percent of their transactions to be balance inquiries**, whereas before such transactions might have been 10 percent or less." *See* Slawsky, Richard, *Five Ways to Boost the Profitability of an ATM Portfolio,* ATM Marketplace White Paper, 2011, at 2 available at: http://www.grantvictor.com/pdfs/Five%20Ways%20to%20Boost%20ATM%20Profitability.pdf (last viewed July 11, 2018) (emphasis added).

**B.     "Balance Inquiry At Start" is a deceptive business practice designed to increase balance inquiries from customers who would not otherwise purchase or engage in them.**

51.     "Balance Inquiry at Start" increases supposed balance inquiries by creating consumer confusion.  It does so by catching unsuspecting customers off guard and tricking them into believing the service is <u>free</u> and an integral part of a cash withdrawal transaction. This consumer confusion is the product of two factors.

52.     First, when consumers use ATMs not owned by their own bank, federal law requires the owners of those Out-of-Network ATMs to inform users of the amount of the usage fees charged by the ATM owner.

53.     Thus, it is standard at ATMs in the United States that when a consumer uses an ATM not owned by her home bank, a message is displayed on the screen stating that usage of the ATM will cost a specified amount ("Surcharge") to proceed with a withdrawal of funds, and that such a fee is in addition to a fee that may be assessed by a consumer's financial institution for use of the ATM.

SECOND AMENDED CLASS ACTION COMPLAINT

54. That message appears only after a user has decided to perform a cash withdrawal and entered the amount of cash she would like to withdraw.

55. By way of example, set forth below is the Cardtronics fee notice presented to every customer prior to making a **cash withdrawal**:



56. Through repeated exposure to such fee warning messages, consumers are accustomed to being warned of fee assessments at out of network ATMs, and to being provided with the opportunity to decide whether the fees charged are reasonable—before proceeding with their cash withdrawal. But there is no warning whatsoever at an ATM that any form of balance inquiry could be an event worthy of a fee, either from the ATM owner or from the consumer's bank.

57.     Without such a notice, a balance inquiry appears to be nothing more than an unremarkable, free lead-in to a cash withdrawal to reasonable, diligent consumers.  The ATM defendants capitalize on this known consumer confusion to lure consumers into inadvertently requesting hundreds of thousands of balance inquiries each year that consumers have no desire or intention to pay for.

58.     Second, many ATM operators—and each of the ATM Defendants—use intentionally deceptive on-screen prompts to exploit and add to the consumer confusion resulting from a lack of an on-screen fee notice.  While varying in certain ways, the intention and effect is the same:  to trick American consumers into repeatedly paying more for a single ATM usage by increasing purported balance inquiries.  Each is discussed in turn below.

**C.     Cardtronics**

**1.     Cardtronics' "Balance Inquiry At Start" Screen Prompt is Deceptive.**

59.     Cardtronics sought to increase the revenue its ATM machines were earning.  The solution it hit upon was to drive up the number of balance inquiries massively, virtually overnight.  How did it do this?  By designing a confusing series of on-screen prompts that turned its interactions with ATM users on their head:  rather than waiting for a consumer to affirmatively request balance inquiries, Cardtronics defaulted consumers into balance inquires and forced them to jump through hoops to opt-out of them.

60.     In short, Cardtronics' Balance Inquiry Screen prompt forces every consumer using an ATM to effectively **opt-out** of a balance inquiry, as opposed to affirmatively selecting to **opt-in.** Cardtronics' on-screen prompts force consumers to successfully navigate numerous balance inquiry screen prompts in order to get to their desired cash withdrawal transaction.

61.     By building an opt-out process into a very quick consumer interaction, where transaction time is minimal and the displayed language is confusing, Cardtronics manages systematized, automatic consumer exploitation.

62.     Worse, Cardtronics machines never even ask their users whether they would like to check their balances or not. Instead, they use language that no reasonable consumer understands to be a request for a balance inquiry.

63.     Upon successfully entering a PIN number, the very first screen presented to a user of a Cardtronics ATM is as follows (*See* Exhibit No. 3; Cardtronics ATM Screen Prompts; Screen Prompt No. 2):



64.     Cardtronics' "Balance Inquiry At Start" screen prompt is woefully misleading. The first question posed to the consumer is:

**Would you like your Available Balances on a receipt?**

65.     Reasonable consumers like Plaintiffs simply have no idea that one of the two possible responses to this question—"Main Menu" or "Yes Continue"—will be construed

by Cardtronics and their banks to be a request for a pre-withdrawal balance inquiry. Indeed, reasonable consumers understand this question to be simply asking whether or not a consumer would like a printed receipt at the end of the cash withdrawal transaction—*a receipt that is already required to be provided, free of charge, by federal law. See* Regulation E, § 205.9 *et seq.*

66. But in seconds, with a fateful choice between two opaque and deceptive options, an unsuspecting ATM user may have just committed himself to the first of three or four discrete fees for using the Cardtronics ATM.

67. Receipts are typically given *after* transactions are performed, *i.e.* following a purchase or in the context of an ATM transaction, *after* a cash withdrawal or deposit.

68. The colors and language used in the two on-screen "buttons" further have the effect of defaulting consumers into balance inquiries they never wanted: "Yes Continue" (in a bright <u>green</u> button) or "Main Menu" (in a bright <u>red</u> button).

69. The ATM user is <u>never</u> presented with the option of simply saying <u>"No".</u>

70. The ATM user is, indeed, never asked the simple question "Would you like to perform a balance inquiry?" As discussed below, the term "balance inquiry" is uniformly used by BofA in their account disclosures, but notably <u>not</u> used by the ATM operators.

71. Moreover, the Green Button doesn't just say, "Yes" – it says, "Yes Continue" – communicating to consumers that the only way or at least the most efficient way to get to their desired cash withdrawal and "Continue" on with their intended transaction, is to select the Green Button. As is commonly known, green is associated with continuing, "going," or proceeding. Cardtronics intended to convey to consumers that the Green Button is the only choice to proceed with the desired cash withdrawal transaction.

72. Customers, including Plaintiff Kristen Schertzer, reasonably believed that by selecting the Green Button, her transaction would "Continue" and she would get to the cash withdrawal screen as quickly as possible. In contrast, the Red Button appears to reasonable consumers as though the transaction will start over or end altogether by sending the

customer back to an undisclosed "Main Menu"; seemingly offering to take the customer back to where he/she started to begin with – begging the question to the customer: "if I press Main Menu, won't I just end up where I am right now?

73.     Fourth, the confusion at the screen prompt is enhanced by the lack of fee notice. Customers, including Plaintiff, believe that the balance inquiry is being offered to them for free. Customers, including Plaintiff, reasonably believe that the Balance Inquiry at Start screen prompt is simply asking them if they want a printed receipt. Absent any warning that a fee will be imposed by the customers' financial institution for either choice, the customer reasonably believes it is free.

74.     Each of these subtle and not-so-subtle tricks has been designed by Cardtronics to exploit consumers, the vast majority of whom are not at the ATM seeking to perform a balance inquiry, but simply to make a cash withdrawal –as fast and conveniently as possible.

75.     Plaintiff Schertzer was deceived by these misrepresentations and deceptive prompts, did not intend to perform a balance inquiry, and certainly never intended to pay for one. *See* Exhibit No. 3, Cardtronics Screen Prompts.

## 2.     Cardtronics profits enormously from its deception

76.     There is no doubt that Cardtronics' deceptive prompts have achieved their intended effect:  the creation of a new, massive stream of balance inquiry revenue almost overnight.

As discussed above, Cardtronics earns revenue on each balance inquiry.   In 2012, Cardtronics disclosed that it earned fifty cents on each balance inquiry from the user's home bank.[5]

---

[5] This figure appeared in a power point presentation prepared by Cardtronics for its shareholders.  Cardtronics, *ATM Interchange Comments,* December 2012, at 3, *available at http://files.shareholder.com/downloads/CATM/0x0x622218/89e3c9a1-cf3e-4f53-bf25-be8d1d11dd95/December-2012-investor-update.pdf.*

77.     In turn, for each supposed balance inquiry that Cardtronics is able to wheedle from unsuspecting users, the users' home bank, including BofA, assesses an OON Fee—profiting even more richly than Cardtronics.  BofA charges its cardholders a $2.50 OON Fee for a balance inquiry (in addition to another $2.50 OON Fee for the cash withdrawal).

78.     Assuming the ATM Marketplace's projections are correct , Cardtronics' adoption of a deceptive "balance inquiry at start" scheme increased the share of its transaction volume resulting from balance inquiries by 10% to 20%.  In 2016 alone, Cardtronics processed 1,358,409,000 billion ATM transactions (it counts cash withdrawals and balance inquiries as separate events)—meaning that the amount of *additional* balance inquiries experienced by Cardtronics as a result of the adoption of its Balance Inquiry At Start scheme could be between *150-200 million balance inquiries per year*.  The likely cost to consumers is between $70 and $100 million dollars annually.

79.     As a publicly traded company, Cardtronics is required to report its operational and financial data to the public in its quarterly and annual reports filed with the SEC.  The chart below provides the transactional data for Cardtronics from 2002-2016 as reported in its annual reports.

SECOND AMENDED CLASS ACTION COMPLAINT

| CARDTRONICS INC (Transactional Data 2002-2016) | | | | |
|---|---|---|---|---|
| **Year** | **(A)** Number of ATMs (excluding Managed Service ATMs) | **(B)** Total ATM Transactions (exluding Managed Service transactions) | **(C)** Cash Withdrawal Transactions (excluding Managed Service transactions) | **(D)** Other ATM Transactions [(B) - (C)] | **(E)** Other ATM Transactions/Total ATM Transactions [(D)/(B)] |
| 2002 | 8,298 | 36,212,000 | 28,955,000 | 7,257,000 | 20.04% |
| 2003 | 12,021 | 64,605,000 | 49,859,000 | 14,746,000 | 22.82% |
| 2004 | 24,581 | 111,577,000 | 86,821,000 | 24,756,000 | 22.19% |
| 2005 | 26,208 | 156,851,000 | 118,960,000 | 37,891,000 | 24.16% |
| 2006 | 25,259 | 172,808,000 | 125,078,000 | 47,730,000 | 27.62% |
| 2007 | 31,515 | 244,862,000 | 163,840,000 | 81,022,000 | 33.09% |
| 2008 | 32,050 | 351,931,000 | 225,846,000 | 126,085,000 | 35.83% |
| 2009 | 32,413 | 380,744,000 | 241,928,000 | 138,816,000 | 36.46% |
| 2010 | 33,116 | 413,780,000 | 253,890,000 | 159,890,000 | 38.64% |
| 2011 | 48,105 | 516,564,000 | 318,615,000 | 197,949,000 | 38.32% |
| 2012 | 56,395 | 704,809,000 | 443,312,000 | 261,497,000 | 37.10% |
| 2013 | 66,984 | 860,062,000 | 521,282,000 | 338,780,000 | 39.39% |
| 2014 | 78,217 | 1,040,241,000 | 617,419,000 | 422,822,000 | 40.65% |
| 2015 | 77,169 | 1,251,626,000 | 759,408,000 | 492,218,000 | 39.33% |
| 2016 | 78,561 | 1,358,409,000 | 848,394,000 | 510,015,000 | 37.55% |

**Notes:**
(1) The column of Other ATM Transactions was not provided by Cardtronics. It was calculated by subtracting Cash Withdrawal Transactions from Total ATM Transactions.
(2) The ratio of Other ATM Transactions to Total ATM Transactions was not provided by Cardtronics. It was calculated by dividing Other ATM Transactions into Total ATM Transactions.

**Sources:**
(1) Cardtronics, Inc. (2006). *Annual Report 2006,* p. 22. (Transactional Data for years 2002-2006).
(2) Cardtronics, Inc. (2011). *Annual Report 2011* , p. 29. (Transactional Data for years 2007-2011).
(3) Cardtronics, Inc. (2016). *Annual Report 2016* , p. 40. (Transactional Data for years 2012-2016).

80.    Upon information and belief, "Other ATM Transactions" are comprised mainly of balance inquiries.  As a percentage of transaction volume, this category grew swiftly during 2002-2014, just as predicted by industry proponents of Balance Inquiry at Start. For Cardtronics, the "Other ATM Tansactions" currently represents 37.55% of "total ATM transactions," and has recently has been as high as 40.65%.

81.    This number is staggering when viewed relative to data from other independent ATM operators.

SECOND AMENDED CLASS ACTION COMPLAINT

82.     In 2013, the U.S. Government Accountability Office did a study examining the issues surrounding ATM fees.[6]  As part of the study, two independent ATM operators provided their transactional data for the calendar year 2011.[7]    The count for "total ATM transactions" reported by the two independent ATM owners was 146,404,805, with cash withdrawals comprising 140,634,638 of that amount.[8]  **In other words, the percentage of "other ATM transactions" to "total ATM transactions" for these two independent ATM operators in 2011 was *3.94%*, as opposed to the *38.32%* experienced by Cardtronics in that same year.[9]**  Since the balance inquiry and transfer options offered by independent ATM operators are indistinguishable from those offered by Cardtronics, it would stand to reason that the transactional ratios of these competing companies should be comparable.  In this case, they are not: Cardtronics is approximately 1,000% higher than its competitors.

83.     Second, the most dramatic spike in the ratio of "other ATM Transactions" to "total ATM transactions" occurred during the 2006 to 2010 time period—the precise time period in which Cardtronics rolled out its own "Balance-Inquiry-At-Start" screen prompts.  The sudden growth in balance inquiries during this time period is otherwise counterintuitive. With the proliferation of smart phone use beginning in 2007, the demand on the part of consumers to engage in balance inquiries and/or transfers at ATMs should have been significantly *diminished* since both can be accomplished on a smart phone (or computer) for free.  Instead of going down, the percentage of "other ATM transactions" to "total ATM transactions" for Cardtronics rose enormously to approximately 50%.

---

[6] *United States Government Accountability Office*; AUTOMATED TELLER MACHINES – Some Consumer Fees Have Increased, GAO-13-266 (April 2013), *available at http://www.gao.gov/assets/660/653723.pdf.*  Attached hereto as Appendix D.
[7] *Id*. at p. 43.
[8] *Id*. at p. 43.
[9] *Id*. at p. 43 (Table 10).

SECOND AMENDED CLASS ACTION COMPLAINT

84.     The increase is directly attributable to Cardtronics adoption of its highly misleading version of "Balance Inquiry At Start."  Beginning in 2006, Cardtronics began adopting on a large scale the practice of Balance Inquiry at Start.  In late 2006, Cardtronics implemented its own EFT transaction processing operation.  This not only gave Cardtronics the ability to monitor transaction activity at ATMs, it gave Cardtronics the ability to control the flow and ***content on the ATM screens*** in its portfolio.  This implementation took a few years to complete.  Cardtronics elaborated in its 2008 annual report stating:

> *In late 2006, we implemented our own EFT transaction processing operation, which is based in Frisco, Texas.  This initiative enables us to monitor transactions on our ATMs and to control the flow and content of information on the ATM screen.  As of December 31, 2008, we had converted approximately 26,000 of our ATMs over to our processing platform.  We currently expect the remaining ATMs in our portfolio to be transitioned to our platform by December 31, 2009, with the exception of approximately 3,500 traditional ATMs acquired in the 7-Eleven Transaction, which will not be converted until 2010.*[10]

85.     Since the transaction processing operation allowed Cardtronics to control the content of information on the ATM screen, Cardtronics was able to implement the Balance Inquiry at Start throughout its ATM portfolio.  The time frame in which the EFT transaction processing operation was implemented paralleled the dramatic increase in the ratio of "other ATM Transactions" to "total ATM transactions" experienced by Cardtronics. The broad implementation of Balance Inquiry at Start was the reason for this increase as it profited from the interchange fees it received from its customers' banks, including BofA.

**D.     FCTI**

       **1.     Not Only Has FCTI Adopted a Deceptive Balance Inquiry at Start Scheme, But It Also Systematically Double-Bills Users for the Same Purported Balance Inquiry.**

---

[10] Cardtronics, Inc. (2008).  *Annual Report 2008*, p. 6.

86. FCTI also sought to increase the revenue its ATM machines were earning, and its solution was in many respects the same as Cardtronics: devise a deceptive series of screen prompts to trick consumers into performing balance inquiries they didn't intend, and had no interest in paying for. But it went even further into the depths of deception and unfairness: it decided to systematically double-bill users for the balance inquiries they were duped into engaging in.

87. Put simply, FCTI is causing banks, including BofA to ***double-bill*** customers who use their ATM machines and conduct balance inquiries incidental to a cash withdrawal by systematically communicating a second, additional, "Phantom Balance Inquiry" on every balance inquiry. The customers are deceived into making **one** balance inquiry – and receive **two** OON Fees from their home banks—*in addition* to the ATM operator's surcharge and the bank's OON Fee, for a total of **four** discrete fees for a single, one minute interaction with a FCTI machine.

88. Every time a banking or credit union customer purportedly makes a balance inquiry at an FCTI ATM machine, banks or credit unions, including BofA, charge *two* OON Fees. BofA charges their own customers, including Plaintiff Covell, two OON Fees for each supposed balance inquiry undertaken by them at an FCTI ATM.

89. Defendant FCTI has and continues to double-charge all retail banking and credit union customers by communicating to them that **two balance inquiries** were made during **a single**, cash withdrawal transaction, when in fact, **only one balance inquiry was made** (and even then, as a result of deception).

90. Suffice it to say, no reasonable consumer is knowingly or intentionally agreeing to undertake two balance inquiries in a single cash withdrawal transaction—much less pay for two such balance inquiries.

### 2. FCTI On-Screen Prompts Are Deceptive

91. FCTI ATM machines are pre-programmed ATMs and uniformly present FCTI's pre-set screen prompt to customers. FCTI ATM users, including Covell and

Abdelsalam (the "FCTI Plaintiffs") entered a 7-Eleven convenience store and made what they understood to be a simple cash withdrawal transaction.

92. Upon PIN entry, FCTI ATM users are immediately presented with FCTI's version of a "Balance Inquiry at Start" screen prompt *See* Exhibit, No. 4; FCTI Screen Prompts; **(FCTI Screen No. 3):**



SECOND AMENDED CLASS ACTION COMPLAINT

93. As discussed above, "Balance Inquiry at Start" increases supposed balance inquiries by creating consumer confusion. It does so by catching unsuspecting customers off guard and tricking them into believing the service is free and an integral part of a cash withdrawal transaction.

94. Moreover, when consumers use ATMs not owned by their own bank, federal law requires the owners of those Out-of-Network ATMs to inform users of the amount of the usage fees charged by the ATM owner.

95. Thus, it is standard at ATMs in the United States that when a consumer uses an ATM not owned by her home bank, a message is displayed on the screen stating that usage of the ATM will cost a specified amount ("Surcharge") to proceed with a withdrawal of funds, and that such a fee is in addition to a fee that may be assessed by a consumer's financial institution for use of the ATM.

96. That message appears only after a user has decided to perform a cash withdrawal and entered the amount of cash she would like to withdraw.

97. Through repeated exposure to such fee warning messages, consumers are accustomed to being warned of fee assessments at out of network ATMs, and to being provided with the opportunity to decide whether the fees charged are reasonable—before proceeding with their cash withdrawal. But there is no warning whatsoever at an ATM that any form of balance inquiry could be an event worthy of a fee, either from the ATM owner or from the consumer's bank.

98. Without such a notice, a balance inquiry appears to be nothing more than an unremarkable, free lead-in to a cash withdrawal to reasonable, diligent consumers. Defendants capitalize on this known consumer confusion to lure consumers into inadvertently requesting balance inquiries each year that consumers have no desire or intention to pay for.

99. Unwitting customers, including each of the FCTI Plaintiffs, have no idea that answering "Yes" at the FCTI ATM was an event that would cause a fee, both because they are never expressly warned it will be the basis for a fee, and for several other reasons.

100. First, and as is the fundamental intention of Balance Inquiry at Start, the fact that the very first screen presented is a question regarding a balance inquiry is an indication to reasonable consumers that they must select "Yes" in order to proceed.

101. Moreover, the ATM user is never asked the simple question "Would you like to perform a balance inquiry?" (As discussed below, the term "balance inquiry" is uniformly used by retail banks, including BofA, in their account disclosures, but notably not used by the ATM operators.) Especially under the quick time constraints of a real world ATM transaction, reasonable consumers do not understand that "viewing your account balance" as a first step to making a cash withdrawals is equivalent to performing a separate "balance inquiry."

102. FCTI ATM users who select "Yes" next receive the following screen prompt, asking them to select an account (*See* Exhibit No. 4; **FCTI Screen No. 4**):



103. After selecting "Checking," consumers are presented with the following screen, presenting a "Total Balance" and their "Available Balance" for their checking

account and asking if the user would like "to print your receipt and ***continue*** the transaction"( *See* Exhibit No. 4, **FCTI Screen Prompt No. 5**):



SECOND AMENDED CLASS ACTION COMPLAINT

104.   Notably, with the phrase "continue the transaction," FCTI's screen prompts expressly represent that the just-performed balance inquiry is part and parcel of the same cash withdrawal "transaction" that the user came to the ATM for in the first place.

105.   Because users are simply trying to execute what they came to the ATM for in the first place—a cash withdrawal—and because reasonable consumers understand they must select "Continue" in order to do so, reasonable consumers like Ms. Covell selected "Continue."  Then the following screen appears, *unexpectedly terminating the interaction with the ATM*:  **FCTI Screen Prompt No. 7** appears:



SECOND AMENDED CLASS ACTION COMPLAINT

106.   Despite having represented that the "transaction" would "continue," FCTI in fact terminates the transaction, then forces users to engage in a *second* transaction, requiring every customer to re-enter their debit card pin in order to proceed with their intended cash withdrawal.

107.   Once a user re-enters his or her pin, another screen appears, requesting if the customer would like a receipt for "this" transaction (**FCTI Screen Prompt No. 8**), with no mention whatsoever of viewing, inquiring or printing a balance:



108.   FCTI Screen Prompt No. 8 (above) asks only if the customer would like a "receipt for their transaction"—a transaction that can only reasonably be the cash

withdrawal they originally set out to make when they first entered their pin on FCTI Screen Prompt No. 1.

109. If the user chooses to request a "receipt," the user is directed to a traditional "main menu" screen (**FCTI Screen Prompt No. 9** (below)):



110. When a user selects the withdrawal screen, he or she is then directed to choose the account from which they make a withdrawal (**FCTI Screen Prompt No. 10** below):

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24



25    111.   The transaction then proceeds, the customer selects an amount of money to be

26  withdrawn, and the cash is dispensed with a receipt of the transaction. *See* Exhibit No. 4,

27  FCTI Screen Prompts 9-12-13.

28

112. After the initial request asking the customer if they would like to view their available account balance (FCTI Screen Prompt No. 3) until this point, at no time was the customer ever asked for their consent to a second balance inquiry. None of the FCTI Plaintiffs ever even arguably provided consent to a second balance inquiry.

113. Yet, in each case, FCTI customers, including the FCTI Plaintiffs, were charged **two** separate Balance Inquiry Fees by BofA during their single cash withdrawal transaction.

114. FCTI is doing one of two things: 1) it is either equating the customers' consent to receiving a receipt for their cash withdrawal (*See* FCTI Screen Prompt No. 6) as a second "balance inquiry"; or 2) it is intentionally or inadvertently miscommunicating to their customers' financial institutions, including BofA, that their customers are performing two balance inquiries when at the most they could only be considered to have performed one (and even then, under the deceptive circumstances described above). Discovery will reveal which one; either scenario is improper, unfair and unlawful, and both FCTI and BofAare reaping huge fee revenues from it.

115. Even putting aside the improper and fraudulent assessment and/or communication to the banks and credit unions (including BofA) that two balance inquiries were authorized, even the first assessed balance inquiry is deceptive and improper for all the reasons described above.

116. The FCTI Plaintiffs were lured with on-screen deception into undertaking a balance inquiry they had no desire or intention to pay for; the harm was then multiplied by FCTI and the Defendant Bank's improper doubling of the first purported balance inquiry.

**E. Cash Depot**

117. Cash Depot has a contract with Wal-Mart to provide the retail giant with its independent ATM machines in every Wal-Mart location—several thousand in total.

118. Cash Depot also sought to increase the revenue its ATM machines were earning, and its solution was in many respects the same as Cardtronics and FCTI: devise a deceptive series of screen prompts to trick consumers into performing balance inquiries

33

they didn't intend, and had no interest in paying for. But Cash Depot went further with its deception, making a prominent marketing representation on signs posted on its ATM machines, intended to lure consumers into performing balance inquiries with the message: **"PREVENT OVERDRAFT FEES CHECK YOUR BALANCE FOR FREE."**

*See* Exhibit No. 5; Cash Depot ATM Signage:



119.   This marketing representation is deceptive and misleading because Cash Depot knows its customers, including those who have accounts with BofA, will be charged OON Fees by their banks for "checking their balance" at a Cash Depot ATM. ***Cash Depot***

*knows this, of course, because it receives a portion of each of those fees from every bank and credit union whose customers fall prey to the trap. s.*

120. Consumers, including Plaintiff Hicks, read the representation as they approach the machine and it is fresh in their mind when they are then immediately confronted with Cash Depot's Balance Inquiry at Start screen. Thanks to Cash Depot's marketing lie, users are even more vulnerable to the deceptive lures of the Balance Inquiry at Start scheme, and are more likely to be deceived into engaging in a balance inquiry as they proceed to their ultimate cash withdrawal transaction.

121. Consumers, including Plaintiff Hicks, read the representation, "Check Your Balance for Free," as they approached the Wal-Mart-based, Cash Depot ATM machines. The representation is prominently placed above the ATM machine, in full view of consumers engaged in transactions: (*See* Id.)



122. It is in the context of that prominent, unavoidable advertisement that Cash Depot's ATM screen prompts (which are similar to those designed by Cardtronics and FTCI) become even more deceptive. The Cash Depot, "Balance Inquiry at Start" screen

prompt, like FCTI and Cardtronics, is offered up to customers immediately following their pin-entry (*See* Exhibit No. 6 Cash Depot Screen Prompts, Screen Prompt No. 2):



123.    Consumers, including Plaintiff Hicks, read the representation, "Check Your Balance for Free," as they approached the Wal-Mart-based, Cash Depot ATM machines. That representation hangs above the screen prompts and misleads consumers as they are presented with Cash Depot's "Balance-Inquiry-At-Start" screen prompt.

124.    Consumers, including Plaintiff Hicks, were lured into making a balance inquiry that they believed was free. Consumers, including Plaintiff Hicks, were deceived by this explicit misrepresentation and the deceptive prompts. They did not intend to perform a balance inquiry, and certainly never intended to pay for one.

## III.    FACTUAL BACKGROUND AND ALLEGATIONS AS TO BOFA.

125.    Plaintiffs bring this class action against BofA arising from its unfair and unconscionable assessment of two or three OON Fees on a single ATM cash withdrawal that—due precisely to the types of deceptive screen prompts and marketing representations described above—happens to be preceded by what BofA and ATM Operators consider to

be a "balance inquiry." There is simply no warning, at the out of network ATM or in the Banks' account disclosures, that:

- First, BofA will consider its account holders' responses to intentionally deceptive prompts at out of network ATM machines to be tantamount to a balance inquiry—much less *two* of them;

- Second, what is described in BofA's disclosures as a fee for a "balance inquiry" undertaken at an out of network ATM will be assessed even when the out of network ATM screens never use the phrase "balance inquiry", and even where such ATM screens disguise balance inquiries with questions like "[W]ould you like your Available Balances on a receipt?" and "Would You Like a Receipt for this Transaction?";

- Third, BofA will assess two or three OON Fees on a single ATM transaction or use;

- Fourth, a balance inquiry performed in conjunction with, and as an integral part of, the same cash withdrawal transaction will, for fee assessment purposes, be treated the same as a balance for OON Fee purposes.

- Fifth, BofA would use its complete discretion to determine what counts as a valid "balance inquiry" to the detriment of their own accountholders.

126. BofA profits handsomely from what it knows to be deceptive and false out of network ATM screen prompts—including Balance Inquiry at Start—that lure consumers into purported balance inquiries without describing them as such, without consumers having freely chosen them, and without consumers ever having been warned they would result in a fee assessment.

127. BofA is fully aware of the infirmities with the representations made on out of network ATMs—they could not help but be aware, as they have seen their ATM fee revenues attributable to OON Fees rise exponentially over the years.

128. When the accountholders of BofA use an out-of-network ATM, including the Cardtronics, FCTI and Cash Depot branded ATM machines described above, the fees add

up very quickly—to their surprise. American consumers simply do not know they can been assessed *three or four discrete fees for a simple out of network ATM session that lasts less than two minutes.* BofA, along with the ATM owners, are all too happy to keep consumers in the dark.

129.  Here's how the fees add up.  Not only do ATM owners charge consumers a surcharge for withdrawing cash at their ATMs, but BofA  charges an OON Fee for that withdrawal as well—a punishing double-fee on accountholders that often rises  $7. BofA never once told or disclosed to consumers the **total** amount of those cash withdrawal double-fees.

130.  BofA does not stop there, however.  Specifically, as noted above, when accountholders are deemed to have checked their account balance prior to withdrawing funds at an Out-of-Network ATM—often through the force of the deceptive screen prompts designed by ATM owners—BofA charges their accountholders *two* or *three* OON Fees—*one for the out of network withdrawal, one for the supposed balance inquiry* (even if the customer was tricked into making it), and in the case of withdrawals at FCTI machines, an additional fee for a *phantom* balance inquiry.

131.  BofA's practice of charging two or three OON Fees per cash withdrawal is deceptive and violates representations in its account documents.  The bank's various account documents do nothing to place consumers on notice of the large triple or quadruple-fee for an Out-of-Network ATM withdrawal preceded by what they deem to be a consented-for "balance inquiry."

132.  BofA knows its consumers expect a fair fee disclosure at the ATM, and have designed a scheme to assess Out of Network Fees on balance inquiries and exploit consumers' reasonable expectation that they will only engage in fee-worthy actions knowingly and with appropriate disclosures—and will be provided a warning and an opportunity to cancel actions before being assessed a fee.  As described herein, the scheme involves assessing two or more additional OON Fees for pressing buttons during a cash

withdrawal transaction that BofA, in its discretion, deems to be tantamount to requests for balance inquiries.

133. As demonstrated above, many ATMs have adopted Balance Inquiry at Start in various forms, with on-screen displays that lure consumers into engaging in purported balances inquires they never intended to perform and never intended to pay for.

134. None of these ATM screens ever disclose that a balance inquiry alone is an independent basis for a fee from either the ATM owner or the user's bank—or warn consumers in any way that checking a balance could result in a fee.

135. Reasonable consumers understand that a balance inquiry is a common lead-in to a withdrawal, a mere first step to the real business at hand, an informational exercise offered by the ATM to help inform the cash withdrawal.

136. Reasonable consumers like Plaintiff do not, in sum, understand a balance inquiry to be an independent transaction worthy of a separate fee.

137. BofA knows this——that in the absence of a prominent warning otherwise, consumers expect a balance inquiry to be an integral, included part of a cash withdrawal—and they know the ATM Defendants, through the deployment of deceptive screen prompts, have figured out a way to sever the actions and make them into separate, fee-worthy transactions, without ever informing the customer that they have just engaged in two, separate, out of network transactions that will be assessed two or more OON Fees.

138. BofA has designed a scheme to assess OON Fees on those purported balance inquiries. BofA preys on the common sense that a balance inquiry preceded by a cash withdrawal is not an independent and separate transaction and therefore should not form the basis for a separate fee.

139. If the bank is going to charge such a conscience-shocking fee, it must fully and fairly disclose such a fee in its account documentation. BofA did the opposite— providing express and implied indications that balance inquires undertaken in conjunction with cash withdrawals would <u>not</u> incur additional OON Fees (much less two of them).

140. BofA holds complete discretion to determine whether an Out of Network Transaction occurred for purposes of determining whether a fee should be assessed. Rather than exercising their discretion in a manner that is fair to the consumer, BofA uniformly accepts what the ATM operators convey to them and gladly assesses a fee for anything deemed an out-of-network transaction by ATM operators like the ATM Defendants. This results in consumers being charged Out of Network fees for transactions where the consumers were tricked into unwanted balance inquiries (*e.g..* at Cardtronics ATM machines), told explicitly that such inquiries would be "Free" (*e.g.* at Cash Depot ATMs), or are even being doubled charged for a single transaction (*e.g.* at all FCTI ATMs).

141. In other words, BofA has adopted automated processes that totally fail to distinguish between the very rare balance inquiries that, because they are not performed in conjunction with a cash withdrawal, are intentionally and knowingly consented to, are fully and daily disclosed at the ATM, and are valid; and those that are not.

### A. <u>Defendant BofA</u>

142. Plaintiffs Hicks, Schertzer and Covell have BofA checking accounts, which are governed by BofA's standardized account agreement.

143. Each Plaintiff conducted an out of network ATM cash withdrawal at one of the ATM Defendants' ATM machines (Hicks, Cash Depot; Schertzer, Cardtronics; Covell, FCTI). Each Plaintiff was charged **three or four** discrete fees for their **single** cash withdrawal transaction that was deemed by BofA to have been preceded by a purported, separate, "balance inquiry," transaction.

### 1. <u>BofA Account Disclosures</u>

144. BofA issues debit cards to its checking account customers, including Plaintiffs, which allow their customers to have electronic access to their checking accounts for purchases, payments, and ATM withdrawals at both BofA and non-BofA ATMs.

145. Against the backdrop of the reasonable consumer expectations described above, BofA's disclosures deceive consumers and reinforce the reasonable understanding that no OON Fee will be assessed for a balance inquiry undertaken in conjunction with a

cash withdrawal; that not more than one OON Fee will be assessed for a single ATM usage—especially if ATM users are not warned beforehand.

146.    Pursuant to BofA's standard account agreement:

> When you use an ATM that is not prominently branded with the Bank of America name and logo, you may be charged a fee by the ATM operator or any network used and you may be charged a fee for a balance inquiry even if you do not complete a fund transfer.  We may also charge you fees.

*See* Exhibit No. 1, BofA Account Disclosures.

147.    Similarly, BofA's Fee Schedule states:

> Non-Bank of America ATM Fee for:  Withdrawals, transfers and balance inquiries at a non-Bank of America ATM in the U.S.    $2.50 each.

> When you use a non-Bank of America ATM, you may also be charged a fee by the ATM operator or any network used and you may be charged a fee for a balance inquiry even if you do not complete a funds transfer.

*See* Exhibit No. 2, BofA Fee Schedule.

148.    These disclosures totally fail to authorize the assessment of multiple OON Fees on the same ATM usage; or on a balance inquiry that precedes a cash withdrawal.

149.    The most reasonable understanding of this disclosure is that for all activities incident to a cash withdrawal, including a balance inquiry undertaken simultaneously, a **<u>single</u>** $2.50 fee will be assessed by BofA, and a single fee "may" be assessed by the ATM operator; conversely, only when an inquiry alone is undertaken at an out of network ATM, a fee of $2.50 will be assessed.

150.    <u>First</u>, the provisions regarding ATM Fees are prefaced by the phrase "*when you use* an [out of network ATM]."  When a balance inquiry precedes a withdrawal, common sense and consumer expectation dictates that that two-step process is part of the same, singular, ATM "use."

151.   Second, in general, and in Plaintiffs' case here, the ATM owner does not warn the user that there is a separate charge for a balance inquiry, and in fact the ATM owner does not charge a separate fee to the user for a balance inquiry.  Therefore, the user can have no reasonable expectation that BofA will assess a fee for an action that the ATM owner does not charge or warn about.

152.   Third, the Account Agreement recites the circumstances in which the **ATM owner *may*** charge a consumer an OON Fee. Importantly, **BofA** then represents to its accountholders that it "**may also** charge you fees." (emphasis added).   The use of the phrase "may also" is significant, since it indicates that the ATM owner **has charged** the consumer **first.**  In other words, the contract states that the accountholder will only be charged a fee by BofA if the ATM owner charges the consumer a fee first.  But in general, ATMs do not directly charge consumers for making a balance inquiry—and the ATM Defendants uniformly do not charge fees for balance inquiries. Therefore, BofA customers, including Plaintiffs Hicks, Schertzer and Covell, have no reasonable expectation that BofA will charge them a Balance Inquiry Fee.  BofA's OON fee for a balance inquiry is not "in addition to" any fee charged by the ATM Defendants. The ATM Defendants, like most ATM operators, do not charge for OON Balance Inquiries.

153.   Fourth, BofA accountholders using a non-BofA ATM are never warned that they will receive two separate fees from BofA—plus another one from the ATM owner—when they check their balance before proceeding with a cash withdrawal at the same ATM. But that is exactly what happens. There is no mention of the possibility of three or more fees.

154.   Fifth, importantly, BofA reserves **sole** discretion as to when it will impose an ATM Fee for a balance inquiry at a "Non-Bank of America ATM" and when it will deem that activities undertaken at an out of network ATM constitute a balance inquiry.  BofA implies that it will exercise its discretion in good faith and in some cases **will not impose a fee**. But, in fact, it has adopted an automated process that blindly and in all cases simply

accepts the ATM owner's electronic communication to it that one or more balance inquiries have been ***knowingly*** requested by its accountholder.

155. Further, BofA's disclosure that the <u>ATM owner</u> may charge a fee for a balance inquiry "even if you do not complete a transaction" is problematic for several reasons.

156. First, as is the case here, owners generally do not charge such fees (and therefore do not disclose such fees). There can thus be no reasonable expectation that BofA alone will do so.

157. Second, even if ATM owners did charge such fees, the "even if you do not complete a transaction" phrase indicates that a consumer will **<u>not</u>** be charged a separate OON Fee for a balance inquiry if she **<u>does</u>** complete a cash withdrawal (and therefore does pay an OON Fee for that cash withdrawal)—especially where, as here, the ATM owner does not charge separate fees for balance inquiries and never provides an on-screen warning that either it or the consumer's bank will do so.

158. The reasonable consumer understanding that a balance inquiry is not itself an independent transaction or basis for a fee is the very reason the "even if you do not complete a transaction" is necessary. *Indeed, the warning would be nonsensical if it was generally understood that the balance inquiry was an independent transaction worthy of a fee.*

159. In other words, if the balance inquiry and the transaction (withdrawal) were not linked and intrinsic to each other in the minds of reasonable consumers—there would be no need to disclose the special case of when they are de-linked.

160. At the very least, by the repeated use of "may," BofA uses contractual discretion in bad faith when it a) unfairly deems as "balance inquiries" supposedly requested during a deceptive and unfair series of ATM prompts; b) assesses two OON Fees during the same ATM use on when a balance inquiry immediately precedes a cash withdrawal; c) never explains the circumstances under which an accountholder interaction with an out of network ATM will be considered a "balance inquiry" for purposes of an additional OON Fee; d) assesses fees for so called "balance inquiries" even when on-screen

prompts at out of network ATMs never use the same phrase—instead offering, for example, requests like: "[W]ould you like your Available Balances on a receipt?" (in the case of Cardtronics ATMs) and "Would You Like a Receipt for this Transaction? (in the care of FCTI ATMs)".

161. Plaintiffs are not challenging the Out of Network Fee incident to the cash withdrawal. Plaintiffs challenge the OON Fee assessed for the supposed balance inquiry that precedes the cash withdrawal and the additional fee assessed for the "phantom" balance inquiry assessed in concert with ATM providers like FCTI.

**B.** **BOFA violates its Account Agreements by charging its customers more than the contract rate of 3.00% for International Exchange Fees.**

162. Continued International Transaction Fees are charged by payment card-issuing retail banks when transactions made by their customers process in foreign currencies or pass through a foreign bank in the payment settlement process.

163. International Transaction Fees are usually comprised of two components. The first is a fee levied by the retail bank, which is typically a 1.00% to 2.00% fee on purchases or ATM withdrawals made abroad. Second, the card's payment network, such as Visa or Mastercard will tack on another fee, typically 1% of the total value of the transaction. The 1% added by the payment network(s) is referred to in the industry as the currency conversion fee, which is assessed by the payment network when a purchase is made in a currency other than U.S. dollars.

164. Despite these separate components, International Transaction Fees are typically disclosed and presented to retail banking customers in deposit account agreements and/or fee disclosure schedules as a fixed percentage, flat fee, ranging from 1.00% to 3.00% of the total value of the international transaction at issue.

165. BofA's Foreign Transaction Fee is not mentioned in its standard, 70 page Deposit Agreement and Disclosures. *See* Exhibit, "1" Deposit Agreement and Disclosures

(Effective November 2, 2018). It appears only, as incorporated by reference, in the BofA Personal Schedule of Fees. *See* Exhibit "2" BofA Personal Schedule of Fees, P.9.

166. BofA levies International Transaction Fees at the highest rate among the largest consumer retail banks in the U.S., at 3% per transaction.

167. BofA processes hundreds of thousands of international payment card transactions each day. When the Bank rounds up each International Transaction Fee amount in violation of its contract, it goes largely unnoticed by accountholders, but the Bank creates for itself millions of dollars in extra revenue annually.

### 1. BofA's International Transaction Fee

168. The BofA standard Deposit Agreement and Disclosures (Effective November 2, 2018) is the contract which governs the relationship between each account holder and the bank. The standard Deposit Agreement and Disclosures incorporates by reference, the Personal Schedule of Fees (Effective November 2, 2018). The Personal Schedule of Fees states:

| **International Transaction Fee** | **3% of the U.S. Dollar amount of the transaction** | • Fee applies if you use your card to purchase goods or services in a foreign currency or in U.S. Dollars with a foreign merchant (a "Foreign Transaction"). Foreign Transactions include internet transactions made in the U.S. but with a merchant who processes the transaction in a foreign country.<br>• Fee also applies if you use your card to obtain foreign currency from an ATM. Visa® or Mastercard® converts the transaction into a U.S. dollar amount , and the International Transaction Fee applies to that converted U.S. dollar amount. ATM fees may also apply to ATM transactions. See ATM Fees section below.<br>• See disclosure information that accompanied your card for more information about this fee. |
|---|---|---|

*See* Exhibit No. 2, BofA Fee Schedule, P. 9, Effective November, 2018.

169. The Personal Schedule of Fees states unambiguously that BofA will not charge more than 3% of the U.S. Dollar amount of the transaction. Simply put, the Bank may not ever assess an International Transaction Fee that exceeds 3.00% of the transaction amount.

170. However, BofA charges in excess of 3.00% on approximately half of all international payment card transactions. In fact, in violation of its contract and without disclosing this to its accountholders, BofA systematically rounds up International Transaction Fee amounts. This systematic, automated, rounding practice ensures that BofA charges foreign transaction fees in amounts greater than the 3.00% contractual limit and in some cases up to 5% of the total transaction amount.

171. For example, on a transaction amount of $10.17, BofA calculates the Foreign Transaction fee by multiplying 3% (0.03) x $10.17 = $0.3051. It then, systematically rounds up the $0.3051 to $0.31. However, in so doing, it violates its Personal Schedule of Fees, because $0.31 is actually 3.04% of the $10.17, not 3.00% as provided for by the contract. Simply stated, in order to avoid exceeding the maximum permissible fee of 3.00%, BofA is required to round down when calculating the fee. This is why other banks, including one of its largest California competitors, Union Bank, N.A., for example, "rounds down" when assessing its customers' foreign transaction fees to avoid a similar occurrence.

172. BofA breached its contract and deceived its customers when it assessed International Transaction Fees in excess of 3.00% due to the Bank's uniform rounding practice.

### 2. Plaintiff Schertzer's Experience

173. Ms. Schertzer maintains a regular checking account at BofA. Ms. Schertzer is a citizen of California and resides in San Diego, California 92101. On or about June 28, 2018, Ms. Schertzer traveled to London on her way to a European vacation. Ms. Schertzer, engaged in several foreign payment card transactions over the course of her nearly two week vacation.

174.   For example, Ms. Schertzer made a payment card purchase in Amsterdam, Netherlands on July 9, 2018 for $0.19. BofA, in its processing of the International Transaction Fee, multiplied the $0.19 x 3% and arrived at $0.0055 cents, a fraction of a penny. Rather than waiving this charge as *de minimis*, BofA, "rounded up" and assessed Ms. Schertzer a Foreign Transaction Fee of $0.01. The $0.01 Foreign Transaction Fee applied by BofA to Ms. Schertzer's $0.19 charge is approximately 5.26% of the total value of her transaction – well over the total permissible contract rate of 3.00%. Ms. Schertzer received several additional overcharges on her trip as a result of BofA's rounding practice.

175.   On or about August 13, 2018, Ms. Schertzer traveled to Tijuana, Mexico for a brief trip. BofA again assessed her International Transaction Fees in excess of the permissible contract rate delineated by the Fee Schedule.

176.   Ms. Schertzer was charged the following International Transaction Fees on her two trips (one to Europe in July 2018 and one to Mexico in August of 2018) in violation of the mandated 3.00% as set forth on the BOFA Fee Schedule:

| Date of Transaction: | Amount of Payment Card Purchase: | Int. Tran. Fee Assessed by BOFA: | Total % of the International Transaction Fee: |
|---|---|---|---|
| | | | Max Rate = 3.00% |
| 07/02/2018 | $13.22 | $0.40 | 3.03% |
| 07/02/2018 | $6.61 | $0.20 | 3.03% |
| 07/02/2018 | $18.50 | $0.56 | 3.03% |
| 07/02/2018 | $6.61 | $0.20 | 3.03% |
| 07/02/2018 | $11.90 | $0.36 | 3.03% |
| 07/02/2018 | $30.87 | $0.93 | 3.01% |
| 07/05/2018 | $4.96 | $0.15 | 3.02% |
| 07/05/2018 | $0.19 | $0.01 | 5.26% |

SECOND AMENDED CLASS ACTION COMPLAINT

| | | | |
|---|---|---|---|
| 07/09/2018 | $56.84 | $1.71 | 3.01% |
| 07/09/2018 | $26.89 | $0.81 | 3.01% |
| 07/09/2018 | $23.53 | $0.71 | 3.02% |
| 07/09/2018 | $3.52 | $0.11 | 3.13% |
| 07/09/2018 | $23.54 | $0.71 | 3.02% |
| 07/11/2018 | $16.60 | $0.50 | 3.01% |
| 07/11/2018 | $10.97 | $0.33 | 3.01% |
| 07/11/2018 | $12.30 | $0.37 | 3.01% |
| 8/13/2018 | $10.17 | $0.31 | 3.05% |
| 8/13/2018 | $17.19 | $0.52 | 3.02% |

177.   Ms. Schertzer was overcharged $0.18 on her two trips alone from July, 2018 and August 2018.  BofA boasts over 47 million accounts (*See* Bank of American Annual Report 2017, p.35, Executive Summary; Business Overview). If even one quarter or one third of those accountholders engaged in international travel or made internet purchases from foreign retailers, the Bank's ill-begotten gains from its rounding practice amount to millions of dollars per year.

178.   Simply stated, the stolen pennies add up to millions of dollars.

### 3.   **BofA Abuses Discretion**

179.   To the extent the account documents do not explicitly permit the charging of International Transaction Fees in excess of 3.00%, as described above, BofA exploits contractual discretion to the detriment of accountholders and breaches good faith and fair dealing when it uses these policies.

180.   BofA routinely and systematically charges International Transaction Fees over and above the contractually permissible rate of 3.00% of the total amount of the transaction, by rounding up, in the calculation of the fee to the nearest penny. What this means is when BofA multiplies 3% times the total dollar amount of the foreign transaction, if the third decimal place results in a "5" or higher number, the fee assessed is "rounded

up" to the nearest penny. The result of this rounding is that fractional charges of a penny, become full pennies, pushing the aggregate International Transaction Fee well above the permissible 3.00%.

181. BofA uses its discretion to round up these calculations without informing or disclosing to its customers that, in so doing, the aggregate International Transaction Fee will exceed 3.00%. BofA uses its discretion in an unreasonable way that violates common sense and reasonable consumer expectations. BofA uses its contractual discretion to set the meaning "3%" to include charges of 3.01%-5.26% of the aggregate foreign transaction amount; a choice that directly causes an improper amount of International Transactional Fees to be imposed.

By assessing International Exchange Fees in this manner, BofA engages in bad faith and contradicts reasonable consumer expectations.

## VI. PARTIES

### A. <u>Plaintiffs</u>

182. Plaintiff **Kristen Schertzer** is a resident of San Diego, California. Ms. Schertzer has a checking account with BofA. On June 1, 2018 and other occasions, she placed her BofA ATM Payment card into the Cardtronics ATM machine located at 817 West Washington Street, San Diego, CA 92103 in order to make a $60.00 cash withdrawal. Following her transaction, Plaintiff was surprised to learn that she was assessed, in addition to the cash withdrawal surcharge paid to Cardtronics ($3.75), a separate $2.50 OON Fee from BofA for making an balance inquiry; and an additional $2.50 fee from BofA for making an cash withdrawal. She was charged $8.75 in total fees for making a $60.00 withdrawal. Plaintiff is challenging the fee for the balance inquiry only.

183. Plaintiff **Brittany Covell** is a resident of San Diego, California. Ms. Covell has a checking account with BofA. On May 29, 2018, she placed her BofA ATM Debit card into the FCTI ATM machine located at a Seven Eleven (7-11) convenience store at 592 Santa Fe Drive, Encinitas, California to make a $20.00 cash withdrawal. Following her transaction, Plaintiff was surprised to learn that she was assessed, in addition to the

cash withdrawal surcharge paid to FCTI ($3.00), a separate $2.50 fee from BofA for making balance inquiry; and an additional $2.50 fee from BofA for making a cash withdrawal. Ms. Covell was also charged a **<u>second</u>** fee for a balance inquiry by BofA.  She was charged $10.50 in total fees for making a $20.00 withdrawal. Plaintiff is challenging both balance inquiry fees.

184.    Plaintiff **Meagan Hicks** is a resident of San Diego, California. Ms. Hicks has a checking account with BofA.  On June 2, 2018 and other occasions she approached the Cash Depot ATM machine located in Wal-Mart at 4840 Shawline Street, San Diego, California 92111.  She observed a large sign above the ATM machine which prominently displayed, the representation: "Avoid Overdraft Fees Check Your Balance for Free."

185.    Plaintiff proceeded to make a $20.00 cash withdrawal. Following her transaction, Plaintiff was surprised to learn that she was assessed, in addition to the surcharge paid to Cash Depot ($2.50), a separate $2.50 fee from BofA for making a balance inquiry; and an additional $2.50 fee from BofA for making a cash withdrawal. She was charged $7.00 in total fees for making a $20.00 withdrawal.

186.    Plaintiff is challenging the fee assessed on the balance inquiry.

## B.    <u>Defendants</u>

187.    Defendant BofA is national bank with over 4,500 retail branches. BofA has its headquarters and principle place of business in Charlotte, North Carolina. Among other things, BofA is engaged in the business of providing retail banking services to customers, including Plaintiffs Schertzer, Hicks, and Covell, and members of the putative class, which includes the issuance of payment cards for use by its customers in conjunction with their checking accounts. BofA operates banking centers and conducts business throughout the State of California.

188.    Defendant Cardtronics, Inc. is the world's largest operator of independent, stand-alone ATM machines. Cardtronics operates approximately 200,000 ATMs worldwide, including thousands of machines in the state of California and in this judicial

district. Cardtronics is a Delaware corporation. Cardtronics' headquarters and principle place of business is located in Houston, Texas.

189. Defendant ATM National, LLC is wholly owned subsidiary of Cardtronics and operates over 37,000 ATMs worldwide, including machines within the State of California and in this judicial district. ATM National is a Maryland Limited Liability Company.

190. Defendant Cash Depot, Ltd. is one of the nation's largest independent ATM operators with over 30,000 stand-alone ATM machines in service. The majority of Cash Depot's ATM machines are located in Wal-Mart retail stores. Cash Depot's headquarters and principle place of business are located in Green Bay, Wisconsin. Cash Depot, Ltd. is a Wisconsin Incorporated entity.

191. Defendant FCTI, is California Corporation, with its headquarters and principle place of business located in Los Angeles, California. FCTI is also one of the nation's largest independent operators of stand-alone ATM machines with over 30,000 such machines in service.

## CLASS ALLEGATIONS

### A.    The Cardtronics Classes:

192. Plaintiffs Schertzer brings this action on behalf of herself and on behalf of all others similarly situated against Cardtronics, Inc. The Class includes:

All holders of a checking account in California who, within the applicable statute of limitation preceding the filing of this lawsuit, were assessed one or more fees for purportedly undertaking a balance inquiry as part of a cash withdrawal at a CARDTRONICS ATM (the "California Cardtronics Class")

All holders of a checking account in the United States who, within the applicable statute of limitation preceding the filing of this lawsuit, were assessed one or more fees for purportedly undertaking a balance inquiry as

part of a cash withdrawal at a CARDTRONICS ATM (the "National Cardtronics Class").

**B.    The FCTI Classes:**

193.    Plaintiffs Covell brings this action on behalf of themselves and on behalf of all others similarly situated against FCTI, Inc. The Class includes:

> All holders of a checking account in California who, within the applicable statute of limitation preceding the filing of this lawsuit, were assessed one or more fees for purportedly undertaking a balance inquiry as part of a cash withdrawal at a FCTI ATM (the "California FCTI Class").

> All holders of a checking account in the United States who, within the applicable statute of limitation preceding the filing of this lawsuit, were assessed one or more fees for purportedly undertaking a balance inquiry as part of a cash withdrawal at a FCTI ATM (the "National FCTI Class").

**C.    The Cash Depot Classes:**

194.    Plaintiff Hicks brings this action on behalf of herself and on behalf of all others similarly situated. The Class includes:

> All holders of a checking account in California who, within the applicable statute of limitation preceding the filing of this lawsuit, were assessed one or more fees for purportedly undertaking a balance inquiry as part of a cash withdrawal at a Cash Depot ATM (the "California Cash Depot Class")

> All holders of a checking account in California who, within the applicable statute of limitation preceding the filing of this lawsuit, were assessed one or more fees for purportedly undertaking a balance inquiry as part of a cash withdrawal at a Cash Depot ATM (the "National Cash Depot Class").

**D.    The BofA Classes relating to OON ATM Fees:**

195.    Plaintiffs Covell, Hicks and Schertzer bring this action on behalf of themselves and on behalf of all others similarly situated.

196.    The proposed classes are defined as:

All BofA checking account holders in the United States who within the applicable statute of limitations were assessed one or more fees for purportedly undertaking a balance inquiry as part of a cash withdrawal at an out of network ATM (the "National BofA Class").

All BofA checking account holders in the United States who within the applicable statute of limitations were assessed one or more fees for purportedly undertaking a balance inquiry as part of a cash withdrawal at an out of network ATM (the "California BofA Sub-Class").

197. The National Class and the California Subclass are collectively referred to as the "BofA Classes."

198. Excluded from the Classes are Defendants, their subsidiaries and affiliates, their officers, directors and member of their immediate families and any entity in which defendants have a controlling interest, the legal representatives, heirs, successors or assigns of any such excluded party, the judicial officer(s) to whom this action is assigned, and the members of their immediate families.

199. Plaintiffs reserve the right to modify or amend the definition of the proposed Classes and/or to add a Subclass(es) if necessary before this Court determines whether certification is appropriate.

200. The questions here are ones of common or general interest such that there is a well-defined community of interest among the class members. These questions predominate over questions that may affect only individual class members because each ATM Defendant and BofA has acted (independently) on grounds generally applicable to the classes. Such common legal or factual questions include, but are not limited to:

201. The parties are numerous such that joinder is impracticable. Upon information and belief, and subject to class discovery, the Classes consist of thousands of members or more, the identity of whom are within the exclusive knowledge of and can be ascertained only by resort to the ATM Defendants' and/or

BofA's records. Defendants collectively have the administrative capability through their computer systems and other records to identify all members of the Classes, and such specific information is not otherwise available to Plaintiffs.

202. With respect to the cases against the ATM Defendants:

    a) Whether the ATM Defendants improperly received interchange fees from financial institutions resulting from improper out of network balance inquiries;

    b) Whether such conduct enumerated herein is deceptive;

    c) Whether the ATM Defendants violated the UCL and CLRA;

    d) Whether the ATM Defendants were negligent in the discharge of their duty to acquire meaningful and legal consent to a balance inquiry; and

    e) Whether Plaintiffs and other members of the Classes have sustained damages as a result of the ATM Defendants' wrongful business practices described herein, and the proper measure of damages.

203. With Respect to BofA:

    a) Whether BofA improperly collected Out of Network fees from their customers, including Plaintiffs, without ensuring their customers performed, engaged or otherwise consented to such transactions;

    b) Whether BofA breached their contracts by collecting Out of Network Balance Inquiry fees for transactions that did not occur;

    c) Whether BofA violated the UCL and CLRA;

    d) Whether BofA breached their contracts with their customers, including Plaintiffs.

    e) Whether BofA reserved discretion in defining the circumstances in which a customer would be deemed to have engaged in transaction that would give rise to a corresponding Out of Network fee;

    f) Whether BofA failed to exercise such discretion in good faith;

g)     Whether Plaintiffs and other members of the Classes have sustained damages as a result of the BofA's wrongful business practices described herein, and the proper measure of damages.

204.   It is impracticable to bring Class members' individual claims before the Court. Class treatment permits a large number of similarly situated persons or entities to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort, expense, or the possibility of inconsistent or contradictory judgments that numerous individual actions would engender. The benefits of the class mechanism, including providing injured persons or entities with a method for obtaining redress on claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action.

205.   Plaintiffs' claims are typical of the claims of the other Class members in that they arise out of the same wrongful business practices by the ATM Defendants and BofA as described herein.

206.   Plaintiffs are more than adequate representatives of each of the Classes in that each has suffered damages as a result of the ATM Defendants' and/or BofA's improper business practices. In addition:

a)  Plaintiffs are committed to the vigorous prosecution of this action on behalf of themselves and all others similarly situated and have retained competent counsel experienced in the prosecution of class actions and, in particular, class actions on behalf of consumers against financial institutions;

b)  There is no conflict of interest between Plaintiffs and the unnamed Class members;

c)  They anticipate no difficulty in the management of this litigation as a class action; and

SECOND AMENDED CLASS ACTION COMPLAINT

d) Plaintiffs' legal counsel has the financial and legal resources to meet the substantial costs and legal issues associated with this type of litigation.

207. Plaintiffs know of no difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

208. The ATM Defendants and BofA have acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.

209. All conditions precedent to bringing this action have been satisfied and/or waived.

**E.      The BofA Foreign Exchange Fee Classes (brought on behalf of Plaintiff Schertzer):**

210. Plaintiff Kristen Schertzer also brings this action on behalf of herself and on behalf of all others similarly situated against BOFA as follows:

All BofA payment card accountholders who, within the applicable statute of limitation preceding the filing of this lawsuit, incurred an International Transaction Fee in excess of 3.00% on an International Transaction conducted with a Payment Card (the "National Class").

All BofA payment card accountholders in the State of California who, within the applicable statute of limitation preceding the filing of this lawsuit, incurred an International Transaction Fee in excess of 3.00% on an International Transaction conducted with a Payment Card (the "California Class").

211. Excluded from the Classes are Defendant, its subsidiaries and affiliates, their officers, directors and members of their immediate families and any entity in which defendants have a controlling interest, the legal representatives, heirs, successors or assigns of any such excluded party, the judicial officer(s) to whom this action is assigned, and the members of their immediate families.

212. Plaintiff reserves the right to modify or amend the definition of the proposed Class and/or to add a Subclass(es) if necessary before this Court determines whether certification is appropriate.

213. The questions here are ones of common or general interest such that there is a well-defined community of interest among the class members. These questions predominate over questions that may affect only individual class members because BOFA has acted on grounds generally applicable to the class. Such common legal or factual questions include, but are not limited to:

> a. Whether BofA improperly "rounds up," to the nearest penny, all International Transaction Fees assessed on foreign payment card transactions.
>
> b. Whether such conduct violates the contract;
>
> c. Whether such conduct is deceptive or in bad faith; and
>
> d. Whether Plaintiff and other members of the Class have sustained damages as a result of BofA's wrongful business practices described herein, and the proper measure of damages.

214. The parties are numerous such that joinder is impracticable. Upon information and belief, and subject to class discovery, the Classes consist of thousands of members or more, the identity of whom are within the exclusive knowledge of and can be ascertained only by resort to BofA's records. BofA has the administrative capability through its computer systems and other records to identify all members of the Class, and such specific information is not otherwise available to Plaintiff.

215. It is impracticable to bring Class members' individual claims before the Court. Class treatment permits a large number of similarly situated persons or entities to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort, expense, or the possibility of inconsistent or contradictory judgments that numerous individual actions would engender. The benefits of the class mechanism, including providing injured persons or entities with a method for

obtaining redress on claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action. No consumer would individually pursue a claim for these amounts. This type of conduct is precisely within the ambit of the F.R.C.P. Rule 23.

216.   Plaintiff's claims are typical of the claims of the other Class members in that they arise out of the same wrongful business practice by BofA, as described herein.

217.   Plaintiff is more than an adequate representative of the Classes in that she has a BofA checking account and has suffered damages as a result of BofA's usurious and improper business practices.  In addition:

a.   Plaintiff is committed to the vigorous prosecution of this action on behalf of herself and all others similarly situated and has retained competent counsel experienced in the prosecution of class actions and, in particular, class actions on behalf of consumers against financial institutions;

b.   There is no conflict of interest between Plaintiff and the unnamed Class members;

c.   They anticipate no difficulty in the management of this litigation as a class action; and

d.   Plaintiff's legal counsel has the financial and legal resources to meet the substantial costs and legal issues associated with this type of litigation.

218.   Plaintiff knows of no difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

219.   BofA has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.

220.   All conditions precedent to bringing this action have been satisfied and/or waived.


**CAUSES OF ACTION**
**(As to the ATM Defendants)**

SECOND AMENDED CLASS ACTION COMPLAINT

**FIRST CAUSE OF ACTION**
**VIOLATION OF THE UNFAIR COMPETITION LAW**
**Cal. Bus. & Prof. Code § 17200, *et seq.***
**(Against Defendants Cardtronics and Cash Depot on**
**Behalf of the California Classes)**

221.    Plaintiffs Schertzer and Hicks incorporate the preceding allegations by reference as if fully set forth herein.

222.    California Business & Professions Code § 17200 prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice." Cardtronics' conduct in re-ordering their ATM screen prompts, utilizing the "Balance Inquiry at Start Screen Prompt," and deceptively requiring customers to opt-out of balance inquiries at their ATM machines violated each of this statute's three prongs.

223.    Cardtronics committed an unlawful business act or practice in violation of Cal. Bus. & Prof. Code § 17200, *et seq.*, by violating California Finance Code § 130080(c) when it failed to adequately disclose to customers the circumstances in which the customer will incur fees for purported balance inquiries.

224.    Cardtronics committed unfair business acts and practices in violation of Cal. Bus. & Prof. Code § 17200, *et seq.*, by, as alleged herein, re-ordering their ATM screen prompts, utilizing the "Balance Inquiry at Start Screen Prompt," and deceptively requiring customers to opt-out of balance inquiries that they would not otherwise engage in or did not knowingly consent to.

225.    Cardtronics committed fraudulent business acts and practices in violation of Cal. Bus. & Prof. Code § 17200, *et seq.*, when it affirmatively and knowingly misrepresented to its customers that deposit account balance inquiries were implicitly offered free of charge and could be printed on the customers' receipt, when in fact, Cardtronics knew that the customers' financial institutions would charge them fees for such purported balance inquiries. Cardtronics, as alleged herein, knowingly and contractually profits from the receipt of out of network fees collected by its customers' financial institutions. Cardtronics' representations are likely to mislead the public with regard to

whether they understand they are engaging in an actual balance inquiry that will cost them money.

226. Additionally, Cardtronics' conduct was unfair insofar as it was not motivated by any business or economic need or rationale. The harm and adverse impact of Cardtronics' conduct on members of the general public was neither outweighed nor justified by any legitimate reasons, justifications, or motives.

227. The harm to Plaintiffs and Class members arising from Cardtronics's unfair practices relating to the imposition of out of network fees outweighs the utility, if any, of those practices.

228. Cardtronics' unfair business practices relating to tricking customers into performing balance inquiries as alleged herein are immoral, unethical, oppressive, unscrupulous, unconscionable, and/or substantially injurious to Plaintiffs and Class members.

229. Cardtronics' conduct was substantially injurious to consumers in that they have been forced to pay Out of Network Balance Inquiry Fees.

230. Similarly, Cash Depot's conduct in explicitly misrepresenting to consumers that balance inquiries undertaken at its Cash Depot ATM machines would be "free," violates each of the UCL's three prongs of liability.

231. Cash Depot committed an unlawful business act or practice in violation of Cal. Bus. & Prof. Code § 17200, *et seq.*, by violating Cal. Fin. Code § 13080(c) when it failed to adequately disclose to customers the circumstances in which the customer will incur Balance Inquiry Fees.

232. Cash Depot committed an unfair business act or practice in violation of Cal. Bus. & Prof. Code § 17200, *et seq.*, by, as alleged herein, explicitly misrepresenting on its Cash Depot ATM machines: "Avoid Overdraft Fees Check Your Balance for Free," utilizing the "Balance Inquiry at Start Screen Prompt," and deceptively requiring customers to opt-out of balance inquiries that they would not otherwise engage in or did not knowingly consent to.

233. Cash Depot committed a fraudulent business act or practice in violation of Cal. Bus. & Prof. Code § 17200, *et seq.*, when it affirmatively, knowingly, and explicitly misrepresented to its customers that balance inquiries were "free" of charge, when in fact, Cash Depot knew that the customers' financial institutions would charge them out-of-network Balance Inquiry Fees. Cash Depot, as alleged herein, knowingly and contractually profits from the receipt of out-of-network fees collected by its customers' financial institutions. Cash Depot's representations are likely to mislead the public with regard to the fact that they will incur a balance inquiry charge at all in light of Cash Depot's representation that such transactions are "free" and/or to whether they understand they are engaging in an actual balance inquiry that will cost them money.

234. Additionally, Cash Depot's conduct was unfair insofar as it was not motivated by any business or economic need or rationale. The harm and adverse impact of Cash Depot's conduct on members of the general public was neither outweighed nor justified by any legitimate reasons, justifications, or motives.

235. The harm to Plaintiff and Class members arising from Cash Depot's unfair practices relating to the imposition of out-of-network fees in light of the plain misrepresentation that balance inquiries will be "free" outweighs the utility, if any, of those practices.

236. Cash Depot's unfair business practices relating to tricking customers into performing available balance inquiries as alleged herein are immoral, unethical, oppressive, unscrupulous, unconscionable, and/or substantially injurious to Plaintiff Hicks and the Class members.

237. Cash Depot's conduct was substantially injurious to consumers in that they have been forced to pay out-of-network Balance Inquiry Fees despite blatant misrepresentations to the contrary.

238. As a result of Defendants' violations of the UCL, Plaintiffs and members of the Class have paid, and/or will continue to pay, unreasonably excessive amounts of money for banking services and thereby have suffered and will continue to suffer actual damages.

239. As a result of Defendants' unfair and deceptive conduct, Cardtronics and Cash Depot have been unjustly enriched and should be required to disgorge their unjust profits and make restitution to Plaintiffs and Class members pursuant to Cal. Bus. & Prof. Code §§ 17203 and 17204.

240. Plaintiffs and the Classes further seek an order enjoining Cardtronics' and Cash Depot's unfair or deceptive acts or practices, and an award of attorneys' fees and costs under Cal. Code of Civ. Proc. § 1021.5.

### SECOND CAUSE OF ACTION
### VIOLATION OF THE UNFAIR COMPETITION LAW
### Cal. Bus. & Prof. Code § 17200, *et seq.*
### (Against Defendant FCTI on Behalf of the Nationwide Classes)

241. Plaintiff Covell incorporates the preceding allegations by reference as if fully set forth herein.

242. FCTI's conduct in double-charging consumers two out-of-network Balance Inquiry Fees for single balance inquiries, and the deceptive manner in which FCTI designs and presents its screen prompts at is ATM machines to consumers, constitutes a fraudulent and unfair business act or practice in violation of Cal. Bus. & Prof. Code § 17200, *et seq.*

243. FCTI's conduct was unfair insofar as it was not motivated by any business or economic need or rationale. The harm and adverse impact of FCTI's conduct on members of the general public was neither outweighed nor justified by any legitimate reasons, justifications, or motives.

244. The harm to Plaintiff and Class members arising from FCTI's unfair practices relating to its deceptive screen prompts and the unconscionable double-charging out-of-network Balance Inquiry Fees for a single purported balance inquiry outweighs the utility, if any, of those practices.

245. FCTI's unfair business practices relating to their deceptive screen prompts and double charging out-of-network Balance Inquiry Fees as alleged herein are immoral,

unethical, oppressive, unscrupulous, unconscionable, and/or substantially injurious to Plaintiffs and Class members.

246.   FCTI's conduct was substantially injurious to consumers in that they have been forced to pay double the amount of out-of-network Balance Inquiry Fees than necessary.

247.   As a result of Defendant's violations of the UCL, Plaintiff and members of the Class have paid, and/or will continue to pay, unreasonably excessive amounts of money for banking services and thereby have suffered and will continue to suffer actual damages.

248.   As a result of Defendant's unfair and deceptive conduct, FCTI has been unjustly enriched and should be required to disgorge their unjust profits and make restitution to Plaintiff and Class members pursuant to Cal. Bus. & Prof. Code §§ 17203 and 17204.

249.   Plaintiff and the Classes further seek an order enjoining FCTI's unfair or deceptive acts or practices, and an award of attorneys' fees and costs under Cal. Code of Civ. Proc. § 1021.5

## THIRD CAUSE OF ACTION
## CONVERSION
### (Against the ATM Defendants on Behalf of the Nationwide Classes)

250.   Plaintiffs Covell, Schertzer and Hicks incorporate the preceding allegations by reference as if fully set forth herein.

251.   The ATM Defendants utilize deceptive screen prompts on their ATM machines to trick customers into engaging in balance inquiries that the consumers would not otherwise purchase. Plaintiffs and each consumer who used one of the ATM Defendants' ATM machine made a single balance inquiry, but was subsequently charged one or more out-of-network ATM Balance Inquiry Fees from their financial institutions.

252.   FCTI's deceptive scheme has allowed consumers' financial institutions to wrongfully collect double the amount of out-of-network Balance Inquiry Fees than they

otherwise might have been entitled to. These funds are specific and readily identifiable from their customers' accounts.

253. Cardtronics' and Cash Depot's deceptive scheme has allowed consumers' financial institutions to wrongfully collect out-of-network Balance Inquiry Fees in addition to lawful, out of network cash withdrawal fees. These funds are specific and readily identifiable from their customers' accounts.

254. As a result, the ATM Defendants have wrongfully collected interchange fees from the consumers' financial institutions through their wrongful practices associated with assessing out-of-network balance inquiries at their ATM machines.

255. The ATM Defendants have thus, without proper authorization, assumed and exercised the right of ownership over these funds, in hostility to the rights of Plaintiffs and the members of the Nationwide Classes, without legal justification.

256. The ATM Defendants continue to retain these funds unlawfully without the consent of Plaintiffs or members of the Nationwide Classes.

257. The ATM Defendants intends to permanently deprive Plaintiffs and members of the Nationwide Classes of those funds.

258. These funds are properly owned by Plaintiffs and members of the Nationwide Classes, not the ATM Defendants which now claim they are entitled to a portion of their ownership, contrary to the rights of Plaintiffs and members of the Nationwide Classes.

259. Plaintiffs and the members of the Nationwide Classes are entitled to the immediate possession of these funds.

260. The ATM Defendants have wrongfully converted these specific and readily identifiable funds.

261. The ATM Defendants' wrongful conduct is continuing.

262. As a direct and proximate result of this wrongful conversion, Plaintiffs and the members of the Nationwide Classes have suffered and continue to suffer damages.

263. By reason of the foregoing, Plaintiffs and the members of the Nationwide Classes are entitled to recover from the ATM Defendants all damages and costs permitted by law, including all amounts that the ATM Defendants have wrongfully converted.

## FOURTH CAUSE OF ACTION
## NEGLIGENCE
### (Against the ATM Defendants on Behalf of the Nationwide Classes)

264. Plaintiffs Covell, Schertzer and Hicks incorporate the preceding allegations by reference as if fully set forth herein.

265. The ATM Defendants utilize deceptive screen prompts on their ATM machines to trick customers into engaging in balance inquiries that the consumers would not otherwise purchase. Plaintiffs and each consumer who used one of the ATM Defendants' ATM machine made a single balance inquiry, but was subsequently charged one or more out-of-network ATM Balance Inquiry Fees from their financial institutions. Defendants FCTI, Cardtronics, and Cash Depot each used deceptive screen prompts at their out-of-network ATM machines, including the "Balance Inquiry At Start Screen Prompt,"

266. Each ATM Defendant owed a duty of care to Plaintiffs and Class Members to explicitly ask consumers and/or otherwise acquire their actual consent to engage in a balance inquiries.

267. The ATM Defendants each had a duty to meaningfully inform their customers, including Plaintiffs that balance inquiries preceding the Cash Withdrawals were separate transactions.

268. The ATM Defendants each had a duty to acquire the consent of the Plaintiffs to engage in a balance inquiry prior to acquiring and providing such information to Plaintiffs and prior to communicating the fact that a balance inquiry had occurred to BofA.

269. The ATM Defendants and each of them had a duty not to mislead Plaintiffs and trick them into engaging into balance inquiries that they otherwise did not seek to perform.

270. The ATM Defendants and each of them, failed in the discharge of their duties and did breach their duties as alleged herein.

271. Each ATM Defendant was negligent and breached its duty of care owed to Plaintiffs and Class Members in one or more of the following respects:

a. Reordering ATM machine screen prompts, (*i.e.,* the "Balance Inquiry at Start Screen Prompt") so that the fist screen a customer views after debit pin entry is an immediate prompt asking if they would like to view their available account balance, creating confusion and causing consumers to believe the service is an integral part of a cash withdrawal transaction; and/or,

b. Utilizing balance inquiry screen prompts that force consumers using the ATM to effectively opt-out of a balance inquiry, as opposed to affirmatively selecting to "opt-in;" and/or

c. Using confusing and misleading language to describe balance inquiries;

d. Failing to clearly ask whether the consumer wishes to engage in a balance inquiry prior to proceeding with their intended cash withdrawal; and/or

e. Misrepresenting and falsely advertising that balance inquiries are "free," when in reality, the consumers' financial institution assesses out-of-network Balance Inquiry Fees on each transaction.

272. Therefore as direct and proximate cause of said breach, Plaintiffs were harmed in the amount of the Out of Network Fees assessed and charged by BofA as alleged herein. Said fees were, in turn, in whole or in part paid directly to the ATM Defendants by BofA. As a direct and proximate result of one or more of the aforementioned negligent acts, Plaintiffs and Class Members suffered economic loss in the amount of each out-of-network Balance Inquiry Fee charged to each Plaintiff and Class Member and a portion of such fees received by the ATM Defendants in the form of interchange fees paid by each consumers' financial institution.

273.   By reason of the foregoing, Plaintiffs and the members of the Nationwide Classes are entitled to recover from the ATM Defendants all damages and costs permitted by law, including all amounts that the ATM Defendants have wrongfully collected.

274.   Accordingly, Plaintiffs seek damages against the ATM Defendants in the amount of interchange fees received directly from the consumers' financial institutions.

**FIFTH CAUSE OF ACTION**
**VIOLATION OF THE FALSE ADVERTISING LAW**
**Cal. Bus. & Prof. Code § 17500, *et seq.***
**(Against Defendant Cash Depot on Behalf of the California Class)**

275.   Plaintiff Hicks incorporates the preceding allegations as if fully set forth herein.

276.   California Business and Professions Code § 17500 provides:
It is unlawful for any . . . corporation . . . with intent . . . to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated . . . from this state before the public in any state, in any newspaper or other publication, or any advertising device, or by public outcry or proclamation, or in any other manner or means whatever, including over the Internet, any statement . . . which is ***untrue or misleading***, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading . . .(Emphasis added).

277.   Cash Depot's practice of advertising on its Cash Depot ATM machines that consumers can "Avoid Overdraft Fees Check Your Balance for Free," when in reality, consumers incur an out-of-network Balance Inquiry Fee from their financial institution, constitutes an unfair, untrue, and misleading practice.

278.   Cash Depot's blatant misrepresentation that they can check their available balance for "free" gives consumers the false impression that they will not later incur an out-of-network Balance Inquiry Fee for conducting a balance inquiry at Defendant's Cash Depot ATM machines.

279. Consumers, including Plaintiff Hicks, read the unavoidable representation at Cash Depot's ATM machine and were subsequently deceived into engaging in a balance inquiry as they proceed to their ultimate cash withdrawal transaction.

280. Cash Depot knows or has reason to know that balance inquiries are not "free" because Cash Depot collects interchange fees from consumers' financial institutions for each balance inquiry that a consumer conducts at its Cash Depot ATM machines.

281. Cash Depot misleads consumers by making misleading and false statements and failing to disclose what is required as stated in the Code alleged above.

282. As a direct and proximate result of Cash Depot's misleading and false advertisement, Plaintiff Hicks and Class Members have suffered injury in fact and have lost money in the form of Balance Inquiry Fees. As such, Plaintiff Hicks requests that this Court order Cash Depot to restore this money to Plaintiff and all Class Members, and to enjoin Cash Depot from continuing these unfair practices in violation of the FAL in the future. Otherwise, Plaintiff Hicks, Class Members, and the broader public will be irreparably harmed and/or denied an effective and complete remedy.

### SIXTH CAUSE OF ACTION
### VIOLATION OF THE CONSUMER LEGAL REMEDIES ACT
### Cal. Civ. Code § 1770, *et seq.*
### (Against Defendant Cash Depot on Behalf of the California Class)

283. Plaintiff Hicks incorporates the preceding allegations as if set forth fully herein.

284. Defendant Cash Depot is a "person" as defined by the CLRA. Cal. Civ. Code § 1761(c).

285. Plaintiff Hicks and Class Members are "consumers" within the meaning of the CLRA as defined by Cal. Civ. Code § 1761(d).

286. The CLRA prohibits "unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer[.]" Cal. Civ. Code § 1770(a).

287. Specifically, the CLRA prohibits "[a]dvertising goods or services with the intent not to sell them as advertised." Cal. Civ. Code § 1770(a)(9).

288. Cash Depot's blatant misrepresentation, "Avoid Overdraft Fees Check Your Balance for Free," constitutes a deceptive and misleading business practice in violation of the CLRA. Moreover, Defendant's misrepresentation violates Section 1770(a)(9) because consumers do incur an out-of-network Balance Inquiry Fee from their financial institutions despite Cash Depot's explicit advertisement that consumers can check their available balance for "free."

289. Cash Depot knows or has reason to know that consumers will be charged for such out-of-network balance inquiries because Cash Depot receives payments from consumers' financial institutions for each balance inquiry that a consumer conducts at its Cash Depot ATM machines.

290. Defendant continues to violate the CLRA and continues to injure the public by using the false, deceptive, and misleading advertisement on its Cash Depot ATM machines that consumers can check their balances for "free," when in reality, that is untrue.

291. Accordingly, Plaintiff Hicks seeks injunctive relief on behalf of the general public to prevent Cash Depot from continuing to engage in such deceptive and illegal practices.

292. Cash Depot's violation of the CLRA has caused Plaintiff and putative Class Members to suffer ascertainable losses. Pursuant to Section 1782(d), Plaintiff reserves the right to amend this cause of action to include a request for damages under the CLRA pursuant to Section 1782(a) within 30 days of providing the required notice.

**CAUSES OF ACTION**
**(Against BofA arising from the assessment of OON Fees)**

**SEVENTH CAUSE OF ACTION**
**BREACH OF CONTRACT INCLUDING THE COVENANT**
**OF GOOD FAITH AND FAIR DEALING**
**(Against BofA on Behalf of the Nationwide Classes)**

293. Plaintiffs incorporate the preceding allegations as if fully set forth herein.

294. Plaintiffs Hicks, Schertzer, and Covell have BofA checking accounts, which are governed by BofA's standardized account agreement, fee schedule, and related documents

295. BofA has misconstrued in its standardized account agreements, fee schedules, and related documents the true nature of their mandatory assessment of OON Fees during out-of-network ATM transactions and breached the terms of their agreements with accountholders. BofA's standardized account agreements indicate that the bank will not assess an additional OON Fee for a balance inquiry undertaken in conjunction with a cash withdrawal and that not more than one OON Fee will be assessed for a single ATM usage and that no fee for a balance inquiry will be assessed without the knowing authorization of the accountholder.

296. BofA violates these provisions.

297. Similarly, no contractual provision authorizes BofA to assess two fee arising from a single purported balance inquiry preceding a cash withdrawal when a customer uses an FCTI ATM machine.

298. Therefore, BofA breached the terms of their standardized account agreements by charging OON Fees for balance inquiries conducted at out-of-network ATM machines.

299. Under the laws of the states where BofA does business, good faith is an element of every contract. Whether by common law or statute, all such contracts impose upon each party a duty of good faith and fair dealing. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit – not merely the letter – of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form. Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

300.    Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes their conduct to be justified.  Bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty.  Examples of bad faith are evasion of the spirit of the bargain, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.

301.    BofA has breached the covenant of good faith and fair dealing in their standardized account agreements through their OON Fee policies and practices as alleged herein.

302.    Plaintiffs and Class Members have performed all, or substantially all, of the obligations imposed on them under BofA's standardized account agreements.

303.    Plaintiffs and Class Members have sustained damages as a result of BofA's breach of the contract and the covenant of good faith and fair dealing.

### EIGHTH CAUSE OF ACTION
### VIOLATION OF THE UNFAIR COMPETITION LAW
### (Against BofA on Behalf of the California Class)

304.    Plaintiffs incorporate the preceding allegations as if fully set forth herein.

305.    BofA's conduct described herein violates the Unfair Competition Law (the "UCL") codified at California Business & Professions Code section 17200, *et seq.*

306.    The UCL prohibits, and provides civil remedies for, unfair competition.  Its purpose is to protect both consumers and competitors by promoting fair competition in commercial markets for goods and services.  In service of that purpose, the Legislature framed the UCL's substantive provisions in broad, sweeping language.

307.    By defining unfair competition to include any "any unlawful, unfair or fraudulent business act or practice," the UCL permits violations of other laws to be treated as unfair competition that is independently actionable, and sweeps within its scope acts and practices not specifically proscribed by any other law.

SECOND AMENDED CLASS ACTION COMPLAINT

308. BofA has committed fraudulent business acts and practices in violation of Cal. Bus. & Prof. Code § 17200, *et seq.*, when they affirmatively and knowingly misrepresented their OON Fee practices. Such representations misled Plaintiffs and are likely to mislead the public.

309. In addition, BofA committed fraudulent business acts and practices in violation of Cal. Bus. & Prof. Code § 17200, *et seq.*, when they affirmatively and knowingly omitted the total price of out of network ATM transactions and failed to adequately inform consumers they would be charged two OON Fees for a cash withdrawal preceded by a balance inquiry at the same out of network ATM. Such omissions misled Plaintiffs and are likely to mislead the public.

310. Additionally, BofA's conduct was unfair insofar as it was not motivated by any business or economic need or rationale. The harm and adverse impact of BofA's conduct on members of the general public was neither outweighed nor justified by any legitimate reasons, justifications, or motives.

311. The harm to Plaintiffs and Class Members arising from BofA's unfair practices relating to the imposition of OON Fees outweighs the utility, if any, of those practices.

312. BofA's unfair business practices relating to the assessment of OON Fees as alleged herein are immoral, unethical, oppressive, unscrupulous, unconscionable, and/or substantially injurious to Plaintiffs and Class Members.

313. BofA's conduct was substantially injurious to consumers in that they have been forced to pay multiple OON Fees, which are misrepresented in their contracts with BofA.

314. BofA also committed fraudulent business acts and practices in violation of Cal. Bus. & Prof. Code § 17200, *et seq.*, in conjunction with the ATM Defendants when BofA blindly permitted the ATM Defendants to determine for them when and how an out-of-network ATM transaction has occurred and then subsequently collecting OON Fees that they would otherwise not be entitled to.

315.   As a result of BofA's violations of the UCL, Plaintiffs and members of the Class have paid, and/or will continue to pay, unreasonably excessive amounts of money for banking services and thereby have suffered and will continue to suffer actual damages.

## NINTH CAUSE OF ACTION
## VIOLATION OF THE CONSUMER LEGAL REMEDIES ACT
### (Against BofA on Behalf of the California Classes)

316.   Plaintiffs incorporate the preceding allegations by reference as if fully set forth herein.

317.   BofA is a "person" as defined by the CLRA. Cal. Civ. Code § 1761(c).

318.   Plaintiffs and Class Members are "consumers" within the meaning of the CLRA, as defined by Cal. Civ. Code § 1761(d).

319.   The CLRA prohibits "unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer[.]" Cal. Civ. Code § 1770(a).

320.   BofA's misrepresentations that they will not charge multiple OON Fees for a cash withdrawal preceded by a balance inquiry at a out-of-network ATM machine constitute deceptive and misleading business practices in violation of the CLRA.

321.   BofA continues to violate the CLRA and continue to injure the public by using false, deceptive, and misleading terms in their standardized account agreements. Accordingly, Plaintiffs seek injunctive relief on behalf of the general public to prevent BofA from continuing to engage in these deceptive and illegal practices.

322.   BofA's violation of the CLRA caused Plaintiffs and putative Class Members to suffer ascertainable losses.

323.   In conjunction with the filing of the First Amended Complaint, Plaintiffs' Counsel mailed BofA a notice of its violations of Cal. Civ. Code § 1770 in accordance with Cal. Civ. Code § 1782 and demanded that it rectify the problems associated with the actions detailed above and give notice to all affected consumers of its intent to act.

324.   BofA failed to appropriately respond to Plaintiffs' letter or agree to rectify the problems associated with the actions detailed above and give notice to all affected consumers within 30 days of the date of written notice pursuant to § 1782 of the CLRA. Therefore, Plaintiffs seek claims for actual or punitive damages, as appropriate, against BofA.

## TENTH CAUSE OF ACTION
## CONVERSION
### (Against BofA on Behalf of the Nationwide Classes)

325.   Plaintiffs incorporate the preceding allegations as if set forth fully herein.

326.   BofA had and continues to have a duty to maintain and preserve their customers' checking accounts and to prevent their diminishment through their own wrongful acts.

327.   BofA has wrongfully collected OON Fees from Plaintiffs and the Nationwide Classes, and have taken specific and readily identifiable funds from their accounts in payment of these fees in order to satisfy them.

328.   BofA has, without proper authorization, assumed and exercised the right of ownership over these funds, in hostility to the rights of Plaintiffs and the members of the Nationwide Classes, without legal justification.

329.   BofA continues to retain these funds unlawfully without the consent of Plaintiffs or members of the Nationwide Classes.

330.   BofA intends to permanently deprive Plaintiffs and the members of the Nationwide Classes of these funds.

331.   These funds are properly owned by Plaintiffs and the members of the Nationwide Classes, not BofA, which now claims that that is entitled to its ownership, contrary to the rights of Plaintiffs and the members of the Nationwide Classes.

332.   Plaintiffs and members of the Nationwide Classes are entitled to the immediate possession of these funds.

333. BofA has wrongfully converted these specific and readily identifiable funds.

334. BofA's wrongful conduct is continuing.

335. As a direct and proximate result of this wrongful conversion, Plaintiffs and members of the Nationwide Classes have suffered and continue to suffer damages.

336. By reason of the foregoing, Plaintiffs and the members of the Nationwide Classes are entitled to recover from BofA all damages and costs permitted by law, including all amounts that BofA has wrongfully converted.

## CAUSES OF ACTION

### (Against BofA arising from overcharging for International Transaction Fees)

### <u>TWELTH CAUSE OF ACTION</u><br><u>BREACH OF CONTRACT INCLUDING THE COVENANT</u><br><u>OF GOOD FAITH AND FAIR DEALING</u>

337. Plaintiff incorporates the preceding allegations by reference as if fully set forth herein.

338. Plaintiff and BofA contracted for checking account and payment card services, as embodied in the Account Agreement and Fee Schedule.

339. The Fee Schedule states that BofA will assess an International Transaction Fee *capped at 3%*. *See* Exhibit No. 2, BofA Fee Schedule, P. 9. (bold and underline added).

340. BofA breached its contract with Ms. Schertzer and class members when it assessed International Transaction Fees in excess of 3.00%, as described herein.

341. Plaintiff and members of the putative Class have performed all of the obligations on them pursuant to Account Agreement and Fee Schedule.

342. Plaintiff and members of the putative Class have sustained monetary damages as a result of Defendant's breach.

343. Under the laws of the State of California and other states where BOFA does business, good faith is an element of every contract. Whether by common law or statute, all such contracts impose upon each party a duty of good faith and fair dealing. Good faith and fair dealing, in connection with executing contracts and discharging performance and

other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form. Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

344. Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes their conduct to be justified. Bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty. Examples of bad faith are evasion of the spirit of the bargain, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.

345. BofA breached the covenant of good faith and fair dealing in its Account Agreement and Fee Schedule by engaging in the policies and practices as alleged herein. Specifically, BofA abuses its discretion under the contract by rounding up transactions such that BofA charges International Transaction Fees exceeding 3.00% on a per transaction basis.

346. Plaintiff and members of the Class have performed all, or substantially all, of the obligations imposed on them under the contract.

347. Plaintiff and members of the Class have sustained damages as a result of BofA's breach of the contract and breach of the covenant of good faith and fair dealing.

**THIRTEENTH CAUSE OF ACTION**
**VIOLATION OF THE UCL**
**Cal. Bus. & Prof. Code § 17200,** *et seq.*
**(On Behalf of Plaintiff and the California Class)**

348. Plaintiff incorporates the preceding allegations by reference as if fully set forth herein.

349. California Business & Professions Code § 17200 prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice."

SECOND AMENDED CLASS ACTION COMPLAINT

BofA's conduct related to the imposition of International Exchange Fees violated the statute's "unfair" and "fraudulent" prongs.

350. BofA committed unfair business acts and practices in violation of Cal. Bus. & Prof. Code § 17200, *et seq*., by representing to Plaintiff and the public that it will charge only a flat 3.00% fee for international payment card transactions. BofA failed to disclose that its rounding practices result in the assessment of such fees in excess of 3.00%.

351. BofA committed fraudulent business acts and practices in violation of Cal. Bus. & Prof. Code § 17200, *et seq*., when it affirmatively and knowingly misrepresented that it charges a flat 3.00% International Transaction Fee.

352. As a direct and proximate result of BofA's unfair and deceptive practices, Plaintiff and Class members suffered and will continue to suffer actual damages.

353. As a result of its unfair and deceptive conduct, BofA has been unjustly enriched and should be required to disgorge its unjust profits and make restitution to Plaintiff and Class members pursuant to Cal. Bus. & Prof. Code §§ 17203 and 17204.

354. Plaintiff and the Class further seek an order enjoining BofA's unfair or deceptive acts or practices, and an award of attorneys' fees and costs under Cal. Code of Civ. Proc. § 1021.5.

## FOURTEENTH CAUSE OF ACTION
## CONVERSION
### (On Behalf of Plaintiff, the National Class, and the California Class)

355. Plaintiff incorporates the preceding allegations by reference as if fully set forth herein.

356. BofA had and continues to have a duty to maintain and preserve its customers' checking accounts and to prevent their diminishment through its own wrongful acts.

357. BofA has collected excessive International Transaction Fees from Plaintiff and the members of the Classes, and has taken specific and readily identifiable funds from their accounts in payment of these fees in order to satisfy them.

358. BofA has, without proper authorization, assumed and exercised the right of

ownership over these funds, in hostility to the rights of Plaintiff and the members of the Classes, without legal justification.

359.    BofA continues to retain these funds unlawfully without the consent of Plaintiff or members of the Classes.

360.    BofA intends to permanently deprive Plaintiff and the members of the Classes of these funds.

361.    These funds are properly owned by Plaintiff and the members of the Classes, not BofA, which now claims that it is entitled to their ownership, contrary to the rights of Plaintiff and the members of the Classes.

362.    Plaintiff and the members of the Classes are entitled to the immediate possession of these funds.

363.    BofA has wrongfully converted these specific and readily identifiable funds.

364.    BofA's wrongful conduct is continuing.

365.    As a direct and proximate result of this wrongful conversion, Plaintiff and the members of the Classes have suffered and continue to suffer damages.

366.    By reason of the foregoing, Plaintiff and the members of the Classes are entitled to recover from BofA all damages and costs permitted by law, including all amounts that BofA has wrongfully converted.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment against Defendants for themselves and the Class members as follows:

(a)    Declaring  BofA's Balance Inquiry Fee policies and practices to be wrongful, unfair, and a breach of contract;

(b)    Restitution of all relevant fees paid by Plaintiffs and members of the proposed classes to BofA as a result of the wrongs alleged herein in an amount to be determined at trial;

(c) Restitution of all relevant fees paid by Plaintiffs and members of the proposed classes to the ATM Defendants as a result of those monies being paid to the ATM Defendants from BofA as alleged herein and as a result of the wrongs alleged herein in an amount to be determined at trial;

(d) Disgorgement of the ill-gotten gains derived by ATM Defendants and BofA from their misconduct;

(e) Actual damages in an amount according to proof;

(f) Statutory, punitive, and exemplary damages, as permitted by law;

(g) Pre-judgment interest at the maximum rate permitted by applicable law;

(h) An order on behalf of the general public enjoining BofA from continuing to employ unfair methods of competition and commit unfair and deceptive acts and practices alleged in this complaint and any other acts and practices proven at trial;

(i) An order on behalf of the general public enjoining the ATM Defendants from continuing to employ unfair methods of competition and commit unfair and deceptive acts and practices alleged in this complaint and any other acts and practices proven at trial;

(j) Costs and disbursements assessed by Plaintiffs in connection with this action, including reasonable attorneys' fees pursuant to applicable law;

(k) Such other relief as this Court deems just and proper.

**-As to Defendant BofA as it relates to the overcharging of International Transaction Fees:**

(l) Declaring BofA's practice of charging International Transaction Fees in excess of 3.00% to be wrongful, unfair, deceptive, and a breach of contract;

(m) Restitution of all relevant International Exchange Fees paid to BofA by Plaintiff and the Classes, as a result of the wrongs alleged herein an amount to be determined at trial;

SECOND AMENDED CLASS ACTION COMPLAINT

(n)     Disgorgement of the ill-gotten gains derived by BofA from its misconduct;

(o)     Actual damages in an amount according to proof;

(p)     Statutory, punitive, and exemplary damages, as permitted by law;

(q)     Pre-judgment interest at the maximum rate permitted by applicable law;

(r)     An order enjoining BofA from continuing to misrepresent its International Transaction Fee policies in its publicly available documents and marketing materials, such as its "Account Agreement" and "Fee Schedule"

(s)     Costs and disbursements assessed by Plaintiff in connection with this action, including reasonable attorneys' fees pursuant to applicable law; and

(t)     Such other relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs and all others similarly situated hereby demand trial by jury on all issues in this complaint that are so triable as a matter of right.

Dated: May 31, 2019

**CARLSON LYNCH SWEET KILPELA & CARPENTER, LLP**

*/s/ Todd D. Carpenter*

Todd D. Carpenter (CA 234464)
1350 Columbia St., Ste. 603
San Diego, California 92101
Telephone: 619.762.1900
Facsimile: 619.756.6991
tcarpenter@carlsonlynch.com

**KALIEL PLLC**
Jeffrey D. Kaliel (CA Bar No. 238293)
Sophia Gold (CA Bar No. 307971)
1875 Connecticut Ave., NW, 10th Floor
Washington, D.C. 20009

80

SECOND AMENDED CLASS ACTION COMPLAINT

(202) 350-4783
jkaliel@kalielpllc.com
sgold@kalielpllc.com

*Attorneys for Plaintiff*

SECOND AMENDED CLASS ACTION COMPLAINT