UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KRISTEN SCHERTZER, et al., on behalf of themselves and all others similarly situated<br><br>           Plaintiffs,<br><br>v.<br><br>BANK OF AMERICA, N.A, et al.,<br><br>           Defendants. | Case No.:  19cv264 JM(MSB)<br><br>**ORDER ON MOTIONS TO DISMISS** |

## I.  INTRODUCTION

Plaintiffs Kristen Schertzer, Meagan Hicks and Brittany Covell have brought this putative class action case, on behalf of themselves and all others similarly situated, against Bank of America, N.A., Cardtronics Inc., ATM National, LLC. FCIT, Inc., and Cash Depot Ltd. (collectively "Defendants") essentially claiming deceptive, misleading, and unwarranted practices have been employed in the charging and collecting of bank balance inquiry and transaction fees.

Presently before the court are five motions to dismiss filed pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(2) and 12(b)(6).  (Doc. Nos. 59, 60, 61, 66, 68.)  The motions have been fully briefed and the court finds them suitable for submission on the

papers and without oral argument in accordance with Civil Local Rule 7.1(d)(1). For the reasons set forth below, Defendants' motions are granted with leave to amend.

## II. PROCEDURAL AND FACTUAL BACKGROUND

On February 5, 2019, Plaintiffs initiated this proposed (or putative) class action by filing suit. (Doc. No. 1.) On May 31, 2019, a second amended complaint ("SAC") was filed alleging original jurisdiction under the Class Action Fairness Act of 2005 and, specifically under 28 U.S.C. § 1332(d)(2) and setting forth a total of thirteen[1] claims against the defendants individually and collectively. (Doc. No. 56, "SAC".) Combined, the claims are for: (1) violation of California's Unfair Competition Law ("UCL"), CAL. BUS. & PROF. CODE § 17200, *et seq*; (2) conversion; (3) negligence; (4) violation of the California's False Advertising Law ("FAL"), CAL. BUS. & PROF. CODE § 17500, *et seq;* (5) violation of the California Consumer Legal Remedies Act ("CLRA"), CAL. CIV. CODE § 1770, *et seq*; (6) breach of contract; and (7) breach of the covenant of good faith and fair dealing. (*Id.* at 58-78.)

The allegations in the complaint center around three distinct categories. First, Plaintiffs allege a scheme by Bank of America ("BofA") to charge its customers unwarranted fees for using out-of-network ("OON") Automatic Teller Machines ("ATMs") for balance inquiries. (SAC at ¶ 1, 8-11, 77, 88, 113, 114, 125-.) Second, Plaintiffs assert that the independent ATM operators Cardtronics, Cash Depot and FCTI (collectively, the "ATM Defendants") made deceptive and misleading representations on the screens and on signs at ATMs they operate regarding the fees that would be charged for balance inquiries. (*Id* ¶¶ 1, 9, 12-15, 33-45, 46-79, 86-124, 125-161.) Third, Plaintiff Schertzer alleges the fees BofA charges for International Transactions are in violation of the governing account documents. (SAC at ¶¶ 1, 16-22, 162-181.)

---

[1] The proper way to refer to a "cause of action" in federal pleadings is by using the term "claim." Therefore, this is the term the court will use. The claims in the SAC are incorrectly numbered to fourteen and do not include an eleventh claim.

Attached to the SAC are the Deposit Agreement and Disclosures (Doc. No. 56-1, Ex.1 "The Agreement") and the Personal Schedule of Fees (Doc. No. 56-2, Ex.2 "Fee Schedule"). No party disputes that these are the contract documents between BofA and the Plaintiffs. The electronic bank services fee provision of the Agreement provides:

> *ATM Fees* When you use an ATM that is not prominently branded with the Bank of America name and logo, you may be charged a fee by the ATM operator or any network used and you may be charged a fee for a balance inquiry even if you do not complete a fund transfer. We may also charge you fees.
>
> *Other Fees* For other fees that apply to electronic banking services, please review the Schedule of Fees for your account and each agreement or disclosure that we provide to you for the specific electronic banking service, including the separate agreement for Online and Mobile Banking services and the separate agreement for ATM and debit cards.

*Id*. at 35. The Fee Schedule that was in effect beginning May 18, 2018, allows for the following ATM fees:

| Fee Category | Fee Name/Description | Fee Amount | Other Important Information About This Fee |
| --- | --- | --- | --- |
| **ATM Fees**<br><br>**Bank of America ATM** – an ATM that prominently displays the Bank of America name and logo on the ATM<br><br>**Non-Bank of America ATM** – an ATM that does not prominently display the Bank of America name and logo on the ATM | Withdrawals, deposits, transfers, payments and balance inquiries at a Bank of America ATM | No ATM fee | • Deposits and payments may not be available at some ATMs. Transaction fees may apply to some accounts. See account descriptions in this schedule. |
| | Non-Bank of America ATM Fee for:<br><br>Withdrawals, transfers and balance inquiries at a non-Bank of America ATM in the U.S. | $2.50 each | • When you use a non-Bank of America ATM, you may also be charged a fee by the ATM operator or any network used and you may be charged a fee for a balance inquiry even if you do not complete a funds transfer.<br>• The non-Bank of America ATM fees do not apply at some ATMs located outside the United States…<br>• See the disclosure information that accompanied your card for other fees that may apply.<br>• Non-Bank of America ATM fees are in addition to other account fees that may apply to the transaction, such as a Withdrawal Limit Fee for savings. |

| | | | • Preferred Rewards Platinum customers using a Bank of America Debit or ATM card are not charged the non-Bank of America ATM fee for one withdrawal, transfer and balance inquiry per statement cycle from a non-Bank of America ATM in the U.S., and receive a refund of the ATM operator fee for one withdrawal, transfer and balance inquiry per statement cycle from a no-Bank of America ATM in the U.S. |
| | | | • Preferred Rewards Platinum Honors customers using a Bank of America Debit or ATM card are not charged the non-Bank of America ATM fee for withdrawals, transfers and balance inquiries from non-Bank of America ATMs in the U.S. and receive a refund of the ATM operator fee for withdrawals, transfers and balance inquiries from non-Bank of America ATMs in the U.S. |

Fee Schedule at 10.

Additionally, the Fee Schedule provides the following information regarding International Transaction Fees:

| Fee Category | Fee Name/Description | Fee Amount | Other Important Information About This Fee |
|---|---|---|---|
| **ATM Card and Debit Card Fees** | International Transaction Fee | 3% of the U.S Dollar amount of the transaction | • Fee applies if you use your card to purchase goods or services in a foreign currency or in U.S. dollars with a foreign merchant (a "Foreign Transaction"). Foreign Transactions include internet transactions made in the U.S. but with a merchant who processes the transaction in a foreign country. |

*Id.* at 9.

On June 1, 2018, Plaintiff Schertzer used her BofA ATM Payment Card at a Cardtronics ATM located at 817 West Washington Street, San Diego, California, 92103, to withdraw $60, for which she was charged a total of $8.75 in fees – $3.75 cash withdrawal

4

fee by Cardtronics, $2.50 OON fee by BofA for making a balance inquiry and $2.50 by BofA for making a cash withdrawal. (SAC at ¶ 182.) Ms. Schertzer is only challenging the fee for the balance inquiry. (*Id.*) On May 29, 2018, Plaintiff Covell used her BofA ATM Debit Card at a FCTI ATM at a Seven Eleven (7-11) convenience store located at 592 Santa Fe Drive, Encinitas, California to withdraw $20, for which she was charged a total of $10.50 in fees – $3.00 cash withdrawal fee by FCTI, $2.50 OON fee by BofA for making a balance inquiry, and $2.50 by BofA for making a cash withdrawal, and a second balance inquiry fee from BofA. (*Id.* at ¶ 183.) Ms. Covell is challenging the two balance inquiry fees charged by BofA. On June 2, 2018, Plaintiff Hicks, a BofA account holder, withdrew $20 from a Cash Depot ATM in Walmart located at 4840 Shawline Street, San Diego, California, 92111, for which she was charged a total of $7.00 in fees – $2.50 cash withdrawal fee by Cash Depot, $2.50 fee by BofA for making a balance inquiry and $2.50 by BofA for making a cash withdrawal. (*Id.* at ¶ 185.) Ms. Hicks is only challenging the balance inquiry fee. (*Id.*)

Plaintiff Schertzer seeks to represent the "California Cardtronics Class" and the "National Cardtronics Class." (*Id.* at 51-52.) Plaintiff Covell seeks to represent the "California FCTI Class" and the "National FCTI Class" (*Id.* at 52.) Plaintiff Hicks seeks to represent the "California Cash Depot Class" and the "National Cash Depot Class." (*Id.*) Each of these classes consists of:

> All holders of a checking account in California who, within the applicable statute of limitations preceding the filing of this lawsuit, were assessed one or more fees for purportedly undertaking a balance inquiry as part of a cash withdrawal at a [ATM Defendant Name] ATM (the "California [ATM Defendant Name] Class")

> All holders of a checking account in California who, within the applicable statute of limitation preceding the filing of this lawsuit, were assessed one or more fees for purportedly undertaking a balance inquiry as part of a cash withdrawal at a [ATM Defendant Name] ATM (the "National [ATM Defendant Name] Class")

*Id.* at 51-52. All three Plaintiffs seek to represent a Nationwide BofA class and a California sub-class of BofA checking account holders who were assessed one or more fees for undertaking a balance inquiry as part of a cash withdrawal at an OON ATM (*Id.* at 53.) Ms. Schertzer also seeks to represent BofA Foreign Exchange Fee classes consisting of:

> All BofA payment card accountholders who, within the applicable statute of limitations preceding the filing of this lawsuit, incurred an International Transaction Fee in excess of 3.00% on an International Transaction conducted with a Payment Card (the "National Class").

> All BofA payment card accountholders in the State of California who, within the applicable statute of limitation preceding the filing of this lawsuit, incurred an International Transaction Fee in excess of 3.00% on an International Transaction conducted with a Payment Card (the "California Class").

*Id.* at 56.

The prayer for relief seeks, amongst others, restitution, disgorgement, damages and an order enjoining Defendants from "continuing to employ unfair methods of competition and commit unfair and deceptive acts and practices alleged in this complaint." (*Id.* at 78- 79.)

On June 14, 2019, Defendants Cardtronics, Inc. ("Cardtronics"), ATM National LLC, doing business as Allpoint ("Allpoint"), FCTI, Inc., ("FCTI"), and BofA separately filed motions to dismiss. (Doc. Nos. 59, 60, 61, 66.) Plaintiffs filed their oppositions to the motions, (Doc. Nos. 76, 77, 78, 79) and Defendants filed replies, (Doc. Nos. 81, 82, 83, 84). On June 27, 2019, Defendant Cash Depot, Ltd. ("Cash Depot") also filed its motion to dismiss (Doc. No. 68). An opposition to the motion was timely filed, (Doc. No. 80) and Cash Depot filed a reply, (Doc. No. 87).

## III. LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(1) allows a party to move to dismiss based on the court's lack of subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). "[T]hose who seek to invoke the jurisdiction of the federal courts must satisfy the threshold requirement imposed by Article III of the Constitution by alleging an actual case or controversy." *City*

*of L.A. v. Lyons,* 461 U.S. 95, 101 (1983). Article III requires that: "(1) at least one named plaintiff suffered an injury in fact; (2) the injury is fairly traceable to the challenged conduct; and (3) the injury is likely to be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (quotation marks and citation omitted). Plaintiff has the burden of establishing that the court has subject matter jurisdiction over an action. *Ass'n of Med. Colls. v. U.S.*, 217 F.3d 770, 778-79 (9th Cir. 2000). "For purposes of ruling on a motion to dismiss for want of standing, both the trial judge and reviewing courts must accept as true all material allegations of the complaint and must construe the complaint in favor of the complaining party." *Maya v. Centex Corp.,* 658 F.3d 1060, 1068 (9th Cir. 2011) (quoting *Warth v. Seldin,* 422 U.S. 490, 501 (1975)). "At the pleadings stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim." *Id.* (internal citation and quotation marks omitted).

In contrast, Federal Rule of Civil Procedure 12(b)(2) allows a district court to dismiss an action for lack of personal jurisdiction. "Where defendants move to dismiss a complaint for lack of personal jurisdiction, plaintiffs bear the burden of demonstrating that jurisdiction is appropriate." *Dole Foods Co. Inc. v Watts,* 303 F.3d 1104, 1108 (9th Cir. 2002). "The court may consider evidence presented in affidavits to assist in its determination and may order discovery on the jurisdictional issues." *Doe v. Unocal Corp.,* 248 F.3d 915, 922 (9th Cir. 2011) (citing *Data Disc, Inc. v. Sys. Tech. Ass'n, Inc.,* 557 F.2d 1280 (9th Cir. 1977)).

Under Rule Federal Rule of Civil Procedure 12(b)(6) a party may bring a motion to dismiss based on the failure to state a claim upon which relief may be granted. A Rule 12(b)(6) motion challenges the sufficiency of a complaint as failing to allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007). This is because a "pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Ashcroft v. Iqbal,*

556 U.S. 662, 678 (2009) (quoting *Twombly,* 550 U.S. at 555). Ordinarily, for purposes of ruling on a Rule 12(b)(6) motion, the court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the non-moving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.,* 519 F.3d 1025, 1031 (9th Cir. 2008). The court must be able to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 556 U.S. at 663. "Determining whether a complaint states a plausible claim for relief … [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

## IV.    DISCUSSION

The court has determined that the most practical way to proceed is to group the arguments for dismissal under the Rules by which they were made.   As such, the court will first discuss the Rule 12(b)(1) motions, then the Rule 12(b)(2) motions, and finally the Rule 12(b)(6) motions.

### A. The Rule 12(b)(1) motions

BofA, FCTI and Cash Depot all move for dismissal under Rule 12(b)(1), asserting this court lacks subject matter jurisdiction because Plaintiffs have not met the Article III standing requirements.  BofA challenges whether the named Plaintiffs have standing to bring claims on behalf of a nationwide class.  Individually, FCTI argues that the injury Plaintiff Covell suffered is not fairly traceable to its challenged conduct.  (Doc. No. 61-1 at 10-14.[2])  Together, FCTI and Cash Depot argue that Plaintiffs Hicks and Covell have not sufficiently alleged any real and immediate threat of repeated injury by FCTI or Cash Depot to warrant prospective injunctive relief.  (Doc. Nos. 61-1 at 13-14, 18-19; Doc. No. 68-1 at 11-15.)

"There is no subject matter jurisdiction without standing, and the "irreducible constitutional minimum" of standing consists of three elements." *Romero v. Securus*

_____

[2] Document numbers and page references are to those assigned by CM/ECF for the docket entry.

*Technologies, Inc.,* 216 F. Supp. 1078, 1085 (2016). A plaintiff must have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robbins*, 136 S. Ct. 1540, 1547 (2016). In a class action at least one of the named plaintiffs must meet the Article III standing requirements. *Bates v. United Parcel Servs., Inc.,* 511 F.3d 974, 985 (9th Cir. 2007). Defendants' arguments implicate the second and third elements.

### 1. *Plaintiffs' Claims on Behalf of the Proposed Nationwide Class*

BofA argues that the claims of absentee class members from outside of California should be dismissed for lack of standing. (Doc. No. 66-1 at 13-14.) Defendant contends that as residents of California, Plaintiffs lack standing to invoke the laws of the other 49 states. Plaintiffs counter that their ability to represent a nationwide class can and should be addressed at class certification. (Doc. No. 77 at 10.)

In a class action "even named plaintiffs who represent a class must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent." *Lewis v. Casey*, 518 U.S. 343, 356 (1996) (citation omitted).

In *Easter,* the Ninth Circuit held that district courts can address "the issue of standing before it addresse[s] the issue of class certification." *Easter v. Am. W. Fin.,* 381 F.3d 948, 962 (9th Cir. 2004) (reasoning that examining class issues before Article III standing questions was a narrow exception carved out by the Supreme Court in *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 831 (1999) that was only applicable to mandatory global settlement classes). Following *Easter,* there is a growing trend among courts within the Northern, Eastern, and Southern Districts of California to address the issue of Article III standing at the pleading stage and dismiss claims asserted under the laws of states in which no plaintiff resides or has purchased products. *See e.g., Azimpour v. Sear, Roebuck & Co.*, Case No.: 15-CV-2798 JLS (WVG), 2017 WL 1496255, at * 11 (S.D. Cal. Apr. 26, 2017)(dismissing plaintiff's nationwide consumer protection law claims because there were no named plaintiffs "from the various state statutes listed …much less named plaintiffs who reside in

those states and actually purchased a product from Sears in reliance on its allegedly deceptive sales tactics."); *Morales v. Unilever U.S., Inc.,* Civ. No. 2:13-2213 WBS EFB, 2014 WL 1389613, at *4 (E.D. Cal. Apr. 9, 2014) (holding that because the named plaintiffs were residents of only two states and did not purchase products in any states other than their own, they did "not have standing to assert a claim under the consumer protection laws of the other states named in the Complaint.") (quoting *Pardini v. Unilever U.S., Inc.*, 961 F. Supp. 2d 1048, 1061 (N.D. Cal. 2013)); *In re Apple AT&T Antitrust Litig.*, 596 F. Supp. 2d 1288, 1309 (N.D. Cal. 2008) (granting motion to dismiss plaintiffs' consumer protection claims in all jurisdictions except where the named plaintiffs resided); *In re Ditropan XL Antitrust Litig.*, 529 F. Supp. 2d 1098, 1107 (N.D. Cal. 2007) (holding that "[a]t least one named plaintiff must have standing with respect to each claim the class representatives seek to bring"); *In re Graphics Processing Units Antitrust Lit.*, 527 F. Supp. 2d 1011, 1026 (N.D. Cal. 2007) (concluding that named plaintiffs lacked standing to bring antitrust claims under the laws of the states in which no named plaintiff resided.)[3]

_____

[3] *See also, e.g., Corcoran v. CVS Health Corp.*, Case No.: 15-CV-3504 YGR, 2016 WL 948880, at *12 (N.D. Cal. Mar. 14, 2016) (noting that "[c]ourts routinely dismiss claims where no plaintiff is alleged to reside in a state whose laws the class seeks to enforce" and dismissing claims based on the laws of states where no named plaintiff resided or made purchases); *Los Gatos Mercantile, Inc. v. E.I. DuPont De Nemours and Co.*, Case No. 13–cv–01180–BLF, 2014 WL 4774611 at *3 (N.D. Cal. Sep, 22, 2014) ("The trend in the Northern District of California is to consider Article III issues at the pleading stage in antitrust cases and to dismiss claims asserted under the laws of states in which no plaintiff resides or has purchased products."); *Pardini*, 961 F. Supp. 2d at 1061 ("Plaintiff does not have standing to assert a claim under the consumer protection laws of the other states named in the Complaint. This is a pleading defect amenable to determination prior to a motion for class certification."). *See also United Food & Commercial Workers Local 1776 & Participating Emp'rs Health & Welfare Fund v. Teikoku Pharma USA*, 74 F. Supp. 3d 1052, 1078 (N.D. Cal. 2014) (collecting cases). *But cf. In re Hydroxycut Mktg & Sales Practice Litig.,* 801 F. Supp. 2d 993 (S.D. Cal. 2011) (finding issue of appropriateness of claims brought on behalf of out-of-state class members was an issue best left for class certification stage); *In re Bayer Corp. Combination Aspirin Prods. Mktg. and Sales Practices Litig.*, 701 F. Supp. 2d 356 (E.D.N.Y. Mar. 30, 2010) (explaining that "whether

The court agrees with the persuasive authority discussed above and holds that in order to have Article III standing to bring claims for conversion and breach of contract, including the covenant of good faith and fair dealing, the named plaintiffs must have been charged the OON balance inquiry fee in the state under whose laws they seek to bring the claims. Further, the court concurs that it is appropriate to rule on the standing issue at the dismissal stage. Here, all three plaintiffs reside in California and are asserting breach of contract and conversion claims without specifying which state laws are in play; the breach of contract claim references "under the laws of the states where BofA does business, good faith is an element of every contract" (SAC at ¶¶ 299, 343) and the claims for conversion is silent.[4] (*See generally, id.* at ¶¶ 325-336, 355-366.) Accordingly, the motion to dismiss the claims brought on behalf of a nationwide class is **GRANTED**.

### 2. *Plaintiff's Injury Fairly Traceable to the Challenged Conduct of the Defendant*

FCTI asserts the claims brought against it should be dismissed because the fees at issue are not charged by FCTI, rather the cardholder pays the card-issuing bank the OON ATM fees for balance inquiries and cash withdrawal fees. (Doc. No. 61-1 at 10-14.) In support of its position, FCTI points to the allegations in the SAC, where Plaintiff Covell admits she paid BofA directly for the use of FCTI's ATMs. Additionally, FCTI argues that the mere existence of a commercial agreement between it and a network provider "by which it is compensated when customers use its machines for transactions is not

the named plaintiffs have standing to bring suit under each of the state laws alleged is 'immaterial' because they are not bringing those claims on their own behalf, but are only seeking to represent other, similarly situated consumers in those states.").

[4] Plaintiffs' failure to identify the applicable law in their conversion claims (twelfth and fourteenth claims) and in the conversion claims against BofA are, therefore, deficient and could potentially provide alternative grounds for dismissal. *See, e.g., In re Samsung Galaxay Smartphone Marketing & Sales Practice Litig.,* Case No. 16-cv-6391-BLF, 2018 WL 1576457, at *4 (N.D. Cal. Mar. 30, 2018).

independently actionable." (Doc. No. 61-1 at 11.) Covell counters that FCTI interprets Article III too narrowly and claims that in asking for restitution in the way of disgorgement of the interchange fees and an injunction, she has adequately alleged an injury for which relief is available. (Doc. No. 76 at 10-12.)

"To survive a motion to dismiss for lack of constitutional standing, plaintiffs must establish a 'line of causation' between defendants' action and their alleged harm that is more than 'attenuated.'" *Maya,* 658 F.3d at 1070. In other words, the causation requirement is only that "the injury is fairly traceable to the challenged action of the defendant." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000)). The "'causal chain' does not fail simply because it has several links, provided those links are not hypothetical or tenuous and remain plausible." *Wash. Envtl. Council v. Bellon*, 732 F.3d 1131, 1141–42 (9th Cir. 2013).

Here, Covell has alleged that FCTI's ATM's deceptive screen prompts tricked her into performing two balance inquiries. (*See* SAC at ¶¶ 7, 86-112.) After Covell had performed the balance inquiry, she opted to continue her transaction. (*Id.*) It is alleged that FCTI informed BofA that Covell performed a second balance inquiry by either equating her consent to receive a receipt for her cash withdrawal as a second balance inquiry or miscommunicated to BofA regarding the second inquiry. (*Id.* at 114.) Either way, BofA, in turn, then charged Covell for both transactions. (*Id.* at 113.) These allegations sufficiently allege how Cowell was injured and trace the injury to the conduct of FCTI. Accordingly, the court concludes that Plaintiff Covell has met the causation requirement. As a consequence, FCTI's motion to dismiss on this ground is **DENIED.**

### 3. *Plaintiffs' Standing to Seek Prospective Injunctive Relief*

Defendant Cash Depot moves to dismiss Plaintiff Hicks' claims for injunctive relief for alleged violations of the CLRA, UCL and FAL under Federal Rule of Civil Procedure 12(b)(1), contending that Hicks lacks standing to seek prospective injunctive relief because she has not demonstrated a likelihood that she will suffer a repeated injury by Cash Depot's alleged conduct. (Doc. No. 68-1 at 11-15.) Defendant FCTI seeks dismissal of Covell's

UCL claim on similar grounds. (Doc. No. 61-1 at 18-19.) Both Hicks and Covell contend that they can properly seek injunctive relief that is public in nature and that they have adequately alleged a repeated injury because they "will continue to pay unreasonably excessive amounts of money for banking services." (Doc. No. 76 at 10-11; Doc. No. 80 at 15-16.)

In order to have standing to seek prospective relief a plaintiff must "demonstrate that he has suffered or is threatened with a concrete and particularized legal harm, coupled with a sufficient likelihood that he will again be wronged in a similar way." *Bates,* 511 F.3d at 985 (internal quotation marks and citation omitted). The likelihood of repetition of the wrong requirement is met by plaintiff establishing a "real and immediate threat of repeated injury." *Id.*; *see also Ervine v. Desert View Reg'l. Med. Ctr. Holdings, LLC.*, 753 F.3d 862, 868 (9th Cir. 2014) (Article III standing to seek injunctive relief is determined by the "imminent prospect of future injury.") (citations omitted). But, while past wrongs alone are insufficient to grant standing, they are "evidence bearing on whether there is a real and immediate threat of repeated injury." *Lyons,* 461 U.S. at 102 (internal quotation marks omitted). In cases where standing is premised entirely on the threat of repeated injury, a plaintiff must demonstrate "a sufficient likelihood that he will again be wronged in a similar way." *Id.* at 111.

In *Davidson v. Kimberly Clark,* 889 F.3d 956, 969 (2018), the Ninth Circuit held that "a previously deceived consumer may have standing to seek an injunction against false advertising or labeling, even though the consumer knows or suspects that the advertising was false at the time of the original purchase, because the consumer may suffer an actual or imminent, not conjectural or hypothetical threat of future harm." *Davidson,* 889 F.3d at 969 (citing *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009)). The court provided further insight as to what types of allegations would suffice to successfully allege the requisite threat of actual or immediate future harm, elucidating that such harm "may be the consumer's plausible allegations that she will be unable to rely on the product's advertising or labeling in the future, and so she will not purchase the product although she would like

to" or that "she might purchase the product in the future, despite the fact that it was once marred by false advertising or labeling, as she may reasonably, but incorrectly assume the product was improved." *Id.* (internal quotation marks and citations omitted).

Here, Hicks alleges that as a result of Cash Depot's violation of the UCL regarding its representations surrounding ATM fees, "Plaintiffs and members of the public have paid, and/or will continue to pay, unreasonably excessive amounts of money for banking services and thereby have suffered and will continue to suffer actual damages." (SAC at ¶ 238.) It is also alleged that Hicks and members of the public "read the unavoidable representation at Cash Depot's ATM machine and were subsequently deceived into engaging in a balance inquiry as they proceed to their ultimate cash withdrawal transaction and, as a result, they have lost money." (*Id.* at ¶ 279.) The SAC alleges Cash Depot "continues to violate the CLRA and continues to injure the public by using the false, deceptive, and misleading advertising on its Cash Depot ATM machines…" with Hicks seeking "injunctive relief on behalf of the general public to prevent Cash Depot from continuing to engage in such deceptive and illegal practices." (*Id.* at ¶¶ 290, 291.) Further, the SAC also alleges it is because of FCTI's purported UCL violations and the resulting double charging and deceptive ATM screen prompts, Covell "and members of the Class have paid, and/or will continue to pay, unreasonably excessive amounts of money for banking services and thereby have suffered and will continue to suffer actual damages." (*Id.* at ¶ 247.)

The FAL claim against Cash Depot makes similar allegations regarding the advertising on the ATM machines which states: "Avoid Overdraft Fees Check Your Balance for Free." *See id.* at ¶¶ 275-279. Notwithstanding this representation, Hicks alleges Cash Depot knows a balance inquiry is not free because it "collects an interchange fee from customers' financial institutions for each balance inquiry" that is conducted at a Cash Depot ATM. (*Id.* at ¶ 280.) It is alleged that because of this misleading and false advertisement, Hicks and class members have "suffered injury in fact and have lost money in the form of Balance Inquiry Fees." (*Id.* at ¶ 281.) Similarly, the CLRA claim against Cash Depot is based off the same advertisement and Hicks' incurrence of OON Balance

14

Inquiry Fee from BofA "despite Cash Depot's explicit advertisement that consumers can check their available balance for 'free.'"  (*Id.* at ¶¶ 288-290.)

Presuming the truth of Plaintiffs' allegations and construing the allegations in their favor, the court concludes Plaintiffs have failed to adequately allege an actual or imminent risk of future harm.  Neither Hicks nor Covell have expressly alleged that they intend to use either an FCTI or Cash Depot ATM in the future to make a balance inquiry knowing the information that they now know.  Simply using "have paid and/or will continue to pay" in the complaint in relation to the UCL claims does not demonstrate an "actual and imminent, not conjectural or hypothetical threat of future harm." *Davidson*, 998 F.3d 969-70.  More specific plausible allegations are required under the standard suggested by *Davidson.  See id.*  Neither are the allegations sufficient to state claims for violation of the FAL or CLRA. Therefore, Plaintiffs Hicks and Covell do not have standing to seek injunctive relief.  Accordingly, the motions to dismiss the claims for injunctive relief under the UCL, FAL and CLRA are **GRANTED** with leave to amend.

### B. The Rule 12(b)(2) Motions

Allpoint moves for dismissal under Rule 12(b)(2) contending that the court lacks both general and specific jurisdiction over it.  (Doc. No. 60-1.)[5]  Specifically, Allpoint contends that specific jurisdiction is lacking because Allpoint was not involved in the transactions alleged in the lawsuit and general jurisdiction is absent because it is a Delaware corporation which is headquartered in Maryland, and it neither owns or operates any ATMs nor interacts with customers.  (*Id.* at 10-14.)  Relatedly, Allpoint asserts that Plaintiffs have not established any facts that would permit them to pierce the corporate veil and hold Allpoint responsible for the alleged acts of Cardtronics.  (*Id.* at 14-15.)  BofA also asserts a lack of personal jurisdiction argument under Rule 12(b)(2), claiming the absentee

---

[5] In the alternative, Allpoint joins Cardtronics' motion to dismiss.  (Doc. No. 60-1 at 15.)

nationwide class members lack any connection to California. (Doc. No. 66-1 at 14-16.) The court will address each of the Defendants' arguments in turn.

"The Due Process Clause of the Fourteenth Amendment constrains a State's authority to bind a non-resident defendant to a judgment of its courts." *Walden v. Fiore*, 134 S. Ct. 1115, 1121 (2014). Any judgment rendered by a court that lacks personal jurisdiction over a defendant is void. *Ruiz v. Snohomish Cnty. Pub. Util. Dist. No. 1,* 824 F.3d 1161, 1164 (9th Cir. 2016). Thus, a court's power to exercise jurisdiction over a non-resident defendant is limited by two independent constraints, namely the applicable state personal jurisdiction statute and the constitutional principles of due process. *Sher v. Johnson*, 911 F.2d 1357, 1361 (9th Cir. 1990); *see also In re W. States Wholesale Natural Gas Antitrust Litig*., 715 F.3d 716, 741 (9th Cir. 2013) ("[p]ersonal jurisdiction over a nonresident defendant is proper if permitted by a state's long-arm statute and if the exercise of that jurisdiction does not violate federal due process."). "Under California's long-arm statute, California state courts may exercise personal jurisdiction 'on any basis not inconsistent with the Constitution of this state or of the United States.'" *Daimler AG v. Bauman*, 571 U.S. 117, 125 (2014) (quoting Cal. Civ. Proc. Code Ann. § 410.10 (West 2004)). Thus, "the jurisdictional analyses under state law and federal due process are the same." *Schwarzenegger v. Fred Martin Motor Co*., 374 F.3d 797, 800-801 (9th Cir. 2004).

To exercise personal jurisdiction over an out-of-state defendant under the Due Process Clause of the Fourteenth Amendment, the defendant must have "certain minimum contacts with [the State] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 923 (2011) (quoting *Int'l Shoe Co. v. Wash.*, 326 U.S. 310, 316 (1945) (internal quotations omitted)). This minimum contact jurisdiction may be either "general or all-purpose jurisdiction," or "specific or case-linked jurisdiction." *Id*. at 919 (citing *Helicopteros Nacionales de Colombia S.A. v. Hall*, 466 U.S. 408, 414 (1984)).

///

///

### 1. Jurisdiction in Relation to Allpoint

For the court to exercise general jurisdiction over Allpoint, its contacts with California must be "so continuous and systematic as to render [it] essentially at home [here]." *Daimler AG,* 571 U.S. at 139. In order to establish specific jurisdiction, Plaintiffs must demonstrate that Allpoint "has purposefully directed [its] activities at residents of the forum, and the litigation results from alleged injuries that arise out of or relate to those activities."[6] *Avocent Huntsville Corp v. Aten Intern. Co.*, 552 F.3d 1324, 1330 (Fed. Cir. 2008) (quoting *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 476-78 (1985) (internal quotations and citations omitted)). Here, because the motion to dismiss for lack of jurisdiction is based on affidavits and documents, Plaintiffs are required to make a prima facie showing that Allpoint is subject to jurisdiction in California. *See Pebble Beach Co. v. Caddy,* 453 F.3d 1151, 1154 (9th Cir. 2006); *Schwarzenegger,* 374 F.3d at 800. The uncontroverted allegations in the complaint must be taken as true and factual conflicts must be resolved in Plaintiff's favor. *Marvix Photo, Inc. v. Brand Techs., Inc.,* 647 F.3d 1218,

---

[6] The Ninth Circuit uses a three-prong test to determine whether a non-resident defendant is subject to specific personal jurisdiction: (1) [t]he non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws; (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable. *Schwarzenegger*, 374 F.3d at 802. The plaintiff bears the burden of satisfying the first two requirements and if successfully met, the "burden then shifts to the defendant to 'present a compelling case' that the exercise of jurisdiction would not be reasonable." Id. at 801-802. The first prong of the test includes both purposeful availment and purposeful direction and "may be satisfied by purposeful availment of the privilege of doing business in the forum; by purposeful direction of activities in the forum; or by some combination thereof." *Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1206 (9th Cir. 2006).

1223 (9th Cir. 2011); *Harris v. Rutsky & Co. Ins. Servs. v. Bell & Clements Ltd.,* 328 F.3d 1122, 1129 (9th Cir. 2003) (citations omitted).

The SAC contains a singular paragraph that directly references Allpoint, wherein Plaintiffs alleges:

> Defendant ATM National, LLC is wholly owned subsidiary of Cardtronics and operates over 37,000 ATMs worldwide, including machines within the State of California and in this judicial district. ATM National is a Maryland Limited Liability Company.

SAC ¶ 189.

In support of its motion, Allpoint has submitted a declaration from Brad Nolan, the Executive Vice President of Allpoint Solutions. (Doc. No. 60-2.) Nolan declares that ATM National, LLC does business under the trade name "Allpoint" and that Allpoint is a wholly owned subsidiary of Cardtronics. (*Id.* at ¶¶ 1-3.) Allpoint is organized under the laws of Delaware and headquartered in Bethesda, Maryland and has no officers or employees in California. (*Id.* at ¶ 2.) Nolan also declares that Allpoint "maintains a network of about 55,000 surcharge-free ATMs domestically and internationally which connects ATMs (owned by third parties) with ATM processors and financial institutions." (*Id.* at ¶ 4.) In addition, Nolan declares that Allpoint does not transact business directly with or provide ATM services to consumers, does not design ATM screens other than as it might relate to branding, and that Allpoint contracts with ATM owners to "add" ATMs to its network. (*Id.* at ¶¶ 6, 8, 9.) Further, Nolan declares that the ATMs referenced in the complaint are not on Allpoint's ATM network and the three transactions performed by Plaintiffs did not use or pass through Allpoint's network. (*Id.* at ¶¶ 11-15.) Moreover, Nolan states that Allpoint has "no signage, branding, or any relationship whatsoever with these ATMs." (*Id.* at ¶ 16.) Finally, Nolan attests that Allpoint earned no revenue from the three ATMs identified in the SAC, and that "Allpoint was not involved in any ATM transaction of the three Plaintiffs alleged in the Second Amended Complaint." (*Id.* at ¶ 18.)

In opposition, Plaintiffs allege that Allpoint's motion is "much ado about nothing," premised on a scrivener's error because the SAC mistakenly identifies the wrong ATM and the wrong amount Schertzer allegedly withdrew from an ATM. (Doc. No. 79 at 8.) According to Plaintiffs, the ATM located inside CVS Pharmacy at 645 Market Street in San Diego, CA where Schertzer actually withdrew $20.00 is within the Allpoint network and operated by Cardtronics. Along with their response, Plaintiffs have attached a declaration from Todd D. Carpenter, counsel for Plaintiffs, (Doc. No. 79-1); a copy of email between Carpenter and Allpoint's counsel informing counsel that Plaintiff Schertzer's ATM transaction was performed at the 645 Market St. address (Doc. No. 79-2 at 2); a copy of Allpoint's ATM webpage locator, identifying the CVS Pharmacy at 645 Market Street as being on the Allpoint Network (*Id.* at 4); a copy of Allpoint's ATM webpage locator, identifying 304 Allpoint ATM locations within 50-miles of San Diego, CA and 1135 Allpoint ATM locations within 100-miles of San Diego, CA (*Id.* at 7); a copy of Cardtronic's ATM webpage locator, identifying the CVS Pharmacy at 645 Market Street as being a Cardtronics ATM that is on the Allpoint Network (Doc. No. 79-2 at 10); a copy of Allpoint's website describing Allpoint's "ATM Services for Financial Institutions" (*Id.* at 12-13); and a copy of Allpoint's webpage providing a visual graphic of Allpoint's retail-based ATMs throughout the world (*Id.* at 16-17.) Carpenter declares:

> the true and correct address for the ATM that Plaintiff Kristen Schertzer withdrew money from on June 1, 2018 and on other occasion, was located at **645 Market Street, San Diego, California 92101** and the true and correct amount of money the Plaintiff Schertzer withdrew was $20.00.

> the location of the ATM that Plaintiff Kristen Schertzer withdrew money from on June 1, 2018 and on other occasions was not raised as a potential personal jurisdiction issue or otherwise discussed. Accordingly, Plaintiff's undersigned counsel overlooked the scrivener's error related to ATM address in the FAC and it was not corrected when Plaintiffs submitted the "[Proposed] Second Amended Class Action Complaint" in conjunction with the Parties' joint motion that was filed…

On May 31, 2019, Plaintiffs filed their SAC, which still had incorrect address-817 West Washington Street, San Diego, CA 92103 – for the ATM that Plaintiff Kristen Schertzer withdrew money from on June 1, 2018 and on other occasion.

(Doc. No. 79-1 at ¶¶ 7, 9, 11.)

The court cannot ignore Plaintiffs' concession that the SAC incorrectly states that the ATM used by Schertzer was located at 817 West Washington Street. Plaintiffs do not dispute that the West Washington ATM is not on the Allpoint network or that it is neither owned nor operated by Cardtronics. The purported scrivener error cannot be overlooked because it is the foundational allegation from which all of Schertzer's ATM related claims are predicated and the court cannot simply read into the SAC allegations which are not contained within it. *See, e.g., Rojas v. Portfolio Recovery Assocs., LLC,* Case No. CV 16-9439 FMO (SSx), 2017 WL 2999030, at *2 (C.D. Cal. June 7, 2017) ("an opposition is not part of a plaintiff's pleadings"); *Barbera v. WMC Mortgage Co.,* No C 04-3738, 2006 WL 167632, at *2 n.4 (N.D. Cal. Jan. 19, 2006) ("It is axiomatic that the complaint may not be amended by briefs in opposition to a motion to dismiss.") (quoting *Car Carriers, Inc. v. Ford Motor Co.,* 745 F.3d 1101, 1107 (7th Cir. 1984)); *Van Buskirk v. Cable News Network, Inc.*, 282 F.3d 977, 980 (9th Cir. 2002) ("Ordinarily, a court may look only at the fact of the complaint to decide a motion to dismiss.").

Additionally, the court notes that the singular paragraph in the SAC that references Allpoint is insufficient to suggest that it was engaged in the conduct alleged in the SAC. The SAC is completely devoid of any facts regarding Allpoint, it does not tie Allpoint to any of the ATMs mentioned in the SAC or the ATM transactions, and Plaintiffs' attempts to simply reference allegations made against Cardtronics, Allpoint's parent company, are not imputed to Allpoint as currently and plausibly alleged. In sum, there are no allegations in the SAC linking any conduct on the part of Allpoint to Plaintiffs or the events described in the SAC. Moreover, Nolan's declaration (Doc. No. 60-2) categorically denies that three ATMS referenced in the SAC are on Allpoint's network, and that Allpoint had any

relationship whatsoever with them. (*Id.* at ¶¶ 11-16.) Further, Nolan's averment that "Allpoint was not involved in any ATM transaction of the three Plaintiffs alleged in the SAC," (*id.* at ¶ 18), was not contradicted by Plaintiffs.

Accordingly, given the current state of the pleadings, it is this court's view that it "would offend traditional notions of fair play and substantial justice," *Goodyear*, 564 U.S. at 923 (quoting *Int'l Shoe*, 326 U.S. at 316 (internal quotations omitted), if Allpoint were to be subject to the jurisdiction of this court.[7]  *See McNack v. Smith*, Case No. 2:15-cv-04810-CAS(SPx), 2015 WL 7302218, at *5 (C.D. Cal. Nov. 16, 2015) (*"*without any allegations suggesting that either Smith or Mehta in some way participated or were involved in the conduct alleged in the complaint, the Court cannot find that it has personal jurisdiction over either of these defendants.") Accordingly, Allpoint's motion to dismiss for lack of jurisdiction is **GRANTED** with leave to amend.

### 2. Jurisdiction in Relation to BofA

As it is undisputed that BofA is headquartered and has its principal place of business in North Carolina, the only way for the court to exercise jurisdiction is via specific jurisdiction.

Relying on *Bristol-Myers Squibb v. Superior Court of California, San Francisco County,* 137 S. Ct. 1773 (2017), BofA argues that "none of the claims of absentee class

_____

[7] Having determined that this court lacks jurisdiction over Allpoint, the court declines to address Allpoint's alternate arguments for dismissal, namely failure to allege a basis to pierce the corporate veil. However, the court notes that a singular, conclusory paragraph, unsupported by facts, *see* SAC at ¶ 189, is not sufficient as a matter of law to warrant holding a subsidiary liable for actions of its parent. *See, e.g., Weiland Sliding Doors & Windows, Inc. v. Panda Windows & Doors, LLC,* No. 10CV677 JLS (MDD), 2011 WL 3490471, at *2 (S.D. Cal. Aug. 10, 2011) (insufficient facts alleged for the court to infer that piercing the corporate veil was proper.); *Pantoja v. Countrywide Home Loans, Inc*., 640 F. Supp. 2d 1177,1192 (N.D. Cal. 2009) ("It is the general rule that a parent corporation and its subsidiary will be treated as separate legal entities."); *Monaco v. Liberty Life Assurance Co.,* No. C06-07021, 2007 WL 1140460, at *4 (N.D. Cal. Apr. 17, 2007) ("conclusory allegation of alter-ego status are not sufficient.").

members from outside of California arise from, or relate to, Bank of America's contacts with California."  (Doc. No. 66-1 at 15.)  It is BofA's position that if the Rule 23 class action claim by the non-Californians is allowed to proceed when it could not be prosecuted by individual claimants, then BofA would be deprived of substantive defenses, such as due process protections.

In *Bristol-Myers,* a nationwide group of consumers, mostly non-California residents, sued the pharmaceutical company Bristol-Myers Squibb in California state court, alleging it's drug, Plavix, had damaged their health.  While the California Supreme Court held California courts had specific jurisdiction to entertain the nonresidents' claim, the Supreme Court reversed, holding "for a court to exercise specific jurisdiction over a claim, there must be an 'affiliation between the forum and the underlying controversy, principally, an activity or an occurrence that takes place in the forum State.'"  *Bristol-Myers*, 137 S. Ct. at 1781 (quoting *Goodyear*, 564 U.S. at 919).  The Court determined "[t]he mere fact that *other* plaintiffs were prescribed, obtained, and ingested Plavix in California – and allegedly sustained the same injuries as did the nonresidents-does not allow the State to assert specific jurisdiction over the nonresidents' claims."  *Id.*  As the 595 nonresident plaintiffs did not "claim to have suffered harm in" California and the "conduct giving rise to [their] claims occurred elsewhere," the Court held "the California courts cannot claim specific jurisdiction over the nonresident claims."  *Id.* at 1782.  Justice Sotomayor in dissent, noted that the majority's decision "does not confront the question of whether the decision would also apply to a class action in which a plaintiff injured in the forum State seeks to represent a nationwide class of plaintiffs, not all of whom were injured there."  *Id.* at 1789 n.4 (Sotomayor, J., dissenting).

The court does not find BofA's argument for applying *Bristol-Myers* in the class action context persuasive as the Supreme Court's holding concerned a state court mass tort action against a corporation engaged in a nationwide course of conduct, not, as here, a class action filed in federal court.  While the Ninth Circuit has yet to address this issue, the reasoning of a majority of cases within the Circuit counsels against *Bristol-Myers* applying

to class actions.  *See, e.g., Cabrera v. Bayer Healthcare, LLC,* Case No. LA CV17-08525 JAK (JPRx), 2019 WL 1146828, at *7-8 (C.D. Cal. Mar. 6, 2019) (collecting cases).  In so finding, courts have focused on the fact that the claims of unnamed class members are not implicated in the question of specific jurisdiction in class actions and the additional due process safeguards provided by Federal Rule of Civil Procedure 23 in the class action context.  For example, in *Fitzhenry-Russell v. Dr. Pepper Snapple Grp., Inc.,* No. 17-cv-564 NC, 2017 WL 4224723, (N.D. Cal. Sept. 22, 2017), the court considered the differences between a mass tort action and a class action, explaining that in a mass tort action, like the one in *Bristol-Myers,* each plaintiff was a real party in interest to the complaints, whereas in a putative class action, one or more plaintiffs seeks to represent others similarly situated, but it is only the "named plaintiffs" who are actually named in the complaint.  *Fitzhenry-Russell*, 2017 WL 4224723, at *5.  After acknowledging that over 88% of the putative class members were non-California residents, the court noted that "nonnamed class members … may be parties for some purposes and not for others.  The label 'party' does not indicate an absolute characteristic, but rather a conclusion about the applicability of various procedural rules that may differ based on context." *Id.* (quoting *Devlin v. Scardelletti,* 536 U.S. 1, 9-10 (2002)).  The court held that plaintiffs were still the "masters of their complaint" and that *Bristol Myers* did not extend to the class action context.  *Id.*  Similarly, in *In re Morning Song Bird Food Litig.*, No. 12CV01592 JAH-AGS, 2018 WL 1382746, (S.D. Cal. Mar. 19, 2018), the court declined to extend the holding of *Bristol-Myers* to the area of class actions finding, "[w]hile the claims of the non-resident named plaintiffs were pertinent to the issue of specific jurisdiction in *Bristol-Myers*, 'claims of unnamed class members are irrelevant to the question of specific jurisdiction.'"  *In re Morning Song Bird Food Litig.*, 2018 WL 1382746, at *5 (quoting *AM Trust v. UBS AG,* 78 F. Supp. 3d 977, 986 (N.D. Cal. 2015).  Moreover, in another detailed opinion, the court in *Allen v. ConAgra Foods, Inc.,* Case No. 3:13-cv-01279-WHO, 2018 WL 6460451, (N.D. Cal, Dec. 10, 2018), reasoned that *Bristol-Myers* does not require a personal jurisdiction inquiry for absent class members, concluding the Supreme

Court "could not have intended, in a sideways manner, to so drastically alter class action plaintiffs' ability to choose their forum. *Allen,* 2018 WL 6460451, at \*7.  Additionally, the court noted how the functional differences of Rule 23 requirements set class actions apart and, like personal jurisdiction, it is rooted in fairness to the defendant and "provides significant safeguards to that end." *Id.*

The court agrees with the persuasive reasoning of its sister courts.  Absent controlling authority to the contrary, the court, therefore, declines to extend *Bristol-Myers* to the class action arena.  Accordingly, BofA's motion to dismiss the claims of the putative non-California class members for lack of personal jurisdiction is **DENIED.**

## C. Motions to Dismiss Under Rule 12(b)(6)

All Defendants have moved for dismissal under Federal Rule of Civil Procedure 12(b)(6) contending that Plaintiffs have failed to plead the necessary elements of their asserted claims.  Some of the arguments made by BofA apply exclusively to the breach of contract and related breach of the implied covenant of good faith and fair dealing claims brought against it.  Because the Rule 12(b)(6) arguments made by each of the ATM Defendants are substantially similar, if not identical, the court will consider them together.  Where appropriate, the court will also consider BofA's arguments in conjunction with those made by the ATM Defendants.[8]

### 1. *Breach of Contract Claim Related to the Assessment of OON Fees for Balance Inquiry Fees*

BofA seeks dismissal of the breach of contract claim, contending that the terms and conditions of the contract specifically undermine all of Plaintiffs' allegations.  (Doc. No. 66-1 at 16-19.)  In opposition, Plaintiffs focus on whether they actually "knowingly"

---

[8] The court notes that Mr. Carpenter's admission that the SAC mistakenly identifies the wrong ATM and the wrong amount Plaintiff Schertzer allegedly withdrew from an ATM, (Doc. No. 79 at 8), provides an additional ground for dismissal of the claims against Cardtronics.

requested or were "lured" into performing balance inquiries before withdrawing cash, (*see* Doc. No. 77 at 14-15), pointing to the confusing screen prompts on ATMs operated by Cardtronics, Cash Depot and FCTI. For the breach of contract inquiry, Plaintiffs' contention misses the mark because regardless of how they were induced, once Plaintiffs selected yes on the ATM screens balance inquiries were performed.[9] The relevant question is, therefore, whether the contract documents provide for the charging of the OON balance inquiry fees.

In California, to successfully bring a breach of contract claim "a plaintiff must show: (1) the existence of a contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to the plaintiff." *Oasis W. Realty, LLC v. Goldman*, 51 Cal. 4th 811, 821 (2001). The determination as to whether a contract is or is not ambiguous is a question of law for the court. *Han v. Mobil Oil Corp.*, 73 F.3d 872, 877 (9th Cir. 1995). "A contract or a provision of a contract is ambiguous if it is reasonably susceptible of more than one construction or interpretation." *Castenada v. Dura-Vent Corp¸* 648 F.2d 612, 619 (9th Cir. 1981).

Here, Plaintiffs allege that BofA's Agreement indicates that it "will not assess an additional OON Fee for a balance inquiry undertaken in conjunction with a cash withdrawal and that not more than one OON Fee will be assessed for a single ATM usage and that no fee for a balance inquiry will be assessed without the knowing authorization of the accountholder." (SAC at ¶ 295.) Plaintiffs endeavor to parcel cash withdrawals, viewing an account balance and receiving a receipt at the end as "*accoutrements,*" "not

---

[9] Covell's claim that she was charged for a second balance inquiry appears to be a singular allegation relating to Covell only, and not class wide. The claim is dismissed but, the allegations regarding the second balance inquiry should be addressed in and clarified further in the third amended complaint.

reasonably understood as a stand-alone ATM "use." (Doc. No. 77 at 16.)[10]  It is Plaintiffs' position that:

> Read reasonably, the phrase "$2.50 each: in the fee schedule refers to the fee itself, *i.e.,* "each" fee costs $2.50.  The word "each" does not define what gives rise to OON Fees and certainly never says that a new $2.50 fee will be charged for each withdrawal, transfer or balance inquiry undertaken as part of the *same* ATM use.

(Doc. No. 77 at 16.)

Contrary to Plaintiffs' assertions, the Fee Schedule clearly provides notice that a BofA account holder will be charged $2.50 for **each** withdrawal, transfer and balance inquiry at an OON ATM.  *See* Fee Schedule at 10.  Further, in the Important Information section accompanying the fees breakdown the account holder is also informed that they "may also be charged a fee by the ATM operator or any network used and you may be charged a fee for a balance inquiry even if you do not complete a funds transfer." *See* Fee Schedule at 10.  This additional wording has provided notice to the Plaintiffs that a balance inquiry fee may be assessed without a transfer or withdrawal taking place.  Coupled with this is the language of the Agreement itself that clearly states that when OON ATMs are used, card holders "may be charged a fee by the ATM operator or any network used and you may be charged a fee for a balance inquiry even if you do no complete a fund transfer. We may also charge you fees." (Agreement at 12.)  The court finds no ambiguity in the Agreement's meaning because only one interpretation of the fee disclosures reasonably makes sense.  *See Castenada¸*648 F.2d at 619; *Am. Alt. Ins. Corp. v Super. Ct*., 135 Cal. App. 4th 1239, 1245-46 (2006) ("if contractual language is clear and explicit and does not involve an absurdity, the plain meaning governs.").

---

[10] Plaintiffs' reliance on *Smith v. Fifth Third Bank,* Case No, 1:18-cv-464, is misplaced because that case involved the imposition of $2.75 fee for balance inquiries when the term "transaction" was undefined and ambiguous and did not definitively include balance inquiries.  Here, the Fee Schedule clearly includes balance inquiries.

19cv264 JM(MSB)

Implicit in Plaintiffs' argument is the suggestion that BofA was required to provide notice on the ATM screen of the balance inquiry fee and receive Plaintiffs' authorization via an ATM screen prompt, yet the court knows of no authority requiring such an obligation and Plaintiffs have provided none. *See* 12 C.F.R. 205.15; *see generally Azose v. Washington Mut. Bank,* 588 F. Supp. 2d 366, 373, n.2 (E.D.N.Y. 2008) (holding that under Regulation E ATM operators are not required to provide notice to card-issuing bank customers of the bank's assessment of fee for a balance inquiry made on the operator's ATM, nor did card-issuing bank have obligation to provide such notice.)

Accordingly, the court **GRANTS** BofA's motion to dismiss the breach of contract claim related to the assessment of OON Fees, with leave to amend.

> ### i. Breach of Implied Covenant of Good Faith and Fair Dealing Claim Related to the Assessment of OON Fees for Balance Inquires

The implied covenant of good faith and fair dealing is present in all contracts. *Marsu B.V. v. Walt Disney Co.,* 185 F.3d 932, 937 (9th Cir. 1999). "In essence, the covenant is implied as a *supplement* to the express contractual covenants, to prevent a contracting party from engaging in conduct which (while not technically transgressing the express covenants) frustrates the other party's rights to the benefits of the contract." *Love v. Fire Ins. Exch.*, 221 Cal. App. 3d 1136, 1153 (1990) (emphasis in original).

Here, Plaintiffs have not established a claim for breach of the implied covenant of good faith and fair dealing. They have not pled this as a separate count and it exists only as part of their breach of contract claim. Plaintiffs simply allege that "BofA has breached the covenant of good fair dealing in their [sic] standardized account agreements through their OON Fee policies and practices as alleged herein." (SAC at ¶ 301.)

Having based their implied covenant claim on essentially the same allegations as the breach of contract claim, this claim cannot stand independently. In their opposition, Plaintiffs attempt to create ambiguity in the terms of the contract by focusing on the use of the word "may" in the Agreement. But this argument is not persuasive. The court views

27

this language as simply vesting in BofA the discretion to charge a fee if it so chooses. The Agreement clearly states that when using an OON ATM, customers "may be charged a fee by the ATM operator or any network operator" for a balance inquiry" even if a funds transfer is not completed and also warns that BofA "may" also charge fees. (*See* The Agreement at 35.) Further, the Fee Schedule sets forth OON ATM Fees for withdrawals, transfers and balances inquires in the amount of $2.50 each. (*See* Fee Schedule at 10.) Rather than reading something nefarious into the use of this language, the court views these statements as two instances where Plaintiffs have been given clear warnings regarding the possible imposition of balance inquiry fees.

Accordingly, the court **GRANTS** BofA's motion to dismiss the implied covenant of good faith and fair dealing claim related to the assessment of OON Fees, with leave to amend.

### 2. Breach of Contract Claim Arising from Overcharging for International Transaction Fees

BofA seeks dismissal Schertzer's breach of contract claims that are premised on her "rounding claims" on the grounds that they also fail to state claims. Specifically, BofA contends that neutral rounding of international transaction fees is reasonable and comports with the terms of its Agreement with Schertzer. (Doc. No. 66-1 at 23-25.)

Schertzer alleges "BofA breached its contract and deceived its customers when it assessed International Transaction Fees in excess of 3.00% due to the Bank's uniform rounding practice." (SAC at ¶ 172.) Specifically, it is alleged that BofA charges

> "in excess of 3.00% on approximately half of all international payment card transactions," by "systematically round[ing] up International Transaction Fee amounts" and that this "systematic, automated, rounding practice ensures that BofA charges foreign transaction fees in amounts greater than the 3.00% contractual limit and in some cases up to 5% of the transaction amount."

(*Id.* at ¶¶ 170, 171.)

For example, rather than having paid the 5.26% surcharge, or $0.01, assessed, Schertzer claims that BofA should have waived the international fee "in order to avoid

exceeding the maximum permissible fee of 3.00%, BofA is required to round down when calculating the fee." (*Id.* at ¶¶ 171, 174.)

Schertzer includes a chart of the dates she was allegedly overcharged the international transaction fee on 18 transactions, $0.01for each of the eighteen transactions listed for an amount totaling $0.18. (*Id.* at 47, 48). In order to provide a complete picture, the court has determined what the actual pre-rounding amount would have been.

| Transaction Date | Purchase Amount | Int'l Transaction Fee Assessed | Actual Amount Owed Pre-Rounding | Total % of Int'l Transactional Fee |
|---|---|---|---|---|
| 07/02/18 | $13.22 | $0.04 | **$0.3966** | 3.03% |
| 07/02/18 | $6.61 | $0.02 | **$0.1983** | 3.03% |
| 07/02/18 | $18.50 | $0.56 | **$0.555** | 3.03% |
| 07/02/18 | $6.61 | $0.20 | **$0.1983** | 3.03% |
| 07/02/18 | $11.90 | $0.36 | **$0.357** | 3.03% |
| 07/02/18 | $30.87 | $0.93 | **$0.9261** | 3.01% |
| 07/05/18 | $4.96 | $0.15 | **$0.1488** | 3.02% |
| 07/05/18 | $0.19 | $0.01 | **$0.0057** | 5.26% |
| 07/09/18 | $56.84 | $1.71 | **$1.7052** | 3.01% |
| 07/09/18 | $26.89 | $0.81 | **$0.8067** | 3.01% |
| 07/09/18 | $23.53 | $0.71 | **$0.7059** | 3.02% |
| 07/09/18 | $3.52 | $0.11 | **$0.1056** | 3.13% |
| 07/09/18 | $23.54 | $0.71 | **$0.7062** | 3.02% |
| 07/11/18 | $16.60 | $0.50 | **$0.498** | 3.01% |
| 07/11/18 | $10.97 | $0.33 | **$0.3291** | 3.01% |
| 07/11/18 | $12.30 | $0.37 | **$0.369** | 3.01% |
| 08/13/18 | $10.17 | $0.31 | **$0.3051** | 3.05% |
| 08/13/18 | $17.19 | $0.52 | **$0.5157** | 3.02% |

In essence, Schertzer is ignoring all of the times BofA rounded down and she received the benefit of BofA's policy. Instead, she is arguing that on the basis of rounding up certain transactions she has paid an infinitesimally small amount more than was disclosed to her. But, Schertzer has provided no facts to support her theory that the use of the rounding policy should be considered a material representation. The agreement does not state, as Schertzer suggests, that the fee is capped at 3 percent or that a fee of over 3 percent may not ever be assessed or that this is somehow an express promise never to charge more than 3%. (*See* SAC at ¶¶ 169, 339.) It simply provides: "3% of the U.S. Dollar amount of the Transaction." (The Agreement at 9.) Had BofA not performed the basic math convention of rounding, the result would have been Schertzer owing a fraction of a penny - which is not an amount that one can pay. *See La Jolla Beach & Tennis Club, Inc. v. Industrial Indemnity Co.*, 9 Cal. 4th 27, 37 (1994) (quoting *Reserve Ins. Co. v. Pisciotta,* 30 Cal. 3d 800, 807 (1982)) (when reading a contract, "courts will not adopt a strained or absurd interpretation in order to create an ambiguity where none exists."). Nothing suggests that BofA's policy is not applied neutrally or that over the course of Schertzer's vacations she did not receive the benefit of this rounding policy. Practically, the court also finds the $0.18 amount at issue in Schertzer's claim to be *de minimis,* and any injuries to members of the putative class are likely to be similarly trifling. *Cf. Sandifer v. U.S. Steel Corp.,* 571 U.S. 220, (2014) (discussing the doctrine of "*de minimis non curate lex* (the law does not take account of trifles)"). *See also e.g., Lindow v. U.S.,* 738 F.2d 1057, 1062-1064 (9th Cir. 1984) (discussing *de minimis* rule in relation to small increments of time in wage and hour setting); *Northern v. Nelson,* 448 F.2d 1266, 1267 (9th Cir. 1971) ($1.05 claim *de minimis); Kostiuk v. Town of Riverhead,* 570 F. Supp. 606, 610-611 (E.D.N.Y.1983) (collecting cases); *Northern v. Nelson,* 448 F.2d 1266, 1267 (9th Cir. 1971) ($1.05 claim *de minimis).*

In light of the above, the court **GRANTS** BofA's motion to dismiss the breach of contract claim related to the assessment of the International Transaction Fees, with leave to amend.

### i. Breach of Implied Covenant of Good Faith and Fair Dealing Claim Related to the Assessment of the International Transaction Fees

Having based their implied covenant cause of action on essentially the same allegations as the breach of contract cause of action, this claim cannot stand independently. Accordingly, the court **GRANTS** BofA's motion to dismiss the implied covenant of good faith and fair dealing related to the assessment of International Transaction Fees, with leave to amend.

### 3. UCL Claims

Setting forth various arguments in support of their positions, all of the Defendants move to dismiss the UCL claims on the grounds that the Plaintiffs have failed to state claims under any of the prongs of the Act.

The UCL protects California's citizens by prohibiting any "unlawful, unfair or fraudulent business act or practice." CAL. BUS. & PROF. CODE §17200. "Because the statute is written in the disjunctive, it is violated where a defendant's act or practice violates any of the foregoing prongs." *Davis v. HSBC Bank Nevada, N.A,* 691 F.3d 1152, 1168 (9th Cir. 2012). "Unfair competition" under section 17200 has been defined very broadly by the California Supreme Court to include "anything that can properly be called a business practice and that at the same time is forbidden by law." *Chabner v. United of Omaha Life Ins. Co.*, 225 F.3d 1042, 1048 (9th Cir. 2000) (internal quotation marks and citations omitted). To pursue either an individual or a representative claim under section 17200 a plaintiff "must have suffered an injury in fact and lost money or property as a result of such unfair competition." *Hall v. Time Inc.,* Cal. 158 Cal. App. 4th 847, 849 (2008).

Before addressing the substance of Plaintiffs UCL claims, the court begins by noting that Plaintiffs' attempts to characterize the OON balance inquiry fees assessed by BofA and the related interchange fees Cash Depot, FCTI and Cardtronics receive from BofA as a "surcharge" or a "kickback" simply because the cost of the interchange fee may be passed through to the cardholder, via the balance inquiry fee, is not persuasive and is belied by the

term's ordinary use within the industry. As the Ninth Circuit has explained, OON or "foreign" ATM transactions generate four fees:

> The cardholder must pay two of these fees – one to the ATM owner for use of the ATM (known as the "surcharge") and one to the card-issuing bank (known as a "foreign ATM fee"). The card-issuing bank also pays two of these fees – one to the ATM network that routed the transaction (known as a "switch fee") and one to the ATM owner (known as an "interchange fee').

*In re ATM Fee Antitrust Litig.,* 686 F.3d 741, 745 (9th Cir. 2012). "The interchange fee, though paid by a card-issuing bank to an ATM owner, is established by the ATM Network, that routes the foreign ATM transaction between the card-issuing bank and the ATM owner." *In re ATM Fee Antitrust Litigation,* No. C 04-02676 CRB, 2010 WL 3701912, at * 2 (N.D. Cal. Sept. 16, 2010).[11] "The interchange fee is specifically designed to compensate ATM owners for the costs of handling network transactions," whereas the "foreign" or OON transaction fee is "imposed by the bank on its own account holder … to recoup the costs it incurs in paying the wholesale fees to the ATM-owning bank and to the network." Kerin E. Coughlin, *ATM Surcharges Violate The Public Policies That Underlie the Anti-Trust Laws,* Columbia Journal of Law & Social Problems, *22 (2002). Cardholders never directly pay interchange fees, rather banks "pass on the costs of the interchange fees through the foreign ATM fees." *See., e.g., In re ATM Fee Antitrust Litigation,* 686 F.3d at 750.

Plaintiffs repeatedly baldly assert that the interchange fee is a "kick-back" while ignoring the standard use of the terms within the industry. If Plaintiffs are attempting to allege that BofA and the ATM operators have conspired to trick consumers into performing

---

[11] Independent Service Organizations like Cardtronics, Cash Depot and FCTI, own and operate ATMs, but do not issue ATM cards, therefore, they only receive interchange fees. As a financial institution, BofA both issues ATM cards and owns ATMs, therefore, it both pays and receives interchange fees.

balance inquires in to order to profit from the fees associated with these transactions, the SAC is woefully inadequate.

### (i) Claim Brought Against BofA Under the Unfair Prong

BofA moves for dismissal of the UCL claims arguing: (1) no reasonable consumer would be deceived into believing balance inquiries were free, as long as it accompanied a cash withdrawal; (2) the contract expressly warns of the possibility of the fees; (3) to the extent Plaintiffs' are complaining about the phrasing on the screens created by ATM operators, they can state no claim against BofA; (4) Plaintiffs have not alleged reliance; and (5) the claims must be dismissed under California's safe harbor doctrine. (Doc. No. 66-1 at 19-22.).

Both Schertzer and BofA agree that the UCL claim brought against it is governed by the "reasonable consumer test. *Williams v. Gerber Prods. Co.,* 552 F.3d 934, 938 (9th Cir. 2008). The test requires that plaintiff demonstrate more than the mere possibility that the provisions of the Agreement 'might conceivably be misunderstood by some few consumers viewing it in an unreasonable manner.'" *Ebner v. Fresh,* 838 F.3d 958, 965 (9th Cir. 2016) (quoting *Lavie v. Procter & Gamble Co.,* 105 Cal. App. 4th 496, 508 (2006)). "Rather, the reasonable consumer standard requires a probability that a significant portion of the general consuming public or of targeted consumers, acting reasonably in the circumstances, could be misled." *Id.* (internal quotation marks omitted).

The court has already determined that the terms of the Agreement disclose that BofA may charge its customers $2.50 for OON balance inquiries, regardless of whether or not the inquiry was accompanied by a cash withdrawal, *see, supra* III.C.1. Because the possibility of being charged a balance inquiry fee has been disclosed, the UCL claim lacks merit. Disclosure of this information would not lead the hypothetical reasonable consumer to conclude that no OON balance inquiry fees would be charged by BofA. *See Lavie,* 105 Cal. App. 4th at 507. ("A representation does not become 'false and deceptive' merely because it will be unreasonably misunderstood by an insignificant and unrepresentative

segment of the class of persons to whom the representation is addressed.") (quoting *In the Matter of Kirchner,* 63 F.T.C. 1282 (1963)).

BofA's argument that the Electronic Fund Transfer Act, "Regulation E", 15 U.S.C. § 1693 *et seq.* creates a safe harbor from the UCL is persuasive. "Under the safe harbor doctrine, 'to forestall an action under the unfair competition law, another provision must actually 'bar' the action or clearly permit the conduct.'" *Davis,* 691 F.3d at 1164 (quoting *Cel-Tech Comms. Inc. v. L.A. Cellular Tel. Co.,* 20 Cal. 4th 163 (1999)).

Regulation E was enacted by the Board of Governors of the Federal Reserve System to establish "the basic rights, liabilities, and responsibilities of consumers who use electronic fund transfer services and of financial institutions that offer these services." 12 C.F.R. 205.1(b). Its primary objective was to protect individual consumers engaging in electronic fund transfers. *Id.* Under the Act and its accompanying regulations, BofA, as a financial institution, must initially disclose "any fees imposed by the financial institution for electronic fund transfers or the right to make transfers," 12 C.F.R. § 205.7(b)(5), and, is required to disclose ATM fees by providing "notice that a fee may be imposed by an automated teller machine operator as defined in § 205.16(a)(1), when the consumer initiates an electronic fund transfer or makes a balance inquiry, and by any network used to complete the transaction," *id* at § 205.7(b)(11). If an ATM operator imposes a fee when the consumer initiates an electronic fund transfer or makes a balance inquiry notice must be given to the customer of the ATM fee. 12 C.F.R. § 205.7(16)(b).

The language in the Fee Schedule provides notice that a BofA account holder will be charged $2.50 for each withdrawal, transfer and balance inquiry at an OON ATM, (*see* Fee Schedule at 10), and the Important Information section accompanying the initial fee disclosure informs the account holder "[w]hen you use a non-Bank of America ATM, you may also be charged a fee by the ATM operator or any network used and you may be charged a fee for a balance inquiry even if you do not complete a funds transfer. We may also charge you fees." (*See* The Agreement at 35.) Fee disclosure requirements have been met. Had the Board wished to dictate precisely the terms in which the initial disclosure

needed to be written, such a regulation could have been crafted. Furthermore, the Board chose to write a specific provision regarding what notice must be presented on-screen to the consumer before they are committed to completing a balance inquiry if an ATM operator is going to impose a fee for the inquiry, but there is no such requirement that BofA give its customers any notice at OON ATMs of any fees it may impose for balance inquiries. *See* 12 C.F.R. §§ 205.7(b)(5), 205.7(b)(11), 205.16; *see also* the ATM Fee Reform Act, 15 U.S.C. section 1693b(3). The court, therefore, recognizes that Regulation E provides a safe harbor from the UCL claim.[12]

Accordingly, the court **GRANTS** BofA's motion to dismiss the UCL Claim, with leave to amend.[13]

### (ii)   Claims Brought Against the ATM Defendants Under the Unlawful Prong

Cardtronics seeks dismissal of the UCL claim on the grounds that it did not cause Schertzer's alleged damages and by asserting she does not state a valid claim. (Doc. No. 59-1 at 14-23.) Both FCTI and Cash Depot move to dismiss the UCL claims brought against them for failure to state a claim because non-restitutionary disgorgement is not an available remedy. (Doc. No. 61-1 at 15-16, 19; Doc. No. 68-1 at 15-19.)

_____

[12] In their opposition brief, Plaintiffs point to the allegations in the SAC where it is alleged that they were deceived by the deceptive ATM prompts into performing a balance inquiry, and never intended to pay for one. (Doc. No. 77 at 22- 23.) These allegations do not demonstrate actual reliance on a statement or non-disclosure of BofA's. *See, e.g., In re iPhone Application Litig.,* 6 F. Supp. 3d, 1004, 1014 (N.D. Cal. 2013) ("A plaintiff may establish that the defendant's misrepresentation is an immediate cause of the plaintiff's conduct by showing that in its absence the plaintiff in all reasonable probability would not have engaged in the injury-producing conduct.") (quoting *In re Tobacco II Cases,* 46 Cal. 4th 298, 326 (2009)). This provides yet another ground for why the claim fails.

[13] Plaintiffs have agreed they will not pursue the UCL claims regarding the "rounding" allegations against BofA. (Doc. No. 77 at 29.) Accordingly, BofA's motion to dismiss the UCL claim based on the imposition of International Transaction Fees (Count 13) is **GRANTED** without leave to amend.

Under the "unlawful prong" of section 17200, a specific activity is not proscribed, rather it, "borrows violations of other laws and treats them as unlawful practices that the [UCL] makes independently actionable." *Chabner,* 225 F.3d at 1048. However, "a common law violation such as breach of contract is insufficient" to support a claim under the unlawful prong of section 17200. *Shroyer v. New Cingular Wireless Servs.,* 622 F.3d 1035, 1044 (9th Cir. 2010).

Plaintiffs have alleged that Cardtronics and Cash Depot violated California Finance Code section 13080(c) by failing to "adequately disclose to customers the circumstances in which the customer will incur fees for purported balance inquiries." (SAC at ¶¶ 223.) But section 13080(c) cannot be read in isolation as the entire provision applies to "Automated teller machines; surcharge disclosure; cancellation of transaction." It provides:

> (a) No operator of an automated teller machine (ATM) in this state shall impose any surcharge upon a customer for the usage of that machine whether or not the customer is using an access device issued by that operator unless that surcharge is clearly disclosed to the customer electronically on the automated teller machine. Unless the disclosure is made prior to the customer being obligated to pay the surcharge, the customer shall be provided an opportunity to cancel that transaction without incurring any surcharge. This subdivision does not apply to a point of sale transaction at an ATM.
> (b) If the sale of a good or service is conducted at the ATM, the operator of that ATM shall disclose to the customer electronically on the ATM the total price of the good or service and any fee charged solely for the usage of the ATM. Unless the disclosure is made prior to the customer being obligated to pay for the good or service, the customer shall be provided with an opportunity to cancel the transaction without incurring any obligation.
> (c) If a surcharge is imposed on a customer using an access device not issued by the operator, the operator shall disclose that the customer may also be charged an additional fee by his or own institution.

CAL. FIN. CODE § 13080. Section 13080(d) defines "surcharge" as "any charge imposed by the operator of the ATM solely for the use of the ATM" and "service" includes, but is not limited to, receiving a statement of account activity. *Id.* at § 13080(d).

Under this language, Plaintiffs have not alleged that Cash Depot and Cardtronics imposed a surcharge on them for performing a balance inquiry. Neither is it alleged that prior to withdrawing funds from Defendants' ATMs, the appropriate warnings were not given regarding the possibility that BofA would charge a fee or that the amount the ATM Defendants would be charging, the surcharge fee, were not displayed. And Plaintiffs have conceded that "this litigation does not concern" "the surcharge fee the "ATM operator charges directly to consumers for engaging in cash withdrawal transaction." (SAC at ¶ 31.) Rather, Plaintiffs allege that Cardtronics and Cash Depot "knowingly and contractually profits from the receipt of out of network fees collected by its customers' financial institutions." (*Id.* at ¶¶ 225, 233.) But, by definition, the OON balance inquiry fees do not just encompass the fees the bank pays to the ATM owners, it also encompasses fees for use of the Network itself, and the interchange fee is not simply the cost the ATM owner charges the customer "solely for the use of the ATM."

Further support for Defendants' position is found when the Agreement itself is considered in relation to when BofA is required to pay the ATM Defendants an interchange fee. Under the Agreement, not every balance inquiry performed at an OON ATM will result in the paying of an OON balance inquiry transaction fee by the customer, (Fee Schedule at 10), whereas a card-issuing institution/bank like BofA gets charged the industry-standard interchange fee each time the card holder uses an ATM machine. *See In re ATM Fee Antitrust Litig.,* 686 F.3d at 745 (recognizing "interchange fee" established by ATM networks and paid by the "card issuing bank … to the ATM owner"; *Bank of Am. v. City & Cty of S.F.,* 309 F.3d 551, 556 n.1 (9th Cir. 2002), *as amended on denial of reh'g and reh'd en banc* (Dec. 20, 2020) (interchange fee is paid by the card issuing bank to the ATM operator). The payment of the interchange fee to the ATM Defendants is not, therefore, dependent on the cardholder's payment of the OON balance inquiry fee.

From the allegations set forth in the SAC, the ATM Defendants appear to be in compliance with Regulation E, 12 C.F.R. § 205.16, which provides in relevant part:

> An automated teller machine operator that imposes a fee on a consumer for initiating an electronic fund transfer or a balance inquiry shall:
>> (1) Provide notice that a fee will be imposed for providing electronic fund transfer services or a balance inquiry; and
>> (2) Disclose the amount of the fee.

12 C.F.R. § 205.16.[14]  A plain reading of the statute establishes that the ATM Defendants are not required to display or disclose what, if any, OON transaction fees BofA may charge for balance inquiries.  Without such allegations, there is nothing to suggest that either Cardtronics or Cash Depot violated any statute, law, or regulation.

The ATM Defendants' arguments related to the alleged injury and request for restitution have merit.  Notably, the OON balance inquiry fees paid directly to BofA, of which Plaintiffs complain about being "forced to pay" (SAC at ¶¶ 229, 237, 246), are fees charged not by Cardtronics, Cash Depot or FCTI, but by BofA under the terms of the Agreement.  (*See generally* The Agreement.)  Despite Plaintiffs' conclusory allegations to the contrary, none of the ATM Defendants were responsible for BofA's decision to impose OON balance inquiry fees on its customers' balance inquiry transactions.

UCL actions are equitable in nature, thus damages cannot be recovered.  *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1144 (2003).  "Disgorgement of money obtained through an unfair business practice is an available remedy in a representative action only to the extent that it constitutes restitution."  *Id.* at 1145.  An order of restitution has been defined as "compelling a UCL defendant to return money obtained through an unfair business practice to those persons in interest from whom the property was taken, that is, to persons who had an ownership interest in the property or those

---

[14] Paragraph 7(b)(5) of the Official Commentary to Regulation E provides that with respect to disclosing interchange fees: "fees paid by the account holding institution to the operator of a shared or interchange ATM system need not be disclosed, unless they are imposed on the consumer by the account-holding institution…" 12 C.F.R. part 205 Supp. I ¶ 7(b)(5)-3.

claiming through the person." *Id.* at 1144 (quoting *Kraus v. Trinity Mgmt Servs., Inc.,* 23 Cal. 4th 116, 126-127 (2000)).

Here, Plaintiffs seek restitution for money lost in the form of OON transaction fees acquired by BofA, not the ATM Defendants. *See., e.g. Phillips v. Apple Inc.,* Case No. 15-CV-04879-LHK, 2016 WL 5846992, at * 10 (N.D. Cal. Oct. 6, 2016) aff'd 725 Fed. App'x. 496, (Feb 20, 2018) (dismissing UCL claim for restitution because plaintiffs did not allege that Apple received money or property, indirectly or otherwise, for the payments they made to their wireless carriers); *In re First All. Mortg. Co.,* 471 F.3d 471 ("In order to draw the necessary connection between the [plaintiffs'] ownership interest and these funds, however, the court would have to assume that all of the money that flowed to [defendant] pursuant to its relationship with [a third party] was taken directly from the [plaintiffs] and should not have been."). Plaintiffs' conclusory allegations that the ATM Defendants receive a portion of the OON transaction fees from BofA is supported neither by the record nor well pled facts. The bald, muddled and, at times, contradictory allegations regarding the payment of interchange fees and the charging of the challenged balance inquiry fees simply add to the confusion. (*See, e.g.,* SAC at ¶¶ 7, 245, 272.). Without more, Plaintiffs have failed to state a claim for restitution.

Thus, Hicks and Schertzer have failed to state a claim under the unlawful prong of the UCL. Because Cowell has only alleged common law claims against FCTI she also fails to state a claim under the first prong of the UCL. *See, e.g. Shroyer,* 622 F.3d at 1044 (plaintiff failed to state a claim under the unlawful prong of section 17200 because he did not go beyond alleging a violation of common law); *Mazal Grp., LLC v. Espana*, 2:17-cv-05856-RSWL-KS, 2017 WL 6001721, at *4 (C.D. Cal. Dec. 4, 2017) (granting motion to dismiss UCL claim when plaintiff did not go beyond alleging a violation of common law).

### (iii) *Claims Brought Against the ATM Defendants Under the Unfair Prong*

A business practice is "unfair" under the UCL if the business practice "violates established public policy or if it is immoral, unethical, oppressive or unscrupulous and

causes injury to consumers which outweighs its benefits." *McKell v. Wash. Mut., Inc.,* 142 Cal. App. 4th 1457, 1473 (2006). Courts within the Ninth Circuit apply either a balancing or tethering test in consumer actions under the unfair prong. *See Lozano v. AT&T Wireless Serv.s, Inc.*, 504 F.3d 718 (9th Cir. 2007). Under the traditional balancing test, "an act or practice is unfair if the consumer injury is substantial, is not outweighed by any countervailing benefits to consumers or to competition, and is not an injury the consumers themselves could reasonably have avoided." *Berryman v. Merit Prop. Mgmt., Inc.,* 152 Cal. App. 4th 1544, 1555 (2007.) Under the test set forth in *Cel-Tech Communications, Inc., v. Los Angeles Celluluar Telephone Company,* 20 Cal. 4th 163, 186 (1999), a business practice is unfair if defendant violated a "legislatively declared policy or proof of some actual threatened impact on competition."

Here, it is alleged that Defendant Cardtronics committed unfair business acts and practices by "re-ordering their ATM screen prompts, utilizing the 'Balance Inquiry at Start Screen Prompt,' and deceptively requiring customers to opt-out of balance inquiries that they would not otherwise engage in or did not knowingly consent to." (SAC at ¶ 224.) As to Cash Depot, the SAC alleges an unlawful business practice or act by "expressly misrepresenting on its Cash Depot ATM machines: 'Avoid Overdraft Fees Check Your Balance for Free,' utilizing the 'Balance Inquiry at Start Screen Prompt,' and deceptively requiring customers to opt-out of balance inquiries that they would not otherwise engage in or did not knowingly consent to." (*Id.* at ¶ 232.) As to FCTI, Plaintiff Covell alleges that its conduct "in double charging customers two out-of-network Balance Inquiry Fees for a single balance inquiries [sic], and the deceptive manner in which FCTI designs and presents its screen prompts at is [sic] ATM machines to consumers constitutes" an unfair business act. (*Id.* at ¶ 242.) The unfair consumer allegations also make general, conclusory references to trickery and "immoral," "unethical," "oppressive," "unscrupulous," "unconscionable," and "substantially injurious" behavior toward Plaintiffs. (*See id.* at ¶ 228, 232, 245.) Plaintiffs also claim that Cash Depot "misrepresented" to its customers

that balance inquiries were "free" of charge, when in fact, Cash Depot knew that the customers' financial institutions would charge them" OON fees. (*Id.* at ¶ 230, 233)

As explained above, Plaintiffs have not alleged any law, statute, regulation, or specifically declared legal policy that the ATM Defendants have violated. Plaintiffs' stringing together of a handful of adjectives to describe Defendants behavior does not excuse the fact that the SAC lacks facts to support this claim under the unfair prong. *See Iqbal,* 556 U.S. at 678 ("a formulaic recitation of the elements of a cause of action will not do.") Notably, neither Cardtronics, FCTI nor Cash Depot actually charged anyone, including Plaintiffs, a surcharge for balance inquiries. Moreover, the OON balance inquiry fees about which Plaintiffs complain, are not charged by either Cardtronics, Cash Depot or FCTI - they are charged by BofA. (SAC at ¶¶ SAC at ¶¶ 229, 237, 246) Thus, Plaintiffs have failed to state a claim under the unfairness prong of the UCL because the alleged injury caused was not of the ATM Defendants' making.

### (iv) *Claims Brought Against the ATM Defendants Under the Fraud Prong of the Act*

For UCL claims brought under the "fraud prong" a plaintiff need only "'show that members of the public are likely to be deceived' by the business practice or advertising at issue." *Kowalsky v. Hewlett-Packard Co.,* 771 F. Supp. 2d 1156, 1159 (N.D. Cal. 2011) (quoting *In re Tobacco II Cases*, 46 Cal. 4th 298, 312 (2009)). As already noted, Cash Depot and Cardtronics advertised "free" balance inquiries. They did not charge customers any surcharge/fee for performing a balance inquiry at their ATMs – it was BofA who charged the OON fees. Thus, this claim suffers from the same flaw as the other unfair competition claims in that neither Cash Depot, Cardtronics nor FCTI are the entities who charged Plaintiffs the complained of fees.

In addition, from the allegations in the SAC, the court was able to ascertain that upon entering their pin numbers Plaintiffs were asked:

Would you like your available Account Balances on a receipt?
 "Main Menu" or "Yes Continue"

If Plaintiffs had chosen the "Main Menu" button they would have been transported to the Main Menu. However, picking "Yes Continue," constituted a request for balance information, which ultimately resulted in an OON balance inquiry fee being charged by BofA. (*See* SAC at ¶¶ ¶63, 122). While the court has found many of the allegations in the SAC difficult to decipher, the court does find Plaintiffs have not sufficiently pled that the reasonable consumer would be deceived by such a simple and straight forward question.

Plaintiffs have, therefore, failed to state a claim with the requisite particularity under the fraud prong of the UCL. Moreover, to the extent that Plaintiffs assert a UCL claim that is based on or grounded in fraud, it does not meet the requirements of Rule 9(b). *See Clark v. Countrywide Home Loans, Inc.*, 732 F. Supp. 2d 1038, at 1050 (E.D. Cal. 2015) ("to the extent Plaintiff asserts a UCL claim that is based or grounded in fraud, it must meet the requirements of Rule 9(b)") (citing *Kearns v. Ford Motor. Co.,* 567 F.3d 1120, 1124-1127 (9th Cir. 2009)).

Accordingly, the Unfair Competition claims against Cash Depot, Cardtronics and FCTI are **DISMISSED** with leave to amend.

#### 4. Conversion Claims

BofA moves for dismissal of the conversion claims, asserting: (1) they are legally defective because, upon deposit, title to Plaintiffs' funds passed to it; (2) voluntary payments cannot be the basis of a conversion claim; and (3) an alleged overcharge cannot be the subject of a conversion claim. (Doc. No. 66-1 at 22-23, 27.) All three of the ATM Defendants move to dismiss the conversion claims, contending that their collection of an interchange fee does not amount to conversion of Plaintiffs' personal property, arguing that if Plaintiffs have any claim at all, it lies entirely with BofA. (Doc. No. 59-1 at 24-25; Doc. No. 61-1 at 20-21; Doc. No. 68-1 at 20-21.) Further, Cash Depot and Cardtronics argue that Plaintiff Hicks and Schertzer cannot base their conversion claims on any monies drawn by BofA from their bank accounts because title to their money was passed to BofA upon deposit. (Doc. No. 59-1 at 24; Doc. No. 68-1 at 19-20.)

California law provides that, "conversion is the wrongful exercise of dominion over the property of another." *Farmers Ins. Exch. v. Zerin*, 53 Cal. App. 4th 445, 451 (1997) (internal quotation marks omitted). The elements of a claim for conversion are (1) the plaintiff's ownership or right to possession of the property at the time of the conversion, (2) the defendant's conversion by a wrongful act or disposition of property rights, and (3) damages. *Prakashpalan v. Engstrom, Lipscomb & Lack,* 223 Cal. App. 4th 1105, 1135 (2014). "California cases permitting an action for conversion of money typically involve those who have misappropriated, commingled, or misapplied specific funds held for the benefit of others." *PCO, Inc. v. Christensen, Miller, Fink, Jacobs, Glaser, Weil & Shapiro,* LLP, 150 Cal. App. 4th 384, 396 (2007). In cases "where the property changes possession more than once, a plaintiff has a cause of action for conversion if the defendant who is sued for conversion took the property from another converter, and took it with actual or constructive notice that the prior conversion took place." *Irving Nelkin & Co. v. S. Beverly Hills Wilshire Jewelry & Loan,* 129 Cal. App. 4th 692, 699 (2005).

"As a matter of law, a bank owns the funds deposited in it." *Trabulsi v. Wells Fargo Bank, Nat'l Ass'n*, Case No. 8:17-cv-02088 JLS (SK), 2018 WL 6444897, at *4 (C.D. Cal. Nov. 16, 2018). "California law is well-settled in this area that a claim against the bank for conversion will not lie. Because title to a deposit passes immediately to the bank upon deposit, a depositor has no conversion claim against a bank under California law." *Chavez v. Bank of Am. Corp.*, No. C–10–0653 JCS, 2012 WL 1594272, at *11 (N.D. Cal. May 4, 2012); *see also Crocker-Citizens Nat. Bank v. Control Metals Corp.*, 566 F.2d 631, 637 (9th Cir. 1977) (the relationship between a bank and its depositor is one of debtor and creditor, the depositor's remedy lies in contract, not tort); *Gutierrez v. Wells Fargo Bank N.A.*, 622 F. Supp. 2d 946, 956 (N.D. Cal. 2009) ("A bank may not be sued for conversion of funds deposited with the bank.").

Plaintiffs' conversion claims fail. Any money became the literal property of BofA upon deposit in the bank and not subject to a claim of conversion. Any injuries or losses the Plaintiffs have allegedly suffered are a result of their pre-existing contractual agreement

with BofA, the bank into which they deposited their funds.  Since a claim for conversion on the purported overcharge against BofA will not lie, it logically follows that any claim against a third-party stemming from the financial institution's alleged practice of overcharging of fees on that account must also fail, especially when third-parties, such as ATM Defendants, never directly charged the customer any of the overcharges.  *See, e.g., Romero,* 216 F. Supp. 3d at 1094 ("as the California Court of Appeal has noted, there is not support for the position that an overcharge, without more, gives rise to a claim of conversion."); *Gutierrez* 622 F. Supp.2d at 956 (plaintiffs failed to state a claim of conversion by challenging bank's practice of taking excessive overdraft fees from their accounts, or "overcharging.")  As a consequence, the conversion claims against BofA, Cash Depot, Cardtronics and FCTI are **DISMISSED** with leave to amend.

### 5. Negligence Claim

FCTI moves to dismiss Covell's negligence claim asserting that she cannot establish that FCTI owed her any duty, or that it breached any such duty.  (Doc. No. 61-1 at 21-22.) Cash Depot and Cardtronics move to dismiss the negligence claim on the basis that the economic loss doctrine, which permits plaintiffs to seek remedies for negligence only where they experience physical injury to person or property and not for pure economic loss, provides a bar to Hicks and Schertzer's negligence claim.  (Doc. No. 59-1 at 25; Doc. No. 68-1 at 21-22.)

Hicks concedes that there is no contractual relationship between her and Cash Depot, countering that a special relationship exists between the parties warranting application of the exception set forth in *J'Aire Corp v. Gregory,* 24 Cal. 3d 799, 804 (1979).  In support of her position she points to Cash Depot's misleading screen prompts, the fact that the OON ATM transaction was intended to affect her, the foreseeability of harm, her injury, and "policy justifications weigh in favor of preventing future harm."  (Doc. No. 80 at 23.) Covell maintains FCTI owed a duty to provide her, and other ATM users, with explicit and meaningful disclosures, to inform her that balance inquiries preceding cash withdrawals were separate transactions, and to avoid using misleading and deceptive screen prompts

that "trick consumers into balance inquiries that they would otherwise not perform." (Doc. No. 76 at 20.)

"To state a claim for negligence in California, a plaintiff must establish the following elements: (1) the defendant had a duty, or an "obligation to conform to a certain standard of conduct for the protection of others against unreasonable risks," (2) the defendant breached that duty, (3) that breach proximately caused the plaintiff's injuries, and (4) damages." *Dent v. Nat'l Football League,* 902 F.3d 1109, 1117 (9th Cir. 2018). A duty of care may "arise through statute or by contract" or be based on "the general character of the activity in which the defendant engaged." *J'Aire*, 24 Cal. 3d at 803.

"The economic loss rule 'requires a purchaser to recover in contract for a purely economic loss due to disappointed expectations, unless he can demonstrate harm above and beyond a broken contractual promise.'" *Takano v. Procter & Gamble Co.,* No. 2:17-cv-00385-TLN-AC, 2018 WL 5304817, at *11 (E.D. Cal. Oct. 24, 2018) (quoting *Robinson Helicopter Co. v. Dana Corp.*, 34 Cal. 4th 979, 988 (2004)). In California, an exception to the economic loss doctrine exists if a plaintiff can establish the existence of a special relationship between the parties. *J'Aire,* 24 Cal. 3d at 804. In determining the existence of a "special relationship" the court looks at: (1) the extent to which the transaction was intended to affect the plaintiff, (2) the foreseeability of harm to the plaintiff, (3) the degree of certainty that the plaintiff suffered injury, (4) the closeness of the connection between the defendant's conduct and the injury suffered, (5) the moral blame attached to the defendant's conduct and (6) the policy of preventing future harm. *Id.*

Here, Plaintiffs allege that the ATM Defendants owed them a duty of care to "explicitly ask consumers and/or otherwise acquire their actual consent to engage in balance inquiries," and to "meaningfully inform" them that "balance inquiries preceding the Cash Withdrawals were separate transactions." (SAC at ¶¶ 266, 267.) Further, Plaintiffs allege the ATM Defendants' duties included acquiring "the consent of the Plaintiffs to engage in a balance inquiry prior to acquiring and providing such information to Plaintiffs and prior to communicating the fact that a balance inquiry had occurred to

BofA." (*Id.* at 268.) Defendants allegedly breached their duty of care by reordering screen prompts, forcing Plaintiffs to opt out of balance inquiries, using confusing and misleading language, failing to "clearly ask whether the consumer wishes to engage in a balance inquiry prior to proceeding with their intended cash withdrawal; and misrepresenting; and/or falsely advertising that balance inquiries are 'free'" when the card-issuing institution would be charging an OON transaction fee. (*Id.* at ¶ 271.)

As discussed, the regulations governing ATM operations require certain messages and screen prompts be displayed before ATM customers incur fees. The screen shots submitted with Plaintiffs SAC confirm that Plaintiffs were given the opportunity to consent to the balance inquiry. (*See, e.g.,* SAC Ex. 4, p.4.) In addition, the ATM Defendants are not required under 12 C.F.R. § 205.16 or under the ATM Fee Reform Act, 15 U.S.C. section 1693b(3)[15], to display what, if any, OON transaction fees a card-issuing institution such as BofA may charge for balance inquires. They are only required to display what fee they, as operators, will be imposing for an electronic fund transfer service or a balance inquiry, and disclose the amount of that fee. *See id.* Since neither FCTI, Cardtronics or

---

[15] (3) Fee disclosures at automated teller machine
    (A) In general
    The regulations prescribed under paragraph (1) shall require any automated teller machine operator who imposes a fee on any consumer for providing host transfer services to such consumer to provide notice in accordance with subparagraph (B) to the consumer (at the time the service is provided) of--
        (i) the fact that a fee is imposed by such operator for providing the service; and
        (ii) the amount of any such fee.
    (B) Notice requirement
    The notice required under clauses (i) and (ii) of subparagraph (A) with respect to any fee described in such subparagraph shall appear on the screen of the automated teller machine, or on a paper notice issued from such machine, after the transaction is initiated and before the consumer is irrevocably committed to completing the transaction.
    (C) Prohibition on fees not properly disclosed and explicitly assumed by consumer
    No fee may be imposed by any automated teller machine operator in connection with any electronic fund transfer initiated by a consumer for which a notice is required under subparagraph (A), unless--
        (i) the consumer receives such notice in accordance with subparagraph (B); and
        (ii) the consumer elects to continue in the manner necessary to effect the transaction after receiving such notice.

15 U.S.C. § 1693b(3)

46

Cash Depot charged Plaintiffs for balance inquiries, they have not violated the law. The ATM Defendants are in compliance with these regulations and the court is unaware of any authority in support of the proposition that they had a duty to reorder ATM screen prompts or use less confusing or misleading language. Finally, the fact that any monetary loss was caused by BofA, in the form of the OON balance inquiry fees deducted from Plaintiffs' accounts, cannot be ignored and is not saved by Plaintiffs' conclusory proximate cause argument. Relatedly, even construing the factual allegations in the SAC as true and construing the pleadings in the light most favorable to Plaintiffs, the court finds that Plaintiffs have failed to allege a "special relationship" with the ATM Defendants beyond an everyday consumer transaction; thus, a negligence cause of action cannot be pursued. *See, e.g., Hameed-Bolden v. Forever 21 Retail, Inc.*, Case No.: CV 18-03-19 SJO (JPRx), 2018 WL 6802818, at *7 (C.D. Cal. Oct. 1, 2018) ("Plaintiffs do not distinguish their transactions from every other garden variety purchase of goods by means of payment by a credit card," to support application of "special relationship" exception); *In re Sony Gaming Networks & Consumer Data Sec. Breach Litig.*, 996 F. Supp. 2d 942, 969 (S.D. Cal. 2014) ("Plaintiffs have failed to allege a 'special relationship' with Sony beyond those envisioned in everyday consumer transactions, and therefore, negligence is the wrong theory on which to pursue recovery for Plaintiffs' economic losses.").

In sum, Plaintiffs have not established any of the elements necessary to state a negligence claim or alleged enough facts for the court to adequately access the plausibility of the claim under the special relationship exception. Accordingly, the negligence claim against Cash Depot, Cardtronics and FCTI is **DISMISSED** with leave to amend.

### 6. CLRA Claims

Defendant Cash Depot argues that Hicks' CLRA claim should be dismissed without prejudice on two grounds: (1) that Plaintiff has failed to allege a transaction between Cash Depot and herself that qualifies under the Act; and (2) no reason exists that Plaintiff could not have sent her demand letter earlier. (Doc. No. 68-1 at 15; Doc. No. 87 at 4-5.) BofA

sets forth the same arguments for dismissal of the CLRA claims as it did for the UCL claim. (Doc. No. 66-1 at 20-22.)

The CLRA prohibits "unfair methods of competition and unfair or deceptive acts or practices in a transaction intended to result or that results in the sale or lease of goods or services to any consumer." CAL. CIV. CODE § 1770(a). Hicks alleges that she is a consumer within the meaning of the act and the advertisement announcing consumers can check their available balance for "free" on Cash Depot's ATM's is a "blatant misrepresentation in violation of Section 1770(a)(9) because Cash Depot knows that consumers will be charged an OON Balance Inquiry Fee by their financial institution. (SAC at ¶¶ 285, 288, 289.) While not explicitly stated, it appears that Hicks is alleging that the charging of the OON balance inquiry fee amounts to the transaction.

The court agrees with Cash Depot that the CLRA does not apply to the type of transaction at issue here. It cannot be said that by simply offering an ATM for use to the public, Cash Depot has undertaken a transaction "intended to result or which results in the sale or lease of goods or services to any consumer …" *Berry v. Am. Express Publ'g, Inc.*, 149 Cal. App. 4th 224, 96 (2007). And Plaintiff has cited no authority in support of her proposition that a CLRA claim can be premised on fees imposed in connection with a debit card transaction. *See Lloyd v. Navy Fed. Credit Union,* Case No. 17-cv-1280-BAS-RBB, 2018 WL 1757609 at *20 (S.D. Cal. Apr. 12, 2018) (performing thorough review of legislative history  before finding that "the CLRA does not apply to claims involving debit cards or overdrafts associated with those cards, separate and apart from any transaction involving, or intended to result in, a sale or lease of goods or services." (collecting cases); *Gutierrez* 622 F. Supp. 2d at 957 ("Plaintiffs cite no authority showing that the bank's action was undertaken 'in a transaction intended to result or which results in the sale or

lease of goods or services.'").[16] Accordingly, the court **GRANTS** Cash Depot's motion to dismiss the CLRA claim without leave to amend.

The arguments BofA presented in support of dismissal of the UCL claim apply equally to the CLRA claim and the court need not rehash them here. Thus, the court **GRANTS** BofA's motion to dismiss the CLRA claim without leave to amend.

## V. CONCLUSION

For the reasons set for above, the Court orders as follows:

1. Claim one for violation of the UCL brought against Cardtronics and Cash Depot on behalf of the California class is **dismissed with leave to amend**;

2. Claim two for violation of the UCL brought against FCTI on behalf of the nationwide class is **dismissed with leave to amend**;

3. Claim three for conversion against the ATM Defendants on behalf of the nationwide class is **dismissed with leave to amend**;

4. Claim four for negligence against the ATM Defendants on behalf of the nationwide class is **dismissed with leave to amend**;

5. Claim five for violation of FAL against Cash Depot on behalf of the California class is **dismissed with leave to amend**;

6. Claim six for violation of the CLRA against Cash Depot is **dismissed without leave to amend**;

7. Claim seven for breach of contract including the covenant of good faith and fair dealing against BofA arising from the assessment of OON fees is **dismissed with leave to amend**;

8. Claim eight for violation of the UCL brought against BofA arising from the assessment of OON Fees is **dismissed with leave to amend**;

---

[16] Finding the CLRA inapplicable, the court declines to address the notice argument.

9. Claim nine for violation of the CLRA brought against BofA arising from the assessment of OON Fees on behalf of the California class is **dismissed without leave to amend**;

10. Claim ten for conversion against BofA on behalf of the nationwide class for the collection of OON Fees is **dismissed with leave to amend**;

11. Claim eleven for breach of contract including the covenant of good faith and fair dealing against BofA arising from the assessment of International Transaction Fees is **dismissed with leave to amend**;

12. Claim twelve for violation of the UCL brought against BOA arising from the assessment of International Transaction Fees is **dismissed without leave to amend**; and

13. Claim thirteen for conversion against BofA brought on behalf of the national class and the California class for the collection of International Transaction Fees is **dismissed with leave to amend**.

Should Plaintiffs elect to file a third amended complaint amending their claims against the Defendant, they must do so by **_March 25, 2020_**. Any amended complaint must address the standing issues related to the claims being brought on behalf of the California and nationwide classes.[17]

IT IS SO ORDERED.

Dated: March 4, 2020

_____
Hon. Jeffrey T. Miller
United States District Judge

---

[17] As demonstrated throughout this order, the court has serious concerns regarding Plaintiffs' standing to represent the nationwide classes.