**CARLSON LYNCH, LLP**
Todd D. Carpenter (CA Bar No. 234464)
tcarpenter@carlsonlynch.com
(Eddie) Jae K. Kim (CA Bar No. 236805)
ekim@carlsonlynch.co,
Scott G. Braden (CA Bar No. 305051)
sbraden@carlsonlynch.com
1350 Columbia St., Ste. 603
San Diego, California 92101
Telephone:  (619) 762-1900
Facsimile:  (619) 756-6991

**KALIEL PLLC**
Jeffrey D. Kaliel (CA Bar No. 238293)
jkaliel@kalielpllc.com
Sophia Gold (CA Bar No. 307971)
sgold@kalielpllc.com
1875 Connecticut Ave., NW, 10th Floor
Washington, D.C. 20009
Telephone:  (202) 350-4783

*Attorneys for Plaintiff*
*and Proposed Class Counsel*

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KRISTEN SCHERTZER, MEAGAN HICKS, BRITTANY COVELL, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>BANK OF AMERICA, N.A., CARDTRONICS, INC., FCTI, INC., CASH DEPOT, LTD., and DOES 1-50, inclusive,<br><br>Defendants. | Case No.: 3:19-cv-00264-JM-MSB<br><br>**CLASS ACTION**<br><br>**THIRD AMENDED CLASS ACTION COMPLAINT**<br><br>**[DEMAND FOR JURY TRIAL]** |

## THIRD AMENDED CLASS ACTION COMPLAINT

Plaintiffs Kristen Schertzer, Brittany Covell, and Meagan Hicks ("Plaintiffs") bring this action, on behalf of themselves and all others similarly situated, against Defendants Cardtronics, Inc. ("Cardtronics"), FCTI, Inc. ("FCTI"), Cash Depot, LTD., and Bank of America, N.A. ("BofA") (collectively, "Defendants"), and state:

## I.     **INTRODUCTION**

1.      Cardtronics, FCTI, and Cash Depot (collectively, "ATM Defendants") are three of the largest independent deployers of ATM machines in the country. The ATM Defendants supply ATM machines to some of the most prominent pharmacies (CVS - Cardtronics), convenience stores (7-11 - FCTI) and retailers (Wal-Mart - Cash Depot) nationwide. One of the primary sources of revenue for the ATM Defendants is the interchange fees they receive from retail banks, including BofA.  Interchange fees are paid by the retail banks to the ATM Defendants each time a retail bank accountholder makes a cash withdrawal, funds transfer, or (most relevant here) account balance inquiry at one of the ATM Defendant's machines. Banks deem these ATM activities, conducted by their accountholders, as "out of network" if they are conducted at the ATM Defendants' machines.

2.      When accountholders undertake balance inquiries at out-of-network ATMs, their home banks will typically assess an out-of-network ATM fee for doing so. For example, BofA debits a $2.50 out-of-network balance inquiry fee from the accountholder's checking account automatically and from that fee pays a series of fees to third parties in conjunction with the purported balance inquiry. For each $2.50 fee assessed, BofA pays an "interchange fee" of approximately $0.25 directly to the ATM Defendant who owns the ATM machine where the balance inquiry was conducted. BofA also pays a "Switch Fee" to the network provider (for example, "Plus" or "Star" networks). Therefore, both BofA and the ATM Defendants profit from the accountholder's out-of-network balance inquiries. BofA collects the out-of-network ATM fee from its accountholder ($2.50) and the ATM Defendant collects the interchange fee from BofA ($0.25).

3.      This case arises from the ATM Defendants' deceptive and unlawful practice of systematically maximizing the number of out-of-network ATM balance inquiries performed by retail bank accountholders. The ATM Defendants have a monetary incentive to generate as many balance inquires as possible. This has led the ATM

Defendants to concoct deceptive screen prompts and related signage to mislead unsuspecting accountholders, including Plaintiffs, into conducting balance inquiries that they did not consent to and did not wish to perform. The ATM Defendants' improper conduct has resulted in bank accountholders, including Plaintiffs, being assessed out-of-network balance inquiry fees by their home banks, including BofA, in circumstances the accountholders reasonably believed would not result in the assessment of a fee.

4.     Accountholders, including the Plaintiffs, have been: 1) assessed fees for requesting a free receipt in conjunction with a cash withdrawal (Cardtronics); 2) charged two fees despite making only one balance inquiry (FCTI); and 3) assessed a fee for performing a balance inquiry when a sign on the ATM machine represented the balance inquiry was free of charge (Cash Depot). Plaintiffs and members of each of the ATM Defendant Classes (defined below) seek to recover wrongfully attained funds from the ATM Defendants pursuant to long standing authority under the Unfair Competition Laws ("UCL"), Cal. Bus. & Prof. Code § 17200, *et seq*., which hold that portions of payments that can be directly traced to an indirect beneficiary are recoverable when the payments were fraudulently induced as a result of the indirect beneficiary's deceptive conduct.

5.     Plaintiffs are BofA accountholders. BofA is also liable for breaching its standard account agreement, the Deposit Agreement and Disclosures ("Account Agreement"), attached hereto as Exhibit 1, and its accompanying fee disclosures, the Personal Schedule of Fees (Fee Schedule"), attached hereto as Exhibit 2, which govern all of their consumer deposit accounts in the United States.

6.     BofA did not define in the Account Agreement or Fee Schedule what it means for its accountholders to engage in a "Balance Inquiry." The real-world application of this undefined term created a latent ambiguity in BofA's contracts with their accountholders when accountholders experienced the deceptive and misleading conduct of the ATM Defendants, which resulted in out-of-network balance inquiry fees being assessed by BofA for purported balance inquiries which accountholders did not consent to. Simply stated, the accountholders do not know when they are engaging in "out-of-

THIRD AMENDED CLASS ACTION COMPLAINT

network" balance inquiries because BofA does not sufficiently explain to them the circumstances in which the bank would deem them to have engaged in such inquiries. The breach occurs when BofA assesses out-of-network balance inquiry fees from Plaintiffs' and other customers' accounts when the accountholders did not reasonably believe they had engaged in a balance inquiry and, therefore, did not knowingly consent to making a balance inquiry.

7.     Plaintiffs and members of the various putative Classes, respectively, have been injured by Defendants and bring claims of breach of contract and the covenant of good faith and fair dealing against BofA, and violation of the UCL against the ATM Defendants, seeking damages, restitution, injunction, and other appropriate relief.

## II.     <u>JURISDICTION AND VENUE</u>

8.     This Court has original jurisdiction of this action under the Class Action Fairness Act of 2005. Pursuant to 28 U.S.C. §§ 1332(d)(2) and (6), this Court has original jurisdiction because the aggregate claims of the putative Class members exceed $5 million, exclusive of interest and costs, and at least one of the members of the proposed classes is a citizen of a different state than Defendants.

9.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because each of the Defendants is subject to personal jurisdiction here and regularly conducts business in this District, and because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District.

10.     Plaintiffs are citizens and residents of San Diego, California.

11.     Cardtronics regularly operates ATM machines throughout the State of California, including in this District, and provides all ATM related services to its customers, including members of the putative Class. As such, it is subject to the personal jurisdiction of this Court.

12.     Cash Depot regularly operates ATM machines throughout the State of California, including in this District, and provides all ATM related services to its

1   customers, including members of the putative Class. As such, it is subject to the personal
2   jurisdiction of this Court.

3         13.    FCTI is a California corporation with its principle place of business in Los
4   Angeles, California. FCTI regularly and systematically operates ATM machines
5   throughout the State of California and the country, including in this District, and provides
6   all ATM related services to its customers, including members of the putative Class. As
7   such, it is subject to the personal jurisdiction of this Court.

8         14.    BofA regularly and systematically operates retail banking branch locations
9   throughout the State of California, including in this District, and provide banking services
10  to its customers, including members of the putative Class. As such, it is subject to the
11  personal jurisdiction of this Court.

12              **III.   FACTUAL BACKGROUND**
13  **A.    ATM Defendants are Incentivized to Maximize Interchange Fees from**
14  **Balance Inquiries**

15        15.    Cardtronics, FCTI and Cash Depot misled Plaintiffs and members of the
16  Classes, through their use of deceptive ATM screen prompts and related signage, into
17  conducting purported balance inquiries at their independent, non-bank affiliated ATM
18  machines. The ATM Defendants then transmitted coded "balance inquiries," to the retail
19  banks, including BofA.[1]  BofA took the ATM Defendants' representations at face-value
20  and did not verify whether their accountholders had actually engaged in balance inquiries.
21  BofA automatically accepted the ATM Defendants' coding, assumed the balance
22  inquiries made at the "out-of-network" or foreign ATMs were appropriate, and assessed
23  a $2.50 fee for each out-of-network balance inquiry against Plaintiffs' accounts.
24  Immediately after collecting the fee, BofA then paid $0.25 of the $2.50 fee directly back
25  to the ATM Defendants in the form of an "interchange fee."

26

27

28  _____
[1] While the allegations against ATM Defendants are on behalf of customer of all retail banks, such allegations largely reference BofA for illustrative purposes as the named Plaintiffs happen to be BofA customers.

16. Based on this interchange fee, the ATM Defendants received a directly traceable and standardized amount of money from BofA and other retail banks each time they misled Plaintiffs and other customers into engaging in a purported out-of-network balance inquiry at one of their ATM machines:

> In ATM transactions, the consumer may pay a foreign fee to his or her bank if the ATM used is not owned by his or her bank. The consumer may also pay a surcharge fee to the ATM owner. The ***issuing bank pays an interchange fee to the ATM owner for the consumer's use of that ATM*** and also pays a switch fee to the ATM network for transmitting the transaction information.

*See* "A Guide to the ATM and Debit Card Industry, 2003 Federal Reserve Bank of Kansas City" ("KC Federal Reserve ATM Guide"), at pp. 5-6 (emphasis added).[2] The report by the Federal Reserve Bank of Kansas City clearly illustrates and describes the traceable nature of this practice in the following flow chart (*id.* at p. 38):



38                                                    *A Guide to the ATM and Debit Card Industry*

**Figure 1 (cont.):** *ATM Transaction—Network on-us*
*1b: Fees*

Suppose Bank A surcharges Bank B's cardholders and Bank B charges a foreign fee to its cardholders.

Cardholder b is charged a surcharge by Bank A, the ATM owner, and is charged a foreign fee by Bank B, the card issuer. Both fees are automatically debited from her/his account.

Bank B, the card issuer, pays the interchange fee set by the network to Bank A, the ATM owner.

Bank B also pays the switch fee set by the network to the network.

Note: Besides the fees described above, Bank A and Bank B pay fees to their third-party processors, depending on what services they get. The ATM owner may pay a terminal driving fee and a transaction routing fee to its third-party processor, and the card issuer may pay an authorization fee to its third-party processor.

---

[2] https://www.kansascityfed.org/publicat/PSR/BksJournArticles/ATMPaper.pdf

THIRD AMENDED CLASS ACTION COMPLAINT

19cv00264

17.     An interchange fee is a payment by the card-issuing bank to the ATM owner to compensate the owner for the expense of installing and maintaining the ATM. Different types of ATM activities carry different interchange fees. Plus and Cirrus, for example, set a fee of 50 cents for a withdrawal and ***25 cents for either a balance inquiry*** or an inter-account transfer. *Id*. (emphasis added). While the networks set the interchange fee amounts, the banks are required to pay the ATM Defendants the preset amount on a per transaction basis.

18.     As set forth in greater detail below, each of the Plaintiffs were assessed a balance inquiry fee as a result of using one of the ATM Defendants' machines. In these transactions, Plaintiffs utilized a Visa-branded debit card issued from BofA. Visa publishes an annual schedule of its interchange reimbursement fees. The April 2019, "Visa USA Interchange Reimbursement Fees; Visa Supplemental Requirements" provides that the interchange reimbursement fee for ATM Balance Inquiries is set at $0.25 per transaction:

| Other ATM Non-Cash Disbursement Transactions | |
| --- | --- |
| ATM Decline Fee | $0.25 |
| ATM Balance Inquiry Fee | $0.25 |
| ATM Funds Transfer Fee | $0.25 |
| ATM Mini Statement Fee | $0.30 |
| ATM Shared Deposit Fee | $2.50 |
| Plus Alternative Media Fee (Paid by acquirer) | $0.10 |

*See* Visa USA Interchange Reimbursement Fees; Visa Supplemental Requirements, April 2019, at p. 18.[3] Accordingly, *every time* an ATM Defendant deceives an accountholder into performing a purported balance inquiry that they did not wish to perform, or were led to believe would be wholly free of charge, the ATM Defendants receive $0.25 from

---

[3] Upon information and belief, Visa's interchange rules or similar rules set by other networks apply to all ATM machine activities owned by ATM Defendants.

the out-of-network balance inquiry fee assessed by BofA and other retail banks, which is directly traceable to the customer's account.

19.    ATM Defendants have a monetary incentive to increase the total number of out-of-network balance inquiries that are performed at their ATM machines by Plaintiffs, as they received interchange fees directly from BofA and other retail banks for each balance inquiry performed by Plaintiffs and other customers at the out-of-network ATMs. As the Federal Reserve Bank of Kansas City observed:

> There are two measures of network volume: transaction and switch. ATM transaction volume includes the total number of deposits, withdrawals, transfers, payments and *balance inquiries performed* on ATMs in the network, whether or not those transactions are transmitted through a network data center. This measure is relevant, in part, because *interchange fees paid to ATM owners are based on transaction volume.*

*See* KC Federal Reserve ATM Guide, at p. 20 (emphasis added).

20.    As set forth in greater detail below, each of the ATM Defendants employed a misleading series of screen prompts or other misrepresentations at the ATM machines to trick accountholders, including Plaintiffs, into engaging in out-of-network balance inquiries.

**B.    Consumers' Experience and Reasonable Expectations in Utilizing ATM Machines.**

21.    There are three relevant facts to consider in the context of Plaintiffs' UCL claims against the ATM Defendants—all centered around the accountholder's experience and mindset when it comes to making an ATM transaction: 1) the vast majority of accountholders intend to use or have used ATMs exclusively to make fast, convenient, cash withdrawals; 2) all of the retail banks servicing accountholders, including BofA, utilize an initial "menu" screen of options at their own ATM machines, wherein accountholders have to affirmatively request a balance inquiry should they wish to make one; and, most importantly, 3) all banks and ATMs are required by federal law to provide accountholders with the option to receive a receipt for their cash withdrawal transaction, free of charge (*see* 12 C.F.R. § 1005.9(a)).

22.     First, accountholders, including Plaintiffs, use ATMs almost exclusively to make fast, convenient, cash withdrawals. In 2012, there were 5.8 billion ATM cash withdrawals—more than twice as many as over-the-counter withdrawals at financial institution branches (2.1 billion). The 2013 Federal Reserve Payments Study, at p. 51.[4] The ATM Defendants have known for years that the vast majority of customers who come to use their ATM machines are there to perform only a cash withdrawal.

23.     In 2002, approximately 77% of the average transaction mix at retail bank ATMs were cash withdrawals, while balance inquiries only made up 11% of all activities. *See* KC Federal Reserve ATM Guide, at p. 119, n. 6. The number of balance inquiry transactions at the Defendant ATMs has declined even further since 2002, due to the rapidly increasing availability of cost-free alternatives, like checking a balance on a mobile app, phone banking, or online access. In other words, paying for a balance inquiry at an ATM is not a rational act for the vast majority of consumers with so many no-cost alternatives which can be conducted anywhere at any time.

24.     Second, retail bank customers, including BofA customers, are accustomed to having to affirmatively ***opt-in*** to perform balance inquiry transactions.

25.     Every major retail bank in California, including the top seven banks by total number of branch locations in California,[5] uniformly present a "menu" screen to their customers at the beginning of an ATM transaction on their bank-owned ATMs. This screen allows users the clear choice as to whether or not they would like a balance inquiry or, as is much more likely, go straight into making a cash withdrawal.

26.     For example, when a BofA customer enters their ATM card into a BofA ATM machine, after they enter their PIN, they are greeted by a ***menu*** of transaction options ("Menu"). At BofA, the Menu options are as follows:

- Withdrawal

---

[4] https://frbservices.org/assets/news/research/2013-fed-res-paymt-study-detailed-rpt.pdf

[5] 1. Wells Fargo – 1008 locations; 2. Chase – 983 locations; 3. BofA – 865 locations; 4. U.S. Bank – 580 locations; 5. Union Bank – 323 locations; 6. Citibank – 292 locations; and 7. Bank of the West – 231 locations.

- Deposit
- Balance Inquiry
- Transfers and Payments
- Set Preferences
- Additional Options

In order for a BofA customer to check their balance, they are required to affirmatively press the "Balance Inquiry" button. This set-up makes sense and is consistent with the terminology in BofA's accountholder agreements that the consumer is making a "Balance *Inquiry.*"

27.    Also important—accountholders of all retail banks, including Plaintiffs, have become accustomed to receiving a receipt at the conclusion of their cash withdrawal transactions conducted at their home bank's ATM machines. For instance, BofA accountholders, including Plaintiffs, are asked if they would like to receive a printed receipt from the BofA ATM machine ***at the conclusion of <u>every</u> cash withdrawal transaction***, which sets forth their resulting account balance following the withdrawal. The same holds true for every major bank in California, including the largest seven banks: their customers are always presented with a separate screen prompt that asks them if they would like a receipt with their account balance on it—free of charge—at the conclusion of a cash withdrawal transaction.

28.    In fact, financial institutions are uniformly required to provide customers the option of receiving a receipt after they complete a funds transfer, free of charge. *See* 12 C.F.R. § 1005.9. The "required receipt" has a dramatic impact on the consumers' expectations and experiences when they approach an ATM machine. Consumers are accustomed to receiving a receipt with their account balance information printed on it following a cash withdrawal transaction at an ATM—free of charge—when they use their home bank's ATM machines.

29.    However, as discussed below, the ATM Defendants preyed on the above reasonable expectations of Plaintiffs and members of the Classes by systematically

implementing prompts and other disclosures at ATM machines that are misleading in order to unlawfully generate greater fee revenue from balance inquiries.

## C.     The Case against Cardtronics

30.     Cardtronics' screen prompts are deceptive and misleading because they trick consumers into performing purported balance inquiries under the guise of consenting to receiving a presumptively-free "receipt" in conjunction with a cash withdrawal. Cardtronics knows its customers are coming to their ATMs almost exclusively to make cash withdrawals. Cardtronics also knows that financial institutions are required by federal law to offer customers a "receipt" after making a cash withdrawal transaction at an ATM. *See* 12 C.F.R. Section 1005.9(a)[6]. After the consumer enters their PIN on the initial screen prompt, the following screen prompt appears:



---

[6] 12 C.F.R. § 1005.9(a) states: **"Receipts at electronic terminals - General.** Except as provided in paragraph (e) of this section, a financial institution ***shall make a receipt available*** to a consumer at the time the consumer initiates an electronic fund transfer at an electronic terminal.

THIRD AMENDED CLASS ACTION COMPLAINT

31.     This Cardtronics' screen prompt is deceptive and misleading to consumers, including Plaintiff Schertzer, for several reasons.

32.     First, the language **"Would you like your available Account Balances *on a receipt***?" is very deceptive because consumers are uniformly accustomed to receiving "receipts" for their cash withdrawals—free of charge. By binding up the purported "balance inquiry" with the presentation of a "receipt," Cardtronics is intentionally misleading the consumer into believing that they are simply receiving a "free" receipt at the end of their intended cash withdrawal transaction.

33.     Contrast this prompt with BofA's own ATM disclosures, which—like all retail banks in California—only asks users if they would like a receipt after they have elected to make a cash withdrawal transaction.  BofA's screen prompt states:

**Would you like a receipt?**

| YES | NO |
| :---: | :---: |

34.     If the customer selects "Yes," at a BofA ATM machine, they are provided a paper receipt setting forth the amount of their cash withdrawal along with their resulting account balance—for free—as required by Federal law. *See* 12 C.F.R. § 1005.9 (Regulation E).

35.     So, when the Cardtronics initial screen prompt above in ¶ 30, asks accountholders (who are virtually all at the Cardtronics ATM for the purpose of making a cash withdrawal), if they would like their available account balances *printed on a receipt*, the consumer reasonably believes that Cardtronics is mimicking retail bank ATMs in offering to provide a free receipt at the conclusion of their intended cash withdrawal transaction.

36.     This is exactly what happened to Ms. Schertzer. She pressed the "Yes Continue" button, believing that she had agreed to receive her balance for free on the receipt at the conclusion of her intended cash withdrawal. Instead, she was charged an out-of-network balance inquiry fee by BofA—a fee that Cardtronics profited from when

they received their interchange fee in the amount of $0.25 from BofA as a direct result of the transaction.

37.    Second, the Cardtronics screen prompt is deceptive because it contorts the definition of the word "receipt" in the context of a balance inquiry.

38.    It is the reasonable consumer's expectation that they will receive a receipt after they obtain something tangible. In the lexicon of consumer experiences, receipts are provided **at the conclusion of transactions**, *i.e.*, after the cash actually being withdrawn is received. Or, *e.g.*, after groceries are purchased and bagged. Consumers get receipts at the conclusion of their transactions.

39.    More importantly, the definition of "receipt" is as follows: "a writing acknowledging the **receiving of goods or money**".[7] The commonly understood definition of the word receipt is an acknowledgment in writing **<u>after</u>** the consumer has received **goods or money**. Reasonable consumers read the question as: "Would you like your available account balances on a receipt"—and they immediately believe the receipt they are being offered by Cardtronics will be presented to them after they have completed their intended cash withdrawal. It does not make sense for the reasonable consumer to expect Cardtronics to simply print the customers' balance on a receipt before the actual cash withdrawal, because the consumer hasn't **received goods or money** yet, which is clearly inconsistent with the common definition of the word "receipt."

40.    Indeed, despite the fact that the overwhelming number of customers approach an ATM machine to make a cash withdrawal, and not an account balance inquiry (which can otherwise be accessed through numerous free and more convenient methods such as mobile app and online banking), Cardtronics does not begin its ATM screen prompts with options for withdrawing cash, but, instead, begins with an option to receive a printed receipt. And pressing the "yes" button expecting to receive a free receipt, in accordance with how all bank ATM's function, as well as the requirements of federal regulations, results in Cardtronics sending the customer to additional screen prompts that

---

[7] https://www.merriam-webster.com/dictionary/receipt, last viewed Mar. 20, 2020.

provide no means whatsoever to withdraw cash, which was the entire point of visiting the ATM machine, and instead result in the customer being charged undisclosed balance inquiry fees.

41.    Cardtronics' refusal to present consumers with the traditional "Menu" screen immediately after they enter their PIN is also deceptive. Consumers, as stated above, have come to expect at their home bank ATMs, and even at other third party ATM deployers' machines, to be presented with a Menu screen, where they categorically are required to "opt-in" to a balance inquiry. Placing the consumers in an "opt-out" balance inquiry screen immediately after they enter their debit card PIN is a calculated maneuver, designed to drive up the volume of "balance inquiries". Moreover, the Green Button doesn't just say, "Yes"—it says, "Yes Continue"—communicating to consumers that the only way, or, at least, the most efficient way, to get to their desired cash withdrawal and "Continue" on with their intended transaction is to select the Green Button (with the color green used as a strong and immediate visual trigger indicating "go" or "proceed" under ubiquitous U.S. custom and practices), as opposed to the Red Button (with the color red used as a strong and immediate visual trigger indicating "stop", "emergency" or "prohibited").

42.    In fact, Cardtronics' placement of the confusing screen prompt (set forth in ¶ 30) at the very beginning of the ATM transaction was their adoption of an industry practice referred to as "Balance Inquiry At Start".

43.    "Balance Inquiry At Start" refers to the reordering of ATM machine screen prompts so that the first screen a customer encounters, following PIN entry, is an immediate prompt to view their available account balance. The adoption of "Balance Inquiry at Start" resulted in a significant increase in balance inquiries made at the beginning of every transaction, prior to the actual cash withdrawal. Indeed, consumers began to believe such balance inquiries were part and parcel of the cash withdrawal they intended to make when they walked up to the ATM. Several industry forums have touted

the financial benefits to Independent ATM deployers ("IADs") of utilizing Balance Inquiry at Start. For example:

> Many IADs do not include balance inquiries as an option during a transaction. Although the ATM doesn't charge the customer, **IADs can derive significant interchange revenue from these transactions. ATMs that are set to suggest balance inquiries at the start of transactions can expect a significant increase in the number of balance inquiries** performed by the machine.

*See* ATM Atom, at http://www.atmatom.com/5-ways-to-boost-atm-portfolio-profitability/ (last viewed July 11, 2018) (emphasis added).

> Enable "balance inquiry at start" on Every ATM—an easy step to make, **"Balance Inquiry at Start" can increase your balance inquiries 20 to 30 percent**—at minimal cost. By making this slight adjustment in programming, the incremental revenue it produces can make quite a difference.

*See* ATM Marketplace at https://www.atmmarketplace.com/blogs/five-ways-to-increase-atm-profitability/ (last viewed July 11, 2018) (emphasis added).

> Once Balance Inquiry At Start is enabled, **deployers can expect between 20-30 percent of their transactions to be balance inquiries**, whereas before such transactions might have been 10 percent or less.

*See* Slawsky, Richard, *Five Ways to Boost the Profitability of an ATM Portfolio,* ATM Marketplace White Paper, 2011, at 2 available at: http://www.grantvictor.com/pdfs/Five%20Ways%20to%20Boost%20ATM%20Profitability.pdf (last viewed July 11, 2018) (emphasis added).

44.    The deployment of Balance Inquiry at Start and the use of the confusing language tethering the consumers' reasonable expectation about receiving a free-of-charge receipt following a cash withdrawal transaction to the balance inquiry, along with the color coded option buttons, is all part of the scheme Cardtronics deployed to manipulate customers into pressing a deceptively prompted and labeled button that leads to the transmission of unintended balance inquiries to the retail banks. Each of these subtle and not-so-subtle tricks has been designed by Cardtronics to exploit consumers, the vast majority of whom are not at the ATM seeking to perform a balance inquiry, but simply to make a cash withdrawal—as fast and conveniently as possible. Cardtronics

1  illicitly profits from this scheme by receiving interchange fees on a per transaction basis

2  of approximately $0.25 per balance inquiry transaction from its customers' banks.

3      45.    Accordingly, Plaintiff and the Class are entitled to restitution of the

4  interchange fees Cardtronics earned because they are directly traceable to the fraudulently

5  induced "balance inquiries" purportedly performed.

6  **D.    The Case Against Cash Depot**

7      46.    Cash Depot has contracted with Wal-Mart to provide the retail giant with its

8  independent ATM machines in every Wal-Mart location—several thousand in total.

9      47.    Cash Depot makes a prominent marketing representation on signs posted on

10  its ATM machines at every location, intended to lure consumers into performing balance

11  inquiries with the message: **"PREVENT OVERDRAFT FEES CHECK YOUR**

12  **BALANCE FOR FREE."**

13      48.    This representation is deceptive and misleading because, as Cash Depot is

14  fully aware, the overwhelming majority of its customers will be charged an out-of-

15  network ATM balance inquiry fee for checking their "balance". Furthermore, Cash Depot

16  is liable for this misrepresentation as it receives an interchange fee from the customers'

17  home bank in the amount of approximately $0.25 each time a customer makes a balance

18  inquiry.

19      49.    Cash Depot knows that nearly every bank in California charges their

20  customers out-of-network balance inquiry fees, including the top largest seven banks in

21  California. Cash Depot receives interchange fee revenue from every single one of them.

22  Cash Depot knows if it increases the number of balance inquiries at its ATM locations,

23  then it will correspondingly increase its own interchange fee revenue. What better way to

24  increase inquiries than to advertise that the service is being provided free of charge?

25      50.    Consumers, including Plaintiff Hicks, read the representation as they

26  approached the ATM machine and it was fresh in their minds as they initiated their ATM

27  transaction. Upon entering their debit card into the machine and inputting their PIN,

28

THIRD AMENDED CLASS ACTION COMPLAINT

customers are immediately confronted with the following "balance inquiry at start" screen:



51.    While this screen on Cash Depot's ATM machines is an improvement on Cardtronics' prompt above (¶ 30), consumers, including Plaintiff Hicks, read the sign affixed to the top of the ATM machine, "Check Your Balance for Free," as they approached the Wal-Mart-based Cash Depot ATM machines and reasonably relied on it in deciding to engage in a balance inquiry.

52.    Consumers, including Plaintiff Hicks, were lured into making a balance inquiry that they reasonably believed was free based on Cash Depot's misrepresentation.

53.    Consumers, including Plaintiff Hicks, selected the "Yes" button and proceeded to check their account balances at their home banks. In the case of Ms. Hicks, she checked her personal checking account balance and then moved forward with her intended cash withdrawal. Plaintiff Hicks was then assessed an out-of-network ATM balance inquiry fee by BofA in the amount of $2.50. BofA, in turn, paid an interchange fee of $0.25 back to Cash Depot. This fee was ***in addition to*** the interchange fee that Cash

THIRD AMENDED CLASS ACTION COMPLAINT

19cv00264

Depot received from BofA for the subsequent out of network cash withdrawal that Ms. Hicks made in conjunction with her balance inquiry.

54.    Accordingly, Plaintiff and the Class are entitled to restitution of the interchange fees Cash Depot earned because they are directly traceable to the fraudulently induced balance inquiries purportedly performed.

**E.    The Case Against FCTI**

55.    FCTI's ATM machines misleadingly and erroneously register two balance inquiries, resulting in the assessment of two out-of-network balance inquiry fees by Plaintiff Covell's and other customers' home banks, even though they (at most) undertook a single balance inquiry.

56.    Indeed, no consumer in his right mind would undertake two balance inquiries on a single ATM use. It would be nonsensical to do so.

57.    Upon entering their PIN, customers, including Plaintiff Covell, were immediately presented with FCTI's version of a "Balance Inquiry at Start" screen prompt:



58.    As mentioned above, "Balance Inquiry at Start" is a deceptive practice to begin with it as pushes onto customers needless balance inquiry transactions and the

resultant out-of-network balance inquiry fees when customers overwhelmingly intend to withdraw cash at the ATM machine.

59.    In any event, when Plaintiff Covell and other customers press the "yes" button, they are shown the following screen whereby they are to select which account's balance they would like to inquire about:



After selecting "Checking," consumers are presented with the following screen: asking if the user would like "to print your balance and continue the transaction":



60.    Because users, including Ms. Covell, were simply trying to execute what they came to the ATM for in the first place—a cash withdrawal—and because reasonable consumers understand they must select "Continue" in order to do so, reasonable consumers like the FCTI Plaintiffs selected "Continue."   Then the following screen appears, *unexpectedly terminating the interaction with the ATM*:



61.    Despite having represented that the "transaction" would "continue," FCTI in fact terminates the transaction, then forces users to engage in a *second* transaction, requiring every customer to re-enter their debit card PIN in order to proceed with their intended cash withdrawal.

62.    Once a user re-enters his or her PIN, another screen appears, requesting if the customer would like a receipt for "this" transaction:



63.     The prompt above asks only if the customer would like a "receipt for this transaction"—a transaction that can only reasonably be the cash withdrawal they originally set out to make when they first entered their PIN.

64.     After the user chooses to request a "receipt," the user is directed to a traditional "main menu" screen. The majority of consumers, including Ms. Covell, proceeded to make a cash withdrawal in the normal course. After Ms. Covell received her cash, a receipt was printed, and her card was returned.

65.     After the initial request asking the customer if they would like to view their account balance, the customer was never asked for their consent to a second balance inquiry. They were only asked if they would like a receipt.

66.     Consumers, including Ms. Covell, never had any reason to suspect they had committed to a ***second*** balance inquiry by simply agreeing to receive a receipt in conjunction with a cash withdrawal.

THIRD AMENDED CLASS ACTION COMPLAINT

19cv00264

67.     Yet, in each case, FCTI customers, including Ms. Covell, were charged **two** separate out-of-network balance inquiry fees by their home banks after performing **one** balance inquiry and one cash withdrawal. FCTI, in turn, received approximately $0.25 each for additional, unwarranted balance inquiries that the accountholders never performed.

68.     Accordingly, Plaintiff and the Class are entitled to restitution of the interchange fees FCTI earned with respect to the purported balance inquires performed as a result of consumers' request for a receipt from FCTI ATMs, as alleged above, because the fees are directly traceable to the purported balance inquiries fraudulently induced by FCTI.

**F.      The Latent Ambiguity in BofA's Account Agreement**

69.     Plaintiffs each have BofA checking accounts, which are governed by BofA's standardized Account Agreement and Fee Schedule. BofA issues debit cards to its checking account customers, including Plaintiffs, which allow them to have electronic access to their checking accounts for purchases, payments, and ATM withdrawals at both BofA and non-BofA ATMs.

70.     Pursuant to BofA's standard account agreement:

> When you use an ATM that is not prominently branded with the BofA name and logo, you may be charged a fee by the ATM operator or any network used and you may be charged a fee for a balance inquiry even if you do not complete a fund transfer. ***We may also charge you fees.***

*See* Exhibit 1 (emphasis added).

71.     Similarly, BofA's Fee Schedule states:

> Non-BofA ATM Fee for:  Withdrawals, transfers and balance inquiries at a non-BofA ATM in the U.S.    $2.50 each.

> When you use a non-BofA ATM, you may also be charged a fee by the ATM operator or any network used and you may be charged a fee for a balance inquiry even if you do not complete a funds transfer.

*See* Exhibit 2.

72. Accountholders, including Plaintiffs, are on notice of two conditions relevant to this lawsuit: 1) if they affirmatively make a balance inquiry at a non-BofA ATM, they may be charged a fee by BofA; and 2) that fee, ***if imposed***, will be $2.50.

73. BofA's Fee Schedule does not define the term "Balance Inquiry." The word "inquiry" means: "an **act** of asking for information." In the absence of any explicit definition or disclosure, accountholders, including Plaintiffs, reasonably assumed that they would only be assessed an out-of-network fee if they took an explicit and definite action to directly request their available checking account balance at a non-BofA ATM machine; not in the circumstances presented by the ATM Defendants' conduct.

74. By failing to define the term, "Balance Inquiry," BofA has reserved exclusive discretion for determining when its customers have consented to an out-of-network balance inquiry. Absent defining this term or providing its customers with disclosures about the circumstances in which the customers may be charged an out-of-network balance inquiry fee, accountholders, including Plaintiffs, reasonably assumed that they would only be charged a fee when they explicitly and intentionally sought to inquire about their available account balance, not in circumstances where they simply requested a free receipt (Cardtronics), requested a single balance inquiry but were deemed to have requested multiple balance inquiries (FTCI) or were told at the ATM machine that checking their balance would be "free" when in fact it was not (Cash Depot). In this way, BofA intentionally grants unfettered discretion and turns a blind eye to the ATM Defendants' fraudulent conduct, to the mutual benefit of BofA (which gets to assess a substantially greater number of out-of-network balance inquiry fees) and the ATM Defendants (which then receives a substantially greater number of interchange fees).

75. BofA reserves **sole** discretion as to when it will impose an ATM Fee for a balance inquiry at a "Non-BofA ATM" and when it will deem that activities undertaken at an out of network ATM constitute a balance inquiry. But in abuse of that discretion, has adopted an automated process that blindly, and in all cases, accepts the ATM owners'

electronic communication to BofA that one or more balance inquiries have been *knowingly* and *non-fraudulently* requested by its accountholder.

76.    California courts and the Ninth Circuit have long recognized that even if a contract appears unambiguous on its face, a latent ambiguity may be exposed by extrinsic evidence which reveals more than one possible meaning to which the language of the contract is susceptible.[8]

77.    The Account Agreement may appear unambiguous on its face with respect to the application of out-of-network fees for a non-BofA balance inquiry. But, as pled herein, misleading screen prompts employed by the ATM Defendants lead customers to believe they are either simply requesting a free receipt in conjunction with a cash withdrawal (Cardtronics), requesting a single balance inquiry (FTCI) or that a balance inquiry will be free of charge (Cash Depot).

78.    The consumers' experience at the ATMs imbues a latent ambiguity into BofA's Account Agreement with respect to *when* an out-of-network fee will be charged in connection with the use of a foreign ATM. The extrinsic evidence necessary to interpret this latent ambiguity, in the form of the misleading ATM machine representations by ATM Defendants, demonstrate that BofA has breached its agreements with Plaintiffs and Class members by assessing out-of-network balance inquiries fees when customers did not intend to make balance inquiries or were told that the inquiries would be free. By simply accepting the ATM Defendants' erroneous and unlawful electronic transmissions that Plaintiff and Class members consented to balance inquiries, and then assessing fees based on those transmissions, BofA has unlawfully taken funds from the accounts of Plaintiffs and other customers.

---

[8] *See, e.g., Fremont Indem. Co. v. Fremont Gen. Corp.*, 148 Cal. App. 4th 97, 114 (2007) ("An ambiguity may appear on the face of a contract, or extrinsic evidence may reveal a latent ambiguity … A court cannot determine based on only the four corners of a document, without provisionally considering any extrinsic evidence offered by the parties, that the meaning of the document is clear and unambiguous. Instead, a court must provisionally consider extrinsic evidence offered by the parties") (internal citations omitted).

79.     The bank also breaches the covenant of good faith and fair dealing when it exercises its contractual discretion to take advantage of the latent ambiguity in its contract and what it knows or should know to be rampant, systematic deception occurring at out-of-network ATM machines owned by ATM Defendants that result in a massive increase in the assessment of out-of-network balance inquiry fees.

80.     To take an extreme example, BofA could interpret its customer agreements such that if a customer went to a third-party ATM machine owned by one of the ATM Defendants and when asked if she wanted to make a balance inquiry the customer pressed the "no" button, but then the ATM Defendant nevertheless registered the transaction as a balance inquiry and transmitted that information to BofA, then BofA would still be entitled to assess an out-of-network balance inquiry fee, and the ATM Defendant would be entitled to receive its $0.25 interchange fee from its portion of the balance inquiry fee. Such a result is not only morally appalling and tremendously injurious to customers, but the law simply does not permit it.

## IV.    PARTIES

A.    **Plaintiffs**

81.     Plaintiff **Kristen Schertzer** is a resident of San Diego, California. Ms. Schertzer has a checking account with BofA.  On June 1, 2018, she placed her BofA ATM debit card into the Cardtronics ATM machine located at 645 Market Street, San Diego, CA 92101 in order, and solely, to make a quick $60.00 cash withdrawal. After entering her pin, she was presented with the screen prompt described in ¶ 30 above, which stated:

**Would you like your available Account Balances on a receipt?**

82.     Ms. Schertzer read the question and was confused. She assumed she was being asked if she would like a receipt following her intended cash withdrawal transaction. She looked at the green, "Yes Continue" button and assumed that this button would permit her to continue to engage in her cash withdrawal transaction. She immediately pressed the "Yes Continue" button and on the next screen identified that she

would like to withdraw her funds from her checking account. At that point, the transaction was ended, and a receipt printed. The next screen prompt appeared that stated: "Transaction Complete. Do you want another transaction? NO  YES."

83.     Ms. Schertzer was even further confused as to what had just occurred. She pressed the YES button and then was required to enter her PIN again. She did. Next, a traditional ATM screen menu appeared. From this menu, she was able to select and complete her $60.00 cash withdrawal as originally intended. She believes she pressed a button that read: "$60 Fast Cash from Checking". After pressing that button, the surcharge fee notice screen appeared. She accepted the cash withdrawal surcharge. Next, her cash was dispensed, and her receipt was printed for the cash withdrawal.

84.     Plaintiff was surprised to learn that she was assessed, in addition to the cash withdrawal surcharge paid to Cardtronics ($3.75), a separate $2.50 out of network Fee from BofA for making an balance inquiry, and an additional $2.50 fee from BofA for making an cash withdrawal. She was charged $8.75 in total fees for making a $60.00 withdrawal. Plaintiff is challenging the fee for the out-of-network balance inquiry only.

85.     Had Plaintiff Schertzer known that Cardtronics would register an out-of-network balance inquiry when she consented to receiving the free receipt, she would have considered other options for reviewing her account balance.

86.     Immediately following her transaction, BofA debited a $2.50 out-of-network ATM fee from her account for the purported balance inquiry. BofA then forwarded approximately $0.25 of the $2.50 collected from Plaintiff to Cardtronics for Plaintiff's purported balance inquiry transaction.

87.     Plaintiff Schertzer intends to continue to use third party ATM machines, including ATM machines owned by Cardtronics at times when she finds them convenient, when she does not have time to visit her home bank's ATM. Ms. Schertzer is seeking an injunction to prevent herself and other from being mislead in the future by the

Cardtronics' screen prompts. Because ATM transactions are so common, the likelihood of Ms. Schertzer falling victim to this improper business practice persists in the future.

88.   Plaintiff **Brittany Covell** is a resident of San Diego, California. Ms. Covell has a checking account with BofA.  On May 29, 2018, she placed her BofA ATM Debit card into the FCTI ATM machine located at a Seven Eleven (7-11) convenience store at 592 Santa Fe Drive, Encinitas, California to make a quick $20.00 cash withdrawal. Ms. Covell placed her debit card into the machine and entered her PIN. She was immediately asked (Consistent with paragraph 57 above):

**Would you like to view your account balance?**

89.   Ms. Covell was confused—believing that she might have pressed the wrong button on the menu screen. She didn't realize that a Menu screen had not been presented to her. Because she was in a hurry and wanted to get to her intended cash withdrawal quickly, she pressed, "YES" and viewed her account balance. The next screen asked her if she would like to "print her balance and continue the transaction?" Still confused, but wanting to get to her cash withdrawal, she pressed, "continue". At that point, a receipt was printed, and her transaction was ended. The next screen asked her to enter her PIN again. Still confused by what was happening, she entered her PIN.  At that point, she was requested:

**Would you like a receipt for this transaction?**

90.   Ms. Covell assumed that this request related to the customary receipt she would receive following a cash withdrawal transaction. She pressed the "Yes" button and was finally presented with a traditional Menu screen. From the Menu screen she completed a $20.00 cash withdrawal and received a receipt at the end of the transaction. She does not recall seeking another balance inquiry.

91.   Following her transaction, Plaintiff was surprised to learn that she was assessed, in addition to the cash withdrawal surcharge paid to FCTI ($3.00), two separate $2.50 fees from BofA for making balance inquiries, and an additional $2.50 fee from BofA for making a cash withdrawal. She was charged $10.50 in total fees for making a

$20.00 withdrawal. Ms. Covell is only challenging the second phantom balance inquiry fee.

92.   Had Plaintiff Covell known that FCTI would register a second out-of-network balance inquiry during the same transaction, she would have considered other options for reviewing her account balance.

93.   Immediately following her transaction, BofA twice debited a $2.50 out-of-network ATM fee from her account directly related to her supposed requests for balance inquiries. BofA then forwarded approximately $0.25 of the $2.50 collected each time from her to FCTI.

94.   Plaintiff Covell intends to continue to use third party ATM machines, including ATM machines owned by FCTI at times when she finds them convenient, when she does not have time to visit her home bank's ATM. Ms. Covell is seeking an injunction to prevent herself and other from being mislead in the future by the FCTI screen prompts. Because ATM transactions are so common, the likelihood of Ms. Covell falling victim to this improper business practice persists in the future.

95.   Plaintiff **Meagan Hicks** is a resident of San Diego, California. Ms. Hicks has a checking account with BofA.  On June 2, 2018 she approached the Cash Depot ATM machine located in Wal-Mart at 4840 Shawline Street, San Diego, California 92111. She observed a large sign above the ATM machine which prominently displayed, the representation: "**Avoid Overdraft Fees Check Your Balance for Free**."  She read the sign and believed that it meant she could perform a balance inquiry transaction at that particular ATM machine free of charge. She thought that made sense because Wal-Mart is a large retailer, and they probably had a deal with her bank, BofA, to provide this service free of charge.

96.   She proceeded to enter her debit card into the machine and typed in her PIN at the first screen prompt. The next screen prompt appeared asking her:

**Would you like to check your balance?**

THIRD AMENDED CLASS ACTION COMPLAINT

97.     Relying on the representation on top of the ATM machine that checking her balance was "free," Ms. Hicks went ahead and pressed the "Yes" button and received her checking account balance. Plaintiff was provided her balance and then directed to the next screen prompt, the "Menu" screen, where she selected a cash withdrawal transaction. Plaintiff next proceeded to make a $20.00 cash withdrawal. She received a receipt at the conclusion of her cash withdrawal transaction.  Following her transaction, Plaintiff was surprised to learn that she was assessed, in addition to the surcharge paid to Cash Depot ($2.50) and $2.50 fee from BofA for making a cash withdrawal, a separate $2.50 fee from BofA was assessed for making a balance inquiry. She was charged $7.00 in total fees for making a $20.00 withdrawal.

98.     Had Plaintiff Hicks known that Cash Depot would register a normal out-of-network balance inquiry for which she would incur a fee instead of the advertised free balance inquiry, she would have considered other options for reviewing her account balance.

99.     Immediately following her transaction, BofA debited a $2.50 out-of-network ATM fee from her account related to the balance inquiry. BofA then forwarded approximately $0.25 of the $2.50 collected from Plaintiff to Cash Depot for Plaintiff's balance inquiry.

100.   Plaintiff Hicks is challenging the fee assessed on the balance inquiry.

101.   Plaintiff Hicks intends to continue to use third party ATM machines, including ATM machines owned by Cash Depot at times when she finds them convenient, when she does not have time to visit her home bank's ATM. Ms. Hicks is seeking an injunction to prevent herself and other from being mislead in the future by the Cash Depot screen prompts. Because ATM transactions are so common, the likelihood of Ms. Hicks falling victim to this improper business practice persists in the future.

**B.    Defendants**

102.   BofA is national bank with over 4,500 retail branches. BofA has its headquarters and principle place of business in Charlotte, North Carolina. Among other

things, BofA is engaged in the business of providing retail banking services to customers, including Plaintiffs, and members of the putative Classes, which includes the issuance of debit cards for use by its customers in conjunction with their checking accounts. BofA operates banking centers and conducts business throughout the State of California.

103.    Cardtronic is the world's largest operator of independent, stand-alone ATM machines. Cardtronics operates approximately 200,000 ATMs worldwide, including thousands of machines in the state of California and in this District. Cardtronics is a Delaware corporation and has its headquarters and principle place of business located in Houston, Texas.

104.    Cash Depot is one of the nation's largest independent ATM operators with over 30,000 stand-alone ATM machines in service. The majority of Cash Depot's ATM machines are located in Wal-Mart retail stores. Cash Depot's headquarters and principle place of business are located in Green Bay, Wisconsin. Cash Depot is a Wisconsin limited company.

105.    FCTI is California corporation, with its headquarters and principle place of business located in Los Angeles, California. FCTI is also one of the nation's largest independent operators of stand-alone ATM machines with over 30,000 such machines in service.

## V.    CLASS ALLEGATIONS

**A.    The Cardtronics Class:**

106.    Plaintiff Schertzer brings this action on behalf of herself and on behalf of all others similarly situated against Cardtronics. The Class includes:

> All holders of a checking account in California who, within the applicable statute of limitations preceding the filing of this lawsuit, were assessed one or more out-of-network balance inquiry fees for purportedly undertaking a balance inquiry at the same time as a cash withdrawal at a CARDTRONICS ATM.

**B.    The FCTI Classes:**

107.    Plaintiff Covell brings this action on behalf of herself and on behalf of all others similarly situated against FCTI. The Classes includes:

All holders of a checking account who, within the applicable statute of limitation preceding the filing of this lawsuit, were assessed more than one fee for purportedly undertaking a balance inquiry at the same time as a cash withdrawal at a FCTI ATM (the "National FCTI Class").

All holders of a checking account in California who, within the applicable statute of limitations preceding the filing of this lawsuit, were assessed more than one fee for purportedly undertaking a balance inquiry at the same time as a cash withdrawal at a FCTI ATM (the "California FCTI Class").

**C.   The Cash Depot Class:**

108.   Plaintiff Hicks brings this action on behalf of herself and on behalf of all others similarly situated against Cash Depot. The Class includes:

All holders of a checking account in California who, within the applicable statute of limitation preceding the filing of this lawsuit, were assessed one or more fees for purportedly undertaking a balance inquiry at the same time as a cash withdrawal at a Cash Depot ATM (the "California Cash Depot Class").

**D.   The BofA Class:**

109.   Plaintiffs bring this action on behalf of themselves and on behalf of all others similarly situated against BofA.

110.   The proposed Classes are defined as:

All BofA checking account holders in the United States who within the applicable statute of limitations were assessed one or more fees for purportedly undertaking a balance inquiry as part of a cash withdrawal at a Cardtronics, FCTI or Cash Depot ATM. (the "National BofA Class").

All BofA checking account holders in California who within the applicable statute of limitations were assessed one or more fees for purportedly undertaking a balance inquiry as part of a cash withdrawal at a Cardtronics, FCTI or Cash Depot ATM. (the "California BofA Class").

111.   Excluded from each of the aforementioned Classes are Defendants, their subsidiaries and affiliates, their officers, directors and member of their immediate families and any entity in which defendants have a controlling interest, the legal representatives, heirs, successors or assigns of any such excluded party, the judicial officer(s) to whom this action is assigned, and the members of their immediate families.

112.   Plaintiffs reserve the right to modify or amend the definition of the proposed Classes and/or to add a Subclass(es), if necessary, before this Court determines whether certification is appropriate.

113.   The parties are numerous such that joinder is impracticable. Upon information and belief, and subject to Class discovery, the Classes consist of thousands of members or more, the identity of whom are within the exclusive knowledge of and can be ascertained only by resort to the ATM Defendants' and/or BofA's records. Defendants collectively have the administrative capability through their computer systems and other records to identify all members of the Classes, and such specific information is not otherwise available to Plaintiffs.

114.   The questions here are ones of common or general interest such that there is a well-defined community of interest among the Class members. These questions predominate over questions that may affect only individual Class members because each ATM Defendant and BofA has acted (independently) on grounds generally applicable to the classes.  Such common legal or factual questions include, but are not limited to:

115.   With respect to the cases against the ATM Defendants:

a)      whether the ATM Defendants improperly received interchange fees from financial institutions resulting from improper out-of-network balance inquiries;

b)      whether such conduct enumerated herein is deceptive;

c)      whether the ATM Defendants violated the UCL; and

d)      whether Plaintiffs and other members of the Classes have sustained financial losses as a result of the ATM Defendants' wrongful business practices described herein, and the proper measure of restitution.

116.   With respect to BofA:

a)      whether the BofA improperly collected out-of-network balance inquiry fees from their customers, including Plaintiffs, without ensuring their customers performed, engaged or otherwise consented to balance inquiries;

b)      whether BofA breached their contracts by collecting out-of-network balance inquiry fees for transactions that did not occur;

THIRD AMENDED CLASS ACTION COMPLAINT

19cv00264

c)   whether BofA breached their contracts with their customers, including Plaintiffs.

d)   whether BofA reserved discretion in defining the circumstances in which a customer would be deemed to have engaged in a balance inquiry that would give rise to a corresponding out-of-network fee;

e)   whether BofA failed to exercise such discretion in good faith; and

f)   whether Plaintiffs and other members of the Classes have sustained damages as a result of the BofA's wrongful business practices described herein, and the proper measure of damages.

117.   It is impracticable to bring Class members' individual claims before the Court. Class treatment permits a large number of similarly situated persons or entities to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort, expense, or the possibility of inconsistent or contradictory judgments that numerous individual actions would engender. The benefits of the class mechanism, including providing injured persons or entities with a method for obtaining redress on claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action.

118.   Plaintiffs' claims are typical of the claims of the other Class members in that they arise out of the same wrongful business practices by the ATM Defendants and BofA as described herein.

119.   Plaintiffs are more than adequate representatives of each of the Classes in that each has suffered damages as a result of the ATM Defendants' and/or BofA's improper business practices.  In addition:

a)   Plaintiffs are committed to the vigorous prosecution of this action on behalf of themselves and all others similarly situated and have retained competent counsel experienced in the prosecution of class actions and, in particular, class actions on behalf of consumers against financial institutions;

b)      there is no conflict of interest between Plaintiffs and the unnamed Class members;

c)      Plaintiffs anticipate no difficulty in the management of this litigation as a class action; and

d)      Plaintiffs' legal counsel has the financial and legal resources to meet the substantial costs and legal issues associated with this type of litigation.

120.   The ATM Defendants and BofA have acted, or refused to act, on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.

121.   All conditions precedent to bringing this action have been satisfied and/or waived.

## FIRST CAUSE OF ACTION

### VIOLATION OF THE UNFAIR COMPETITION LAW
### Cal. Bus. & Prof. Code § 17200 (fraud prong)

(Against Defendant Cardtronics on
Behalf of the California Cardtronics Class)

122.   Plaintiff Schertzer incorporates the preceding allegations by reference as if fully set forth herein.

123.   Cardtronics' conduct described herein violates the UCL, codified at Cal. Bus. & Prof. Code § 17200, *et seq.*

124.   The UCL prohibits and provides civil remedies for unfair competition. Its purpose is to protect both consumer and competitors by promoting fair competition in commercial markets for goods and services. In service of that purpose, the Legislature framed the UCL's substantive provisions in broad, sweeping language.

125.   By defining unfair competition to include any "any unlawful, unfair or fraudulent business act or practice," the UCL permits violations of other laws to be treated as unfair competition that is independently actionable and sweeps within its scope acts and practices not specifically proscribed by any other law.

126.   The UCL expressly provides for restitution and injunctive relief, and also contains provisions denoting its public purpose.  A claim for injunctive relief under the UCL is brought by a plaintiff acting in the capacity of a private attorney general. Although the private litigant controls the litigation of an unfair competition claim, the private litigant is not entitled to recover compensatory damages for his own benefit, but only disgorgement of profits made by the defendant through unfair or deceptive practices in violation of the statutory scheme or restitution to victims of the unfair competition.

127.   Cardtronics committed deceptive and fraudulent business acts and practices in violation of Cal. Bus. & Prof. Code § 17200, *et seq*., by employing a deceptive screen prompt at its ATM machines which had the effect of misleading consumers, including Plaintiff Schertzer, into engaging in out-of-network balance inquiries that they did not consent to, nor reasonably understand to be balance inquiries. By conflating the purported "balance inquiry" with the presentation of a "receipt," Cardtronics intentionally misleads consumers into believing that they are simply receiving a "free" receipt at the end of their intended cash withdrawal transaction. Had consumers, including Plaintiff Schertzer, been adequately informed by Cardtronics that they were in fact engaging in a balance inquiry, they would have been able to weigh the convenience and benefit in engaging in these transactions against the cost of the out-of-network fee assessed to them by their home banks.

128.   Plaintiff and members of the Class acted as reasonable consumers in relying upon the material representation of the screen prompt associating the purported balance inquiry with the printing of a receipt and equating it with the receipt that is required to be provided as a matter of law, free of charge, subsequent to a cash withdrawal transaction.

129.   Cardtronics' unfair business practices are immoral, unethical, oppressive, unscrupulous, unconscionable and/or substantially injurious to Plaintiff and members of the Class.

130.   As a result of Cardtronics' violations of the UCL, Plaintiffs and members of the Class have unwittingly paid, and/or will continue to pay, out of network balance

inquiry fees to their home banks, and thereby, have suffered and will continue to suffer financial harm. In addition, Cardtronics' conduct continues to deceive the general public. Cardtronic's misrepresentations and omissions in its ATM screen prompts are likely to deceive current and prospective accountholders making corresponding public injunctive relief necessary.

131.   Cardtronics receives an approximately $0.25 interchange fee from the consumers' home banks each time it tricks a consumer into performing an out-of-network balance inquiry at one of its ATM machines. Cardtronics is liable to Plaintiff Schertzer and the proposed Class, because those funds are directly traceable from the out-of-network balance inquiry fee assessed by all retail banks and directly result from the misleading conduct of Cardtronics.

132.   Therefore, Plaintiff Schertzer and the California Cardtronics Class seek restitution, injunctive relief and other appropriate relief as prayed for below.

## SECOND CAUSE OF ACTION

### VIOLATION OF THE UNFAIR COMPETITION LAW
### Cal. Bus. & Prof. Code § 17200 (fraud prong).

(Against Defendant Cash Depot on
Behalf of the California Cash Depot Class)

133.   Plaintiff Hicks incorporates the preceding allegations by reference as if fully set forth herein.

134.   Cash Depot's conduct described herein violates the UCL, codified at Cal. Bus. & Prof. Code § 17200, *et seq*.

135.   The UCL prohibits and provides civil remedies for, unfair competition. Its purpose is to protect both consumer and competitors by promoting fair competition in commercial markets for goods and services. In service of that purpose, the Legislature framed the UCL's substantive provisions in broad, sweeping language.

136.   By defining unfair competition to include any "any unlawful, unfair or fraudulent business act or practice," the UCL permits violations of other laws to be treated

as unfair competition that is independently actionable and sweeps within its scope acts and practices not specifically proscribed by any other law.

137.   The UCL expressly provides for restitution and injunctive relief and also contains provisions denoting its public purpose.  A claim for injunctive relief under the UCL is brought by a plaintiff acting in the capacity of a private attorney general.  Although the private litigant controls the litigation of an unfair competition claim, the private litigant is not entitled to recover compensatory damages for his own benefit, but only disgorgement of profits made by the defendant through unfair or deceptive practices in violation of the statutory scheme or restitution to victims of the unfair competition.

138.   Cash Depot committed deceptive and fraudulent business acts and practices in violation of Cal. Bus. & Prof. Code § 17200, *et seq.*, by making prominent marketing representation on signs posted above its ATM machines at every location, intended to lure consumers into performing balance inquiries with the message:

**"PREVENT OVERDRAFT FEES CHECK YOUR BALANCE FOR FREE."**

139.   This representation is deceptive and misleading because, as Cash Depot is fully aware, the overwhelming majority of its customers will be charged an out-of-network ATM balance inquiry fee for checking their "balance".  Cash Depot knows that nearly every bank in California charges their customers out of network balance inquiry fees.

140.   Consumers, including Plaintiff Hicks, were reasonable in assuming that if a prominent sign, hanging above the ATM at a large retailer such as Wal-Mart advertises that the balance inquiry is free of charge, that representation was true. Had consumers, including Ms. Hicks, been adequately informed by Cash Depot that Plaintiff and other customers were in fact engaging in a balance inquiry in the normal course, they would have been able to weigh the convenience and benefit in engaging in these transactions against cost of the out-of-network fee assessed to them by their home banks.

141.   Plaintiff and members of the Class acted as reasonable consumers in relying upon the material representation that the balance inquiry transaction would be free of charge.

142.   Cash Depot's unfair business practices are immoral, unethical, oppressive, unscrupulous, unconscionable and/or substantially injurious to Plaintiff and members of the Class.

143.   As a result of Cash Depot' violations of the UCL, Plaintiffs and members of the Class have paid, and/or will continue to pay, out of network balance inquiry fees to their home banks and thereby have suffered and will continue to suffer financial harm. In addition, Cash Depot' conduct continues to deceive the general public.

144.   Cash Depot receives an approximately $0.25 interchange fee from the consumers' home banks, each time it tricks a consumer into performing an out of network balance inquiry at one of its ATM machines. Cash Depot is liable to Plaintiff and the proposed Class, because those funds are directly traceable from the out-of-network balance inquiry fee assessed by all retail banks, including BofA and directly result from the misleading conduct of Cash Depot.

145.   Therefore, Plaintiff Hicks and the California Cash Depot Class seek restitution, injunctive relief and other appropriate relief as prayed for below.

### THIRD CAUSE OF ACTION

**VIOLATION OF THE UNFAIR COMPETITION LAW**
**Cal. Bus. & Prof. Code § 17200 (fraud prong).**

(Against Defendant FCTI on
Behalf of the National FCTI Class and California FCTI Class)

146.   Plaintiff Covell incorporates the preceding allegations by reference as if fully set forth herein.

147.   FCTI's conduct described herein violates the UCL, codified at Cal. Bus. & Prof. Code § 17200, *et seq*.

148.   The UCL prohibits and provides civil remedies for, unfair competition. Its purpose is to protect both consumer and competitors by promoting fair competition in

commercial markets for goods and services. In service of that purpose, the Legislature framed the UCL's substantive provisions in broad, sweeping language.

149.  By defining unfair competition to include any "any unlawful, unfair or fraudulent business act or practice," the UCL permits violations of other laws to be treated as unfair competition that is independently actionable and sweeps within its scope acts and practices not specifically proscribed by any other law.

150.  The UCL expressly provides for restitution, injunctive relief and also contains provisions denoting its public purpose.  A claim for injunctive relief under the UCL is brought by a plaintiff acting in the capacity of a private attorney general. Although the private litigant controls the litigation of an unfair competition claim, the private litigant is not entitled to recover compensatory damages for his own benefit, but only disgorgement of profits made by the defendant through unfair or deceptive practices in violation of the statutory scheme or restitution to victims of the unfair competition.

151.  FCTI committed deceptive and fraudulent business acts and practices in violation of Cal. Bus. & Prof. Code § 17200, *et seq.*, by employing a deceptive screen prompt at its ATM machines, which had the effect of misleading consumers, including Plaintiff Covell, into engaging in out-of-network balance inquiries that they did not consent to, nor reasonably understand to be balance inquiries. Prior to presenting consumers with a "menu" screen and permitting them to proceed to their intended cash withdrawal transaction, FCTI presents a screen prompt which asks the consumer:

**Would you like a receipt for this transaction?**

152.  When consumers, including Ms. Covell read this screen prompt, they reasonably believe they are being offered a receipt for their forthcoming cash withdrawal transaction, free of charge, consistent with both experiences in using ATMs and federal law.  When consumers, including Ms. Covell, agree to receive a receipt, this request for a receipt is communicated by FCTI to the consumers' home bank as a balance inquiry. Had consumers, including Plaintiff Covell, been adequately informed by FCTI that they were in fact engaging in a balance inquiry or multiple balance inquiries, they would have

been able to weigh the convenience and benefit in engaging in these transactions against cost of the out-of-network fee assessed to them by their home banks.

153.   Plaintiff and members of the Class, acted reasonably in believing the screen prompt asking if they would like a receipt, meant that it would be provided as a matter of law, free of charge, subsequent to a cash withdrawal transaction.

154.   FCTI's unfair business practices are immoral, unethical, oppressive, unscrupulous, unconscionable and/or substantially injurious to Plaintiff and members of the Class.

155.   As a result of FCTI's violations of the UCL, Plaintiffs and members of the Class have paid, and/or will continue to pay, out of network balance inquiry fees to their home banks and thereby have suffered and will continue to suffer financial harm. In addition, FCTI's conduct continues to deceive the general public. FCTI's misrepresentations and omissions in its ATM screen prompts are likely to deceive current and prospective accountholders making corresponding public injunctive relief necessary.

156.   FCTI receives a $0.25 interchange fee from the consumers' home banks, each time it tricks a consumer into performing an out of network balance inquiry at one of its ATM machines. FCTI is liable to Plaintiff and the proposed Classes, because those funds are directly traceable from the out-of-network balance inquiry fee assessed by all retail banks, including BofA, and directly result from the misleading conduct of FCTI.

157.   Therefore, Plaintiff Covell and the National FCTI Class and California FCTI Class seek restitution, injunctive relief and other appropriate relief as prayed for below.

## FOURTH CAUSE OF ACTION

### BREACH OF CONTRACT & BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING.

(Against Defendant BofA on
Behalf of the National Class and California Class)

158.   Plaintiffs incorporate the preceding allegations by reference as if fully set forth herein.

159.   Consumers, including Plaintiffs, and BofA have contracted for bank account deposit, checking, ATM, and debit card services. BofA has represented to Plaintiffs that in the event Plaintiffs utilize a non-BofA branded ATM to perform a balance inquiry, BofA may charge them a $2.50 out of network balance inquiry fee.

160.   No contract provision authorizes BOFA to charge out-of-network balance inquiry fees to Plaintiffs and the proposed Class in circumstances where they simply requested a free receipt (Cardtronics), requested a single balance inquiry but were deemed to have requested multiple balance inquiries (FTCI) or were told at the ATM machine that checking their balance would be "free" when in fact it was not (Cash Depot).  In assessing out-of-network balance inquiry fees in circumstances where accountholders did not consent to balance inquiries, BofA breached the express terms of its agreements.

161.   Furthermore, BofA failed to define the term, "Balance Inquiry." In so doing, BofA has reserved exclusive discretion for determining when its customers have consented to an out-of-network balance inquiry.

162.   Whether by common law or statute, all contracts, including BofA's Account Agreement and Fee Disclosures, impose upon each party a duty of good faith and fair dealing. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain.  Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form. Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

163.   Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes their conduct to be justified.  Bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty.  Examples of bad faith are evasion of the spirit of the bargain, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.

164.   BofA has breached the covenant of good faith and fair dealing in the contract through its assessment of out-of-network balance inquiry fees in circumstances where consumers and Plaintiffs did not knowingly or affirmatively consent to a balance inquiry.

165.   Specifically, BofA harms consumers by abusing its contractual discretion in a number of ways which no reasonable consumer would anticipate.

166.   BofA uses its contractual discretion to assess out-of-network balance inquiry fees knowingly assessing such fees in transactions where the BofA has failed to exercise its discretion to assure that Plaintiffs and members of the class had actually engaged in a balance inquiry transaction.

167.   In addition, BofA uses its contractual discretion to define "balance inquiry" in a way that no reasonable consumer could anticipate, which includes the requesting of a free receipt in conjunction with a cash withdrawal transaction. Furthermore, BofA uses its contractual discretion to define "balance inquiry" in circumstances where the out-of-network ATM owners it contracts with deceptively and fraudulently register balance inquiry information to BofA.

168.   Plaintiffs and members of the Classes have performed all, or substantially all, of the obligations imposed on them under the account documents.

169.   Plaintiffs and members of the Classes have sustained damages as a result of BofA's breach of contract and breach of the covenant of good faith and fair dealing, under California law.  As California law on breach of contract and breach of the covenant of good faith and fair dealing is the same or substantially the same with respect to all other states in which BofA does business, Plaintiffs assert this claim on behalf of the National BofA Class and California BofA Class.

## **FIFTH CAUSE OF ACTION**

### **UNJUST ENRICHMENT.**

#### (Against all Defendants on Behalf of All Classes)

170.   Plaintiffs incorporate the preceding allegations by reference as if fully set forth herein.

THIRD AMENDED CLASS ACTION COMPLAINT

171.   Plaintiffs, on behalf of themselves and the Classes, assert a common law claim for unjust enrichment to the extent that they have no adequate remedy at law.

172.   By means of Defendants' wrongful conduct alleged herein, Defendants engaged in financial services to Plaintiffs and members of the Classes that was unfair, unconscionable, and oppressive.

173.   Defendants knowingly received and retained wrongful benefits and funds from Plaintiffs and members of the Classes.  In so doing, Defendants acted with conscious disregard for the rights of Plaintiffs and members of the Classes.

174.   As a result of Defendants' wrongful conduct as alleged herein, Defendants have been unjustly enriched at the expense of, and to the detriment of, Plaintiffs and members of the Classes.

175.   Defendants' unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein.

176.   Under the common law doctrine of unjust enrichment, it is inequitable for Defendants to be permitted to retain the benefits it received, and is still receiving, without justification, from Plaintiffs and members of the Classes in an unfair, unconscionable, and oppressive manner.  Defendants' retention of such funds under circumstances making it inequitable to do so constitutes unjust enrichment.

177.   The financial benefits derived by Defendants rightfully belong to Plaintiffs and members of the Classes and must be returned to them.

178.   Therefore, Plaintiffs assert a claim of unjust enrichment under California law.  Furthermore, as California law on unjust enrichment is the same or substantially the same with respect to all other states in which Defendants do business, Plaintiffs assert this claim on behalf of the national classes and the California classes

## VI.   **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment against Defendants for themselves and the Class members as follows:

THIRD AMENDED CLASS ACTION COMPLAINT

1       a)    declaring BofA's Balance Inquiry Fee policies and practices to be a

2  breach of contract;

3       b)    restitution of BofA's portion of all relevant fees taken from Plaintiffs'

4  accounts and restitution of the interchange fee transferred from BofA to the ATM

5  Defendants for each of these fees as alleged herein and as a result of the wrongs

6  alleged herein in an amount to be determined at trial;

7       c)    actual damages from BofA for breach of contract and/or breach of the

8  implied covenant of good faith and fair dealing in an amount according to proof;

9       d)    pre-judgment interest at the maximum rate permitted by applicable

10  law;

11       e)    an order on behalf of the general public enjoining the ATM

12  Defendants from continuing to employ unfair methods of competition and commit

13  unfair and deceptive acts and practices alleged in this complaint and any other acts

14  and practices proven at trial;

15       f)    costs and disbursements assessed by Plaintiffs in connection with this

16  action, including reasonable attorneys' fees pursuant to the customer agreements,

17  Cal. Civ. Proc. Code § 1021.5, and other applicable law; and

18       g)    Such other relief as this Court deems just and proper.

## VII.   DEMAND FOR JURY TRIAL

20      Plaintiffs and all others similarly situated hereby demand trial by jury on all issues

21  in this complaint that are so triable as a matter of right.

22  Dated: March 25, 2020        **CARLSON LYNCH LLP**

23              By:  */s/ Todd D. Carpenter*

24                  Todd D. Carpenter (CA Bar No. 234464)
                        tcarpenter@carlsonlynch.com

25                  (Eddie) Jae K. Kim (CA Bar No. 236805)
                        ekim@carlsonlynch.co,

26                  Scott G. Braden (CA Bar No. 305051)
                        sbraden@carlsonlynch.com

27                  1350 Columbia St., Ste. 603
                        San Diego, California 92101

28                  Telephone:   (619) 762-1900
                        Facsimile:   (619) 756-6991

THIRD AMENDED CLASS ACTION COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**KALIEL PLLC**
Jeffrey D. Kaliel (CA Bar No. 238293)
jkaliel@kalielpllc.com
Sophia Gold (CA Bar No. 307971)
sgold@kalielpllc.com
1875 Connecticut Ave., NW, 10th Floor
Washington, D.C. 20009
Telephone:  (202) 350-4783

*Attorneys for Plaintiff*
*and Proposed Class Counsel*

THIRD AMENDED CLASS ACTION COMPLAINT