UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

KRISTEN SCHERTZER, et al., on behalf of themselves all others similarly situated,

Plaintiffs,

v.

BANK OF AMERICA, N.A. et al.,

Defendants.

Case No.:  19cv264 JM(MSB)

**ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

Presently before the court are Plaintiffs Kristen Schertzer's and Brittany Covell's ("Plaintiffs") Motion for Class Certification (Doc. No. 198) and Defendant Bank of America, N.A.'s ("BANA"[1]) Motion for Summary Judgment (Doc. No. 231).  The motions have been fully briefed and the court held oral argument on February 28, 2022.

I.   **PROCEDURAL BACKGROUND**

On February 5, 2019, Plaintiffs Schertzer, Hicks and Covell initiated this proposed (or putative) class action by filing suit. (Doc. No. 1.)  The basis of Plaintiffs' claims arise out of the fees charged by BANA to its account holders for balance inquiries performed at out-of-network ("OON") Automatic Teller Machines ("ATMs").

---

[1] Plaintiffs refer to Defendant as "BofA" while Defendant and its counsel shorten Bank of America to "BANA."  Feeling it appropriate to defer to Defendant's chosen abbreviation, the court will refer to Defendant as "BANA" throughout this order.

1

On May 31, 2019, a second amended complaint ("SAC") was filed alleging original jurisdiction under the Class Action Fairness Act ("CAFA") of 2005 and, specifically under 28 U.S.C. § 1332(d)(2) and setting forth a total of thirteen claims against the defendants individually and collectively. (Doc. No. 56, "SAC".)   Combined, the claims were for: (1) violation of California's Unfair Competition Law ("UCL"), CAL. BUS. & PROF. CODE § 17200, *et seq.*; (2) conversion; (3) negligence; (4) violation of the California's False Advertising Law ("FAL"), CAL. BUS. & PROF. CODE § 17500, *et seq.*; (5) violation of the California Consumer Legal Remedies Act ("CLRA"), CAL. CIV. CODE § 1770, *et seq.*; (6) breach of contract; and (7) breach of the covenant of good faith and fair dealing. (*Id.* at 58-78.)   On March 4, 2020, this court granted Defendants' motions to dismiss with leave to amend.  (Doc. No. 94.)

On March 24, 2020, the operative third amend complaint ("TAC") was filed, again claiming original jurisdiction under CAFA. (Doc. No. 96.) It alleges claims for: (1) violation of the UCL, CAL. BUS. & PROF. CODE § 17200, *et seq.*; (2) breach of the covenant of good faith and fair dealing; and (3) unjust enrichment. (TAC at 34-431.)

On July 29, 2021, Plaintiff Hicks and Defendant Cash Depot filed a joint motion for voluntary dismissal with prejudice, which was granted by the court.  (Doc. Nos. 179, 180.) Cash Depot was dismissed as a party to this litigation. (Doc. No. 180 at 2[2].)

On October 21, 2021, Plaintiff Schertzer and Defendant Cardtronics filed a joint motion for voluntary dismissal with prejudice, which was granted by the court.  (Doc. Nos. 204, 205.)  Cardtronics was dismissed as a party to this litigation. (Doc. No. 205 at 2.)

On November 17, 2021, Plaintiff Hicks and Defendant BANA, filed a renewed joint motion for voluntary dismissal with prejudice, which was granted by the court. (Doc. Nos. 225, 227.)  Having no remaining claims in this action, Plaintiff Hicks was dismissed as a party to this action.  (Doc. No. 227 at 2.)

---

[2] Document numbers and page references are to those assigned by CM/ECF for the docket entry.

19cv264 JM(MSB)

As set forth in the TAC, Plaintiffs Schertzer and Covell seek to represent two putative BANA classes defined as:

> All BofA checking account holders in the United States who within the applicable statute of limitations were assessed one or more fees for purportedly undertaking a balance inquiry as part of a cash withdrawal at a Cardtronics, FCTI or Cash Depot ATM. (the "National BofA Class").

> All BofA checking account holders in California who within the applicable statute of limitations were assessed one or more fees for purportedly undertaking a balance inquiry as part of a cash withdrawal at a Cardtronics, FCTI or Cash Depot ATM. (the "California BofA Class").

TAC at ¶ 110.  Additionally, as set forth in the TAC, Covell seeks to bring this action on behalf of herself and two putative FCTI classes defined as:

> All holders of a checking account, who, within the applicable statute of limitation preceding the filing of this lawsuit, were assessed more than one fee for purportedly undertaking a balance fee inquiry at the same time as a cash withdrawal at a FCTI ATM (the "National FCTI Class").

> All holders of a checking account in California who, within the applicable statute of limitations preceding the filing of this lawsuit, were assessed more than one fee for purportedly undertaking a balance inquiry at the same time as a cash withdrawal at a FCTI ATM (the "California FCTI Class").

TAC at ¶ 107.

The prayer for relief seeks an order declaring BANA's Balance Inquiry Fee policies and practices to be a breach of contract; restitution; actual damages; costs and attorney fees; and an order enjoining the ATM Defendants from continuing to employ unfair methods of competition and committing unfair and deceptive acts and practices alleged in the complaint.  (*Id*. at 43-44.)

///

///

19cv264 JM(MSB)

On October 16, 2021, Plaintiffs Schertzer and Covell filed a motion for class certification.  (Doc. No. 198.)  On November 15, 2021[3], both FCTI and BANA filed opposition briefs.  (Doc. Nos. 220, 221.)  On November 29, 2021, Plaintiffs duly filed their reply.  (Doc. No. 234.)

Relatedly, on November 15, 2021, BANA filed a Motion to Exclude the Expert Opinion of Arthur Olsen, filed in support of Plaintiffs' motion for class certification.  (Doc. No. 223.)  On December 6, 2021, Plaintiffs filed their opposition, (Doc. No. 243) and BANA duly filed its reply (Doc. No. 246).

On November 29, 2021, Defendant BANA moved for summary judgment on Plaintiffs' breach of contract and breach of the covenant of good faith and fair dealings claims.  (Doc. No. 231-1.)  Plaintiffs filed an Opposition (Doc. No. 254) and BANA replied (Doc. No. 259).

## II.    FACTUAL BACKGROUND

Plaintiffs Kristen Schertzer and Brittany Covell are account holders at BANA.  (Doc. No. 96 at ¶¶ 4, 81).   The terms of Plaintiffs' accounts are governed by: (1) a "Deposit Agreement and Disclosures" (Doc No. 231-4, "Deposit Agreement"); (2) a "Personal Schedule of Fees" (Doc. No. 231-5, "Personal Fee Schedule"); (3) a "Schedule of Electronic Fees and Dollar Limits on Transactions Supplement to Your Card Agreement" (Doc. No. 231-6, "Electronic Fee Schedule"); and (4) an "Important Information Brochure: Card Agreement and Disclosure" (Doc. No. 231-7, "Information Brochure") (collectively, the "Agreements").  (Doc. Nos. 254-1 at ¶ 1).

///

///

///

---

[3] The parties asked for, and were given, an extended briefing schedule on the motions because of ongoing discovery issues.

19cv264 JM(MSB)

The Agreements outline, among other things, how OON ATM fees are charged to BANA account holders.  With respect to such fees, the Deposit Agreement states:

> *ATM Fees*      When you use an ATM that is not prominently branded with the Bank of America name and logo, you may be charged a fee by the ATM operator or any network used and you may be charged a fee for a balance inquiry *even if you do not complete a fund transfer*.  We may also charge you fees.

*Id.* at 35 (emphasis added).

The Personal Fee and Electronic Fee Schedules, in turn, provide that for "withdrawals, transfers, and balance inquiries" conducted at OON ATMs in the United States, BANA account holders are charged a $2.50 per transaction fee.  (Doc. Nos. 231-5 at 10; 231-6 at 2).

Like the Deposit Agreement, the Personal Fee Schedule also provides that:

> When you use a non-Bank of America ATM, you may also be charged a fee by the ATM operator or any network used and you may be charged a fee for a balance inquiry *even if you do not complete a funds transfer*.

*Id.* (emphasis added).  The Information Brochure states BANA account holders "authorize" BANA to "act on the instructions you give us through ATMs."  (Doc. No. 231-7 at 3).

The Deposit Agreement includes a section entitled "Reporting Problems" which states:

> If you find that your record and ours disagree, if you suspect any problem or unauthorized transaction on your account or you do not receive a statement when expected, call us immediately at the number for customer service on your statement.  If you fail to notify us in a timely manner, your rights may be limited.

(Doc. No. 231-4 at 25).

The section defines "problems and unauthorized transactions" as:

> Problems and unauthorized transactions include suspected fraud; missing deposits; unauthorized electronic transfers; missing,

5

19cv264 JM(MSB)

> stolen, or unauthorized checks or other withdrawal orders; checks or other withdrawal orders bearing an unauthorized signature, endorsement, or alteration; illegible images; encoding errors made by you or us; and counterfeit checks. This is not a complete list.

*Id.*

## A.   Plaintiffs' OON Transactions

### 1.   *Plaintiff Schertzer*

On June 1, 2018, Plaintiff Schertzer conducted a transaction at an OON ATM machine operated by former Defendant Cardtronics, Inc. ("Cardtronics").  (Doc. No. 96 at ¶ 81).  Plaintiff alleges she intended to make a $ 60.00 cash withdrawal.  *Id.*  After placing her ATM debit card into the machine and entering her PIN, Plaintiff was presented with a screen prompt stating: "Would you like your available Account Balances on receipt?" with two available options: a "Main Menu" button and a "Yes Continue" button.  *Id.* at ¶¶ 30, 81

Plaintiff Schertzer pressed the "Yes Continue" button, at which point a receipt was printed and she was presented with a second screen prompt stating: "Transaction Complete. Do you want another transaction?" with "Yes" and "No" buttons.  *Id.* at ¶ 82.  In response to this prompt, Plaintiff pressed the "Yes" button, entered her PIN again, and was presented with a "traditional" menu from which she was able to select and complete her $60.00 cash withdrawal.  *Id.* at ¶ 83.

Plaintiff was assessed two OON fees by BANA:  a $2.50 fee for making a balance inquiry and a $2.50 fee for making a cash withdrawal.  *Id.* at ¶ 84.  The fees appeared on Plaintiff Schertzer's monthly statement for the period from May 22, 2018 through June 20, 2018.  (Doc. No. 254-1 at ¶ 29).

### 2.   *Plaintiff Covell*

On May 29, 2018, Plaintiff Covell conducted a transaction at an OON ATM machine operated by Defendant FTCI, Inc. ("FTCI").  (Doc. No. 96 at ¶ 88).  Plaintiff alleges she intended to make a $20.00 cash withdrawal.  *Id.*  After placing her ATM debit card into the

19cv264 JM(MSB)

machine and entering her PIN, Plaintiff was presented with a screen prompt stating: "Would you like to view your account balance?" with two available options: a "Yes" and "No" button. *Id.* at ¶¶ 57, 88. Plaintiff pressed the "Yes" button and was presented with her account balance and a prompt asking if she would like to "print her balance and continue the transaction?" *Id.* at ¶ 89. Plaintiff subsequently pressed the option to continue the transaction, at which point a receipt was printed and the transaction ended. *Id.*

Plaintiff was then asked to enter her PIN again at which point the screen prompt asked: "Would you like a receipt for this transaction?" *Id.* When Plaintiff pressed the "Yes" button, she was presented with a "traditional" menu from which she was able to complete her $20.00 cash withdrawal. *Id.* at ¶ 90.

Plaintiff was assessed three OON fees by BANA: two separate $2.50 fees for making balance inquiries and an additional $2.50 fee for making a cash withdrawal. *Id.* at ¶ 91. The fees appeared on Plaintiff Covell's monthly statement for the period from May 8, 2018 through June 6, 2018. (Doc. No. 254-1 at ¶ 30).

### 3. *How the ATM Network System Works*

ATMs are governed by rules set by the ATM Networks. (*See generally* Doc. No. 231-9.) The exhibits submitted explain that these Network Rules are in essence a code of conduct or set of procedures to which member banks agree to adhere. (Doc. No. 231-24 at ¶ 28.)

BANA is a member of the Mastercard and Visa ATM networks, which permit BANA's account holders to access and use non-BANA ATMs. (Doc. Nos. 231-8 at ¶ 6; 231-24 at ¶ 25). Mastercard processes transactions under at least three brands: Mastercard, Cirrus and Maestro. (Doc. No. 231-24 at ¶ 26.) The transactions made by Plaintiffs Schertzer and Covell were routed over the Cirrus network, which is part of the Mastercard network. (Doc. No. 231-8 at ¶ 6).

When a BANA customer uses an OON ATM and makes a selection on screen, BANA receives a standard electronic message (ISO 8583 request message) from the ATM Network. (Doc. No. 231-24 at ¶¶ 26, 50.) The message contains limited information

7

including the user's primary account number, a transaction code for the particular transaction type, the date and time the transaction is initiated, the ATM terminal's financial institution identification, and the ATM terminal identifier and date specific to the card used for the transaction. (Doc. No. 231-18 at 6-9; Doc. No. 231-24 at ¶¶ 51, 52, 82.) No information regarding the type of screen presented to the customer is transmitted over the Network to BANA. (Doc. No. 231-24 at ¶¶ 31, 84.) The OON ATM sends the authorization request to an ATM driving computer, which then routes the ISO 8583 request to the Network. (Doc. No. 231-24 at ¶¶ 57, 58.) The Network then sends the authorization request to BANA. (*Id.* at ¶ 59.) Once the transaction is approved or denied by BANA, BANA responds according to the Network's ISO 8583 response format, which is returned over the same channels as the request channels and contains similar data. (*Id.* at ¶¶ 60-63.) The appropriate information is then either displayed on the ATM screen, receipt, or both – but is done without input from the card issuing bank (in this case BANA). (*Id.* at ¶ 62.)

The Network Rules require ATM operators, like Cardtronics and FCTI, to provide a balance inquiry option at their ATMS. (Doc. No. 231-9 at 19; Doc. No. 231-24 at ¶ 34.) The Network Rules also require banks to approve transactions based on the ISO messages as long as five specific circumstances are present, namely: the account holder has sufficient funds to complete the transaction; there is no fraud or credit risk presented by individual cardholder usage patterns; the account does not have specific high-risk account restrictions; and there are no cardholder-designated restrictions in place; there is no other restriction on use that [Mastercard] Corporation may permit. (Doc. No. 231-9 at 11; Doc. No. 231-24 at ¶¶ 29-30, 60, 81.) Finally, the Network Rules do not allow a card-issuing bank to deny a transaction based on who owns the ATM. (Doc. No. 231-9 at 10; Doc. No. 231-24 at ¶¶ 32, 81; Doc. No. 254-9 at 8.)

## III.   EVIDENTIARY OBJECTIONS

The court will begin by addressing the numerous evidentiary objections made by the parties before delving into the arguments set forth in the papers.

///

A.   **Plaintiffs' Evidentiary Objections (Doc. No. 254-22)**

Plaintiffs object to statements made in the Declaration of Rodman K. Reef (Doc. No. 231-23 at 2), an expert retained by BANA, for lack of relevance.  (Doc. No. 254-22 at 1-4).  Plaintiffs further object to statements made in the Declaration of Preston Taylor (Doc. No. 231-3), BANA's Senior Vice President in Deposit Products Fee Strategy and Revenue Management, as conclusory and self-serving and improper opinion testimony from a lay witness.  (Doc. No. 254-22 at 5).

Plaintiffs' objections on these grounds are **OVERRULED**.  "Objections such as lack of foundation, speculation, hearsay and relevance are duplicative of the summary judgment standard itself."  *All Star Seed v. Nationwide Agribusiness Ins. Co.*, No. 12cv146 L(BLM), 2014 WL 1286561, at *16 (S.D. Cal. Mar. 31, 2014).  As the Ninth Circuit has stated, "parties briefing summary judgment motions would be better served to 'simply *argue*' the import of the facts reflected in the evidence rather than expending time and resources compiling laundry lists of relevance objections."  *Sandoval v. Cty. of San Diego*, 985 F.3d 657, 665 (9th Cir. 2021) (emphasis in original).

With respect to the statements made in Mr. Taylor's declaration, although declarations in support of summary judgment motions are "often self serving" and the "source of the evidence may have some bearing on its credibility, and thus on the weight it may be given by a trier of fact," this is "not a basis for the district court to disregard that evidence at the summary judgment stage."  *Nigro v. Sears, Roebuck & Co.*, 778 F.3d 1096, 1098 (9th Cir. 2015).  Plaintiffs' other objection, that Mr. Taylor's declaration statements constitute improper opinion testimony is also overruled.  As an employee of BANA, Mr. Taylor may properly provide his personal knowledge of what he understood BANA's policies and procedures to be.  *See Trosper v. Styker Corp.*, No. 13-CV-0607-LHK, 2014 WL 4145448, at *6 (N.D. Cal. Aug. 21, 2014).

B.      **BANA's Evidentiary Objections (Doc. No. 259-3)**

BANA objects to multiple documents submitted in support of Plaintiffs' Opposition to its Motion for Summary Judgment for lack of relevance, mischaracterization of

9

evidence, hearsay, improper legal conclusion, and lack of foundation.  (Doc. No. 259-3 at 2-9).  BANA's objections on these grounds are **OVERRULED.**

As the court already stated above, such objections are "duplicative of the summary judgment standard itself."  *All Star Seed*, 2014 WL 1286561, at \*16; *see Rose v. JPMorgan Chase Bank, N.A.*, Civ No. 2:12-225 WBS CMK, 2014 WL 546584, at \*3 (E.D. Cal. Feb. 10, 2014) ("Statements based on improper legal conclusions or without personal knowledge are not facts and can be considered as arguments, not as facts, on summary judgment.  Instead of challenging the admissibility of this evidence, lawyers should challenge its sufficiency.").  Indeed, the court notes many of BANA's objections, in particular BANA's hearsay objections, are merely "boilerplate recitations of evidentiary principles or blanket objections without analysis applied to specific items of evidence."  *Stonefire Grill, Inc. v. FGF Brands, Inc.*, 987 F. Supp. 2d 1023, 1033 (C.D. Cal. 2013) (quotation omitted).

The court, nevertheless, addresses a number of BANA's specific objections below.

## 1.  *Expert Report of Thomas Maronick*

BANA objects to the expert report of Thomas Maronick as inadmissible hearsay. (Doc. No. 259-3 at 3.)  Specifically, BANA argues Mr. Maronick's expert report is not admissible because it is an unsworn report attached to a counsel's declaration.  *Id.*

BANA's objection on these grounds is **SUSTAINED.**  "[I]t is well established that unsworn expert reports are inadmissible and cannot be used to create a triable issue of fact for purposes of summary judgment."  *Liebling v. Novartis Pharms. Corp.*, No. CV1110263MMMMRWX, 2014 WL 12576619, at \*1 (C.D. Cal. Mar. 24, 2014) (collecting cases); *see also FNBN-RESCON I LLC v. Ritter*, No. 2:11-CV-1867-JAD-VCF, 2014 WL 979930, at \*5 (D. Nev. Mar. 12, 2014) ("[C]ourts in the Ninth Circuit 'have routinely held that unsworn expert reports are inadmissible.'") (collecting cases).

Because no declaration or affidavit by Mr. Maronick supports his report, it "is not competent evidence to be considered on a motion for summary judgment*." Sansi N. Am., LLC v. LG Elecs. USA, Inc.*, No. CV 18-3541 PSG (SKX), 2019 WL 8168069, at \*10 (C.D.

Cal. Nov. 14, 2019); *see also Reed v. NBTY, Inc.*, Case No. EDCV 13-0142 JGB (OPx), 2014 WL 12284044, at *4 (C.D. Cal. Nov. 18, 2014) (sustaining objections to two expert reports attached to counsel's declaration); *Harris v. Extendicare Homes, Inc.*, 829 F. Supp. 2d 1023, 1027 (W.D. Wash. 2011) (striking two expert reports attached to counsel's declaration).

### 2. *Deposition Testimony of Ron Schnittman*

BANA objects to certain deposition testimony taken of its Rule 30(b)(6) witness, Ron Schnittman, as answers that do not bind BANA, because they were objected to during deposition as being beyond the scope of the 30(b)(6) deposition. (Doc. No. 259-3 at 5-6). The court agrees deposition testimony provided by Mr. Schnittman in his individual capacity would not bind BANA. *See e.g.*, *Badger v. Wal-Mart Stores, Inc.*, No. 2:11-CV-1609-KJD-CWH, 2013 WL 3297084, at *6 (D. Nev. June 28, 2013). Despite this, the court does not necessarily agree with BANA's premise that *just because* an objection was made to the question as it was being posed, it *necessarily follows* this question was outside the scope of Mr. Schnittman's 30(b)(6) deposition. Indeed, the court is without sufficient information to properly assess whether this question was actually outside the topics listed in Plaintiffs' 30(b)(6) deposition notice.

Nevertheless, Plaintiffs have not filed any response to BANA's evidentiary objection. For these reasons, BANA's objections on these grounds are **SUSTAINED.** For purposes of this motion, the court assumes Mr. Schnittman answered the questions—as set forth in Doc. No. 198-12 at 93:13-94:1—in his individual capacity.

### 3. *Photos of OON ATM Screens*

BANA objects to images Plaintiffs submitted of OON ATM screens on the basis these images were not properly authenticated. (Doc. No. 259-3 at 8). BANA's objections on these grounds are **OVERRULED**.

The 2010 amendments to Federal Rule of Civil Procedure 56 "eliminate[d] the unequivocal requirement that evidence submitted at summary judgment must be authenticated[.]" *Romero v. Nev. Dep't of Corr.*, 673 F. App'x 641, 644 (9th Cir. 2016).

Instead, Rule 56 "mandates only that the substance of the proffered evidence would be admissible at trial." *Sweet People Apparel, Inc. v. Phx. Fibers, Inc.*, 748 F. App'x 123, 125 (9th Cir. 2019); *see also James Huntsman v. Corp. of the President of the Church of Jesus Christ of Latter-Day Saints*, No. 2:21-CV-02504, 2021 WL 4296208, at *5 (C.D. Cal. Sept. 10, 2021) ("Since the 2010 amendments to Rule 56 of the Federal Rules of Civil Procedure, evidence need not be admissible in the form presented to a court on summary judgment. Rather, it is the content of the evidence that must be admissible.") (emphasis in original); *Hartranft v. Encore Cap. Grp., Inc.*, No. 3:18CV01187 BEN (RBB), 2021 WL 2473951, at *11 (S.D. Cal. June 16, 2021) ("The Court will consider the substance of evidence that would be admissible at trial even if the form of the evidence is improper so long as that same evidence may be admissible in another form.").

Here, however, BANA is not contending—and the court is not convinced—that the substance of this proffered evidence could not be presented in a form that would be admissible as evidence. BANA is also not arguing these images are not what they purport to be. At this stage of the proceedings, the court, therefore, does not find BANA's objections on these grounds well-taken.

## IV.   ANALYSIS

Defendant BANA has moved for summary adjudication on Plaintiffs' claims. (Doc. No. 231). Plaintiffs have moved for class certification. (Doc. No. 198). As BANA's Motion is potentially dispositive of Plaintiff's class certification motion, the court addresses it first.

### A.   MOTION FOR SUMMARY JUDGMENT

BANA argues that Plaintiffs' breach of contract and breach of covenant of good faith claims fail as a matter of law and undisputed fact. (Doc. No. 231-1.) Plaintiffs oppose, arguing the court has already determined that the term "balance inquiry" is ambiguous, and that the proffered extrinsic evidence is irrelevant and inadmissible. (Doc. No. 254.)

///

///

12

19cv264 JM(MSB)

### 1. *Legal Standard for Motion Summary Judgment*

A motion for summary judgment shall be granted where "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial burden of informing the court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). But Federal Rule of Civil Procedure 56 contains "no express or implied requirement . . . that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." *Id.* (emphasis in original).

In response to a motion for summary judgment, the non-moving party cannot rest on the mere allegations or denials of a pleading but must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal citations omitted). In other words, the nonmoving party may not rely solely on conclusory allegations unsupported by factual data. *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). The court must examine the evidence in the light most favorable to the nonmoving party, *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962), and any doubt as to the existence of an issue of material fact requires denial of the motion, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

### 2. *Discussion*

BANA makes four main arguments in support of its position that the breach of contract and breach of the covenant of good faith and fair dealing claims fail as matter of law and undisputed fact. (*See generally*, Doc. No. 231-1.) First, it argues there is no ambiguity in the contract; the term "balance inquiry" is unambiguous in that it encompasses all balance inquiries, not just those inquiries "consented" to or "knowingly" performed. Second, it asserts that, to the extent the contract is ambiguous, the extrinsic evidence demonstrates that it must be construed in BANA's favor. Third, BANA contends that it did not violate the implied covenant of good faith and fair dealing because its assessment

13

of the OON fees is allowed under the express terms of the contract; nor did it act in subjective bad faith or in an objectively unreasonable manner.  Fourth, it maintains that Plaintiffs' claims fail because they did not follow the pre-dispute procedures required under the contract.  Plaintiffs present counter-arguments to every point raised.  (*See generally*, Doc. No. 254.)

### i.      No ambiguity in the contract term

BANA contends that on its face, the contract term "balance inquiry" is unambiguous and does not mean "*intentional* balance inquiry."  (Doc. No. 231-1 at 18-20.)  Plaintiffs take the opposite position, arguing that the term is ambiguous, and that this ambiguity should not be resolved in the contract drafter's favor.  (Doc. No. 254 at 11, 16-17.)  Additionally, Plaintiffs argue that the court already found the term "balance inquiry" ambiguous in its motion to dismiss order, therefore, law-of-the-case precludes relitigation of this issue. (*Id*. at 15.)  Neither party disputes that the term "balance inquiry" is not expressly defined.

The determination as to whether a contract is or is not ambiguous is a question of law for the court.  *Han v. Mobil Oil Corp.*, 73 F.3d 872, 877 (9th Cir. 1995). "A contract or a provision of a contract is ambiguous if it is reasonably susceptible of more than one construction or interpretation." *Castenado v. Dura-Vent Corp.*, 648 F.2d 612, 619 (9th Cir. 1981).  "When parties dispute the meaning of language in a contract, the court must determine whether such language is ambiguous by deciding whether it is 'reasonably susceptible' to more than one of the interpretations urged by the parties." *LF Centennial Ltd. v. Z-Line Designs, Inc.*, Case No. 16cv0929 JM(NLS), 2017 WL 6945088, at *2 (S.D. Cal. Aug. 10, 2017).  *See also Eriksson v. Nunnink*, 233 Cal. App. 4th 708, 722 (2015) ("An ambiguity exists when a party can identify an alternative, semantically reasonable, candidate of meaning of a writing.").  However, "an agreement is not ambiguous merely because the parties (or judges) disagree about its meaning." *LF Centennial*, 2017 WL 6945088, at *2 (citing *Abers v. Rounsavell*, 189 Cal. App. 4th 348, 356 (2010)).  "If contractual language is clear and explicit and does not involve an absurdity, the plain

meaning governs." *Am. Alt. Ins. Corp. v. Super. Ct*., 135 Cal. App. 4th 1239, 1245 (2006). Summary judgment is warranted when a contract is unambiguous as a matter of law.

Here, the pertinent provision of the Fee Schedule provides: "When you use a non-Bank of America ATM, you may also be charged a fee by the ATM operator or any network used and you may be charged a fee for a balance inquiry even if you do not complete a funds transfer." (Doc No. 231-5 at 10.)  The BANA Important Information Brochure: Card Agreement Disclosure also states: "You authorize us to act on the instructions you give us through ATMS."  (Doc. No. 231-7.)

BANA asserts the language "when you use" an OON ATM introduces no ambiguity about whether balance inquiries were limited to only those knowingly performed. (Doc. No. 231-1 at 18-20; *see* Doc. No. 259 at 2-4.)  Further, it contends that the plain language of "when you use" simply describes the initial action account holders take when they "transact" with an OON ATM and that the term "balance inquiry" refers to exactly what it sounds like, an inquiry into a BANA account balance.  (*Id*.)

Plaintiffs' theory of ambiguity centers around the idea that the express terms of the contract only allow for the assessment of OON fees in instances where the BANA customers have provided "valid" consent to make a balance inquiry.  (Doc. No. 254 at 11.) Plaintiffs maintain that the contract contains a disputed term because their interactions with ATM Defendants' ATMs could not reasonably be considered a "balance inquiry" under the BANA contract. (*Id*. at 16-17.)  In other words, they, or any member of the putative class, only "consent to" or "knowingly" or "intentionally" perform a balance inquiry by affirmatively requesting the desired information.  (*Id.* at 17.)  In support, Plaintiffs point to the dictionary definition of inquiry, which is defined as "a request for information."  (*Id.*) In essence, Plaintiffs contend that the provision "you authorize us" makes it clear that the bank cannot assume the ATM company has sent the bank the proper instruction.  (*Id.*)

Thus, the question is whether Plaintiffs are overreaching in reading and/or suggesting a subjective consent/intent requirement into the "when you use a non-Bank of America ATM" clause for a "balance inquiry."  The court determines Plaintiffs are.  If the

court were to read the statement as Plaintiffs suggest, the court would be ignoring the language of the entire provision and altering the terms of the contract for the benefit of one party to the detriment of the other. *See Levi Strauss & Co. v. Aetna Cas. & Sur. Co*., 184 Cal.App.3d 1479,1486 (1986) ("The court does not have the power to create for the parties a contract which they did not make, and it cannot insert in the contract language which one of the parties now wishes were there."). Reading the contract as a whole, and in a commonsense manner, the phrase appears to refer to a customer's general use of the ATM. That is when a customer places their debit/credit card in an ATM machine and enters their PIN and selects options on the screen to access their bank account/s, they are "using" a non-Bank of America ATM machine. The fact that the actions are being performed by the customer implicitly signifies consent in the circumstances. In other words, the "instruction" is carried out by the customer hitting buttons or prompts on the ATM screen over which BANA has no control. To require BANA to glean the subjective intent of OON ATM users defies logic and common sense given the protocols and mechanics of OON ATMs.

Plaintiffs also argue BANA's definition creates an absurd result because "BANA could charge consumers for a balance inquiry if the Bank receives notice from an ATM operator, even if a consumer clicks 'no' and declines to perform a balance inquiry, or even if the customer was prompted a different transaction than a balance inquiry." (Doc. No. 254 at 16.) But Plaintiffs are straining BANA's definition and are misconstruing how the whole ATM Network system works – it is the court's clear understanding that had Plaintiffs clicked "no," under the ATM Network system, no balance inquiry would have been sent to BANA, and no charge would have been incurred. Plaintiffs have not provided any evidence suggesting otherwise.

Moreover, BANA's additional point, that Plaintiffs would have the court add a consent requirement only to the balance inquiry but not to the other transactions (withdrawals, or balance transfers) available at OON ATMs, has merit. Such selective and subjective parsing would prove unworkable. (*See* Doc. No. 231-1 at 20.) Indeed, Plaintiffs

16

do not even suggest that OON fees for these other transactions offered at OON ATMs require the same additional "valid consent" "knowledge," or "intent" monitoring as that of a balance inquiry.

Parenthetically, Plaintiffs submit that this court previously ruled, in denying BANA's motion to dismiss, the relevant contract language is susceptible to two reasonable interpretations and that, therefore, the "law of the case" dictates the motion for summary judgment presently before the court should be denied on that basis.

As to Plaintiffs' law-of-the-case argument (Doc. No. 254 at 15), their position overstates the court's earlier order (*see* Doc. No. 270 at 19-23). This court is free to revisit its earlier order and provide clarity of its holding. *Askins v. U.S. Dep't of Homeland Sec.*, 899 F.3d 1035, 1042 (9th Cir. 2018) ("The law of the case doctrine does not, however, bar a court from reconsidering its own orders before judgment is entered or the court is otherwise divested of jurisdiction over the order.") While it is true at one point in the order, the court stated that both parties had set forth reasonable opposing interpretations of the Agreement, the court clarified at oral argument on the instant motion that the ill-chosen word, "interpretation," was not a ruling that ambiguity existed. As mentioned at oral argument, the court was recognizing that it would not be appropriate in this case to decide the issue of ambiguity at the motion to dismiss stage: "applying the liberal standards, 'balance inquiry' is at least plausibly susceptible to the meaning alleged by Plaintiffs Schertzer and Covell." (Doc. No. 109 at 22- 23.) As the court explained at the hearing, "it might have been better said if it [the court] had stated 'both parties have set forth reasonable opposing arguments regarding the agreement ….'" (*See* Doc. No. 270 at 19-22.)

In sum, this court made no ruling at the motion to dismiss stage that as a matter of law there were two reasonable interpretations of the Agreement language. Instead, it was the intent of the court to convey at the early juncture of the case that liberal pleading standards would allow the case to proceed to summary judgment.

///

///

17

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

>             ***ii.    Assuming an ambiguity exists in the contract term, extrinsic evidence demonstrates the provision should be construed in BANA's favor***

BANA also argues that, to the extent the contract term "balance inquiry" is ambiguous, the extrinsic evidence demonstrates that it must be construed in its favor.  (Doc. No. 231-1 at 20-25.)  Plaintiffs counter that this extrinsic evidence creates additional questions of fact.  (Doc. No. 254 at 17-23.)

Under California law "[e]ven if a contract appears unambiguous on its face, a latent ambiguity may be exposed by extrinsic evidence which reveals more than one possible meaning to which the language of the contract is yet reasonably susceptible." *Wolf v. Super. Ct.*, 114 Cal.App.4th 1343, 1351 (2004).  *See also Skilstaf, Inc. v. CVS Caremark Corp.*, 669 F.3d 1005, 1017 (9th Cir. 2012) ("A party's assertion of ambiguity does not require the district court to allow additional opportunities to find or present extrinsic evidence if the court considers the contract language and the evidence the parties have presented and concludes that the language is reasonably susceptible to only one interpretation. That conclusion can be reached on a motion for summary judgment[.]"); *Pac. Gas & Elec. Co. v. G. W. Thomas Drayage & Rigging Co.*, 69 Cal. 2d 33, 37-40 (1968) (courts preliminarily consider extrinsic evidence on summary judgment where a latent ambiguity is alleged in order to decide whether, in light of that evidence, the agreement is reasonably susceptible to one party's interpretation).

The screenshots provided of the ATM prompts illustrate that Plaintiffs Schertzer and Covell were not directly asked if they would like to perform a balance inquiry. (Doc. No. 231-16 at ¶ 24.)  In Schertzer's case, her deposition testimony supports this contention: the question "would you like your available Account Balances on a receipt?" led her to believe that she was affirming her choice to receive a "free" receipt at the end of her intended cash withdrawal transaction. (Doc. No. 231-13 at 5, 6; Doc. No. 254-5 at 5.) BANA charged Schertzer $2.50 for this "receipt," on her selection of the "yes" button as requesting an OON Balance Inquiry.  Scherzer maintains that the fee should not apply.

18

(Doc. No. 254-5 at 6.)  Similarly, after affirmatively performing a balance inquiry, Covell was presented with the question "would you like to print your Balance and continue the Transaction?" (Doc. No. 231-14 at 9, 10.) Thinking that selecting "continue" would allow her to move onwards with her cash withdrawal, instead, the transaction ended.  Covell had to reenter her PIN and was presented with: "would you like a receipt for this transaction?" (Doc. No. 231-14 at 8, 9.)  Covell selected the "yes" button and BANA charged her $2.50, or a second OON balance inquiry fee, for this "receipt." (Doc. No. 231-14 at 10, 11, 19, 20.)

BANA's first extrinsic evidence argument is that Plaintiffs' evidence regarding the ATM prompts still leaves it undisputed that requests for balance inquiries were transmitted through the ATM Network and that BANA provided the balance information in response to each request it received.  (Doc. No. 231-1 at 21-24.)  Further, BANA also notes that it is undisputed that it has no input, oversight, or role whatsoever in designing, approving, or inspecting either Cardtronics' or FCTI's screens or prompts.  (*Id.* at 23.)  Plaintiffs counter that it would not be absurd for BANA to provide some oversight over the ATM operators prior to imposing fees on its account holders for using OON ATMs and claims that it is not credible that some BANA executives have never used an ATM at a CVS or 7-Eleven. (Doc. No. 254 at 18.)   Additionally, Plaintiffs try to assign knowledge to BANA by pointing to the complaints regarding the confusing screen prompts made by other banks, who were in fact "customers" of Cardtronics/FCTI, and were working in branding/usage negotiations.  (*Id.*)

Second, BANA argues that relevant industry standards show that it is not actually possible for a "balance inquiry to be interpreted with the conditions Plaintiffs desire." (Doc. No. 231-1 at 22-23.)  BANA contends that Plaintiffs' proffered meaning would require it to discern between balance inquiries that customers have "consented to" from those that they have been tricked into making.  Yet, BANA claims that as a participant in the industry's ATM Network, it has no ability to do that because: (i) it has no relationship with Cardtronics or FTCI that would allow it to assert any control over the screens at issue;

(ii) it does not communicate directly with Cardtronics or FCTI when one of its customers uses a Cardtronics or FCTI ATM; (iii) as a member of the ATM Network, BANA, like all participating issuing banks, must respond to OON requests for balance information and cannot selectively respond based on customer "intent;" and (iv) BANA cannot distinguish whether a customer using an OON ATM pressed a button asking to have the balance printed on the screen or on a receipt.  (*Id.* at 14, 23-24.)  In opposition, Plaintiffs argue that industry practice did not compel it to assess fees on OON balance inquiries and that this industry practice evidence is facially unpersuasive.  (Doc. No. 254 at 18-19.)

Absent any agency relationship, the court is loath to hold BANA responsible for the actions of a third party.  While the practices of the ATM Defendants may indeed be questionable, BANA has no control over them.  *See* Doc. No 231-15 at 5; Doc. No. 231-21 at ¶ 7; Doc. No. 231-24 at ¶ 35.  There is no evidence to demonstrate that BANA communicates directly with Cardtronics, FCTI or any other ATM operator, with the exceptions of a contract between BANA and Cardtronics for Cardtronics to provide certain in-network branded ATMs – the relevance of which is unclear (Doc. No. 245-20[4]), and a presentation where Cardtronics was aiming to have BANA outsource its ATMs.  (*See* Doc. No. 254-16.)  The exhibits submitted explain that when a BANA customer uses an OON ATM and makes a selection on screen, the communications between the ATM terminal and the card issuing bank, in this case, BANA, are done via electronic messages that contain limited information (Doc. No. 231-18 at 6-9; Doc. No. 231-24 at ¶¶ 26, 50, 51, 52, 57, 58, 59, 60-63, 82, 88.)  What is displayed either on the ATM screen, receipt, or both, is done without input from the card issuing bank.  (Doc. No. 231-24 at ¶ 62.)  At bottom,

---

[4] The parties refer to an agreement to "brand" Cardtronics ATMs with the BANA logo at certain Dash-In retail locations, and purportedly allowed certain prepaid cardholders access to the Allpoint network (Doc. No. 259-1 at ¶¶ 23, 24, Doc. No. 259 at 4.).  But, as pointed out in the Reply, branded BANA ATMs are not part of this lawsuit and are, therefore, not relevant (*see* Doc. No. 259 at 4).

19cv264 JM(MSB)

1    the whole ATM Network requires participating banks to trust that the messages being
2    transmitted are valid.  *See, e.g.*, Doc. No. 231-15 at 5, Schnittman, BANA, 30(b)(6)
3    deposition at 110:25-111:8, 111:21-112:4; 112:7-15 ("You know, we are trusting again,
4    the message we're getting from our payment network.")).  Indeed, if one follows Plaintiffs'
5    position to its logical conclusion, one is left with: (1) assigning to BANA the responsibility
6    of monitoring every ATM transaction undertaken by BANA cardholders to ensure every
7    balance inquiry was intentionally performed, which hardly seems feasible or; (2)
8    permitting BANA to decline/prevent its customers from performing OON ATM balance
9    inquiries, in violation of the Network Agreement, (*see generally* Doc. No. 231-24); and/or
10   (3) requiring BANA to waive OON balance inquiry fees for all of its customers.  *See Citri-*
11   *Lite Co. v. Cott Beverages, Inc.*, 721 F. Supp. 2d 912, 924 (E.D. Cal. 2010) (plaintiffs'
12   reading "create[s] an absurdity [that] cannot be adopted.").

13         Notably, Plaintiffs have conceded that the survey they themselves commissioned
14   demonstrated that "no customer was trapped into a balance inquiry when presented with
15   BANA's own main menu [ATM] screen."  (Doc. No. 254 at 10; *see also* Doc. No. 254-3
16   at ¶ 73.)  Thus, to hold BANA responsible for the screens over which it has no control does
17   not seem justified here.

18         Relatedly, Plaintiffs attempt to impose upon BANA the monitoring and oversight
19   responsibility for Cardtronics' and FCTI's ATM screens by referring to (1) the personal
20   ATM usage of BANA executives or, (2) to other financial institutions' internal
21   communications with Cardtronics.  *See* Doc. No. 254 at 12, 18 ("Nor would it be absurd
22   for BANA to provide oversight over the ATM operators . . . . It is also not credible that no
23   BANA executive had ever visited an ATM at a CVS or 7-Eleven.  Moreover, nearly every
24   other major financial institution in the country criticized Cardtronics' screens as deceptive,
25   except for BANA.")[5].  The court is not persuaded.  From the papers, it appears that the

26
27   ───────────────
28   [5] Plaintiffs' attempt to portray Mr. Schnittman's testimony as to what he personally
     believed would be occurring when following the screenshots shown to him as a "stunning

parties responsible for enforcing the practices of the ATM Defendants would be Mastercard or Cirrus (the ATM Networks) or the ATM Defendants' Sponsoring Banks[6]. *See* Doc. No. 231-9 at 8; Doc. No. 231-24 at ¶¶ 35, 36, 46.)

As to Plaintiffs' attempt to recast BANA's argument as if it was claiming industry practice compelled the bank to assess fees for OON balance inquiries, that is not the court's reading of BANA's argument. Rather, the court interprets BANA as simply trying to state that under the ATM Network Rules (which are applicable to all banks), it has no discretion to determine what is or is not a valid balance inquiry. From BANA's perspective, what occurred were transactions, conducted by BANA customers at OON ATMs, with BANA's only involvement being its receipt of electronic ISO messages over the ATM Network. (Doc. No. 231-24 at ¶¶ 52-63.) In response to the ISO message, BANA then electronically transmitted the requested balance information and assessed an OON ATM fee. (*Id.*) BANA, from its perspective, was merely complying with the electronic request it received via the Network, in accordance with the Network rules it was governed by. (*Id.* at ¶¶ 60, 74.) Thus, BANA's perspective was reasonable and in accordance with the Network Rules in existence at the relevant period in time. Any conduct or practice by Cardtronics or FCTI should not be imputed to BANA on this evidentiary record, directly or indirectly. *See Arizona v. Tohona O'odham Nation*, 818 F.3d 549, 561-62 (9th Cir. 2016) ("Federal

_____

admission" by BANA that "customers would be improperly guided to a balance inquiry transaction" at a Cardtronics ATM and that "BANA should not have charged its customers two balance inquiries" if customers pressed the "Continue" button to print the already-displayed balance is chosen at the FCTI screen. (Doc. No. 254 at 12, 13, 21). This mischaracterizes Mr. Schnittman's testimony. As the court noted above, there are specific objections on the record that anything Mr. Schnittman said regarding his "belief" about what would have been performed at/on the ATM screen was outside the scope of what he had been designated to testify about as a corporate representative and was his opinion as a consumer. (Doc. No. 198-12 at 94-102.)

[6] At oral argument, Plaintiffs acknowledged that for purposes of this case, BANA is not a Sponsoring Bank. (Doc. No. 270 at 8.)

22

Common law follows the traditional parol evidence rule: A contract must be discerned within its four corners, extrinsic evidence being only relevant to resolve ambiguity in the contract.") (internal quotations and changes omitted).  Ultimately, the evidence concerning OON ATM protocols and Network Rules buttresses this court's prior conclusion that no ambiguity exists in the Agreement language related to the use of OON ATM balance inquiries and associated fees.

Equally unavailing is Plaintiffs' additional argument that if "BANA had no mechanism in place for ensuring a valid balance inquiry took place, it did not need to charge fees on those transactions," (Doc. No. 254 at 18).  These days, it is common practice for banks to charge customers fees for OON ATM transactions, with the waiving of fees often used as an incentive to account holders.  In fact, the National Bank Act ("NBA") provides banks with the right to generally assess OON ATM fees.  *See Gutierrez v. Wells Fargo Bank, N.A.*, 704 F.3d 712, 723-25 (9th Cir. 2012) (The Office of Comptroller of the Currency has interpreted the National Banking Act and federal banking regulations to specifically include "the power to set account terms, and the power to charge customers non-interest charges and fees.").  Plaintiffs are free to open accounts at another bank or subscribe to one of the accounts where such fees are waived.

Finally, despite Plaintiffs' allegations to the contrary, BANA, appears to have no part in the payment of the interchange fee to Cardtronics or FCTI.  In their opposition, Plaintiffs claim that "BANA further admits Cardtronics and FCTI were financially motived to defraud BANA customers and generate as many Balance Inquiry transactions as possible because they received kickback payments from BANA in the form of interchange fees, for each OON balance inquiry transaction," but this mischaracterizes the testimony of BANA's designated 30(b)(6) deponent.[7]   Rather, BANA pays the Network for every

---

[7] Q:  For a balance inquiry transaction on the Mastercard or Cirrus networks, Bank of America pays a $0.25 interchange fee to the network –
A: Correct

23

1  "transaction" its customers performed at OON ATM's regardless of what OON fees it does

2  or does not later recoup, and the ATM Defendants are paid the interchange fees directly by

3  the Network.[8]  (*See* Doc. No. 231-15 at 6, 7; Doc. No. 231-24 at ¶¶ 40, 50, 75.)

4  In sum, if there is an ambiguity, the extrinsic evidence presented demonstrates that

5  the terms should be construed in BANA's favor and provides another ground for the

6  granting of the motion for summary judgment.

7  ### iii.   Assessment of OON Fees is allowed under the contract

8  BANA argues that the breach of good faith and fair dealing claim fails for the same

9  reason as Plaintiffs' breach of contract claim fails.  (Doc. No. 231-1 at 25.)  Alternatively,

10  BANA argues that Plaintiffs have misread the use of the word "may" in the contract

11  language, inferring far too much discretion into the word Plaintiffs claim BANA abused.

12  (*Id.* at 25-26.)  Plaintiffs take the opposing position, maintaining that a genuine dispute

13  exists concerning this claim.

14  The implied covenant of good faith and fair dealing is present in all contracts.  *Marsu*

15  *B.V. v. Walt Disney Co.,* 185 F.3d 932, 937 (9th Cir. 1999).  "In essence, the covenant is

_____

…..
Q: For transactions on the Mastercard or for Cirrus network, does the network assess a service fee to the ATM operator for each transaction?
A: I don't know whether every operator assessed those fees.
Q: That's not something Bank of America would necessarily have insight to?
A: Correct.
Doc. No. 231-15 at 6.

[8] In relation to the interactions between BANA and the ATM Defendants, the TAC alleges that BANA directly pays an "interchange fee of approximately $0.25 directly to the ATM Defendant who owns the ATM machine where the balance inquiry was conducted." (Doc. No. 96. ¶ 2.)  Further, it is alleged that "immediately after collecting the fee, BANA then paid $0.25 of the $2.50 fee directly back to the ATM Defendants in the form of an 'interchange fee.'" (*Id.*)  The TAC concludes that "based on this interchange fee, the ATM Defendants' received a directly traceable and standardized amount of money from BANA and other retail banks each time they misled Plaintiffs and other customers into engaging in a purported out-of-network balance inquiry at one of their ATM machines. (*Id.* ¶ 16.)

implied as a *supplement* to the express contractual covenants, to prevent a contracting party from engaging in conduct which (while not technically transgressing the express covenants) frustrates the other party's rights to the benefits of the contract." *Love v. Fire Ins. Exch.*, 221 Cal.App.3d 1136, 1153 (1990) (emphasis in original). The covenant of good faith "finds particular application in situations where one party is invested with a discretionary power affecting the rights of another. Such power must be exercised in good faith." *Carma Developers (Cal.) v. Marathon Dev. Cal., Inc.*, 2 Cal.4th 342, 372 (1992) (citations omitted).

The covenant of good faith and fair dealing "cannot impose substantive duties or limits on the contracting parties beyond those incorporated in the specific terms of their agreement." *Guz v. Bechtel Nat'l Inc.*, 24 Cal.4th 317, 349 (2000); *see also L.A. Equestrian Ctr., Inc. v. City of L.A.*, 17 Cal. App.4th 432, 447 (1993) ("If there exists a contractual relationship between the parties . . . the implied covenant is limited to assuring compliance with the express terms of the contract, and cannot be extended to create obligations not contemplated in the contract.") (citation omitted). "It is universally recognized the scope of conduct prohibited by the covenant of good faith is circumscribed by the purposes and express terms of the contract." *Carma*, 2 Cal.4th at 373. "A party violates the covenant if it (1) subjectively lacks belief in the validity of its act or (2) if its conduct is objectively unreasonable." *Id.* at 372.

Here, the pertinent contract provisions provide:

> *ATM Fees* When you use an ATM that is not prominently branded with the Bank of America name and logo, you *may* be charged a fee by the ATM operator or any network used and you *may* be charged a fee for a balance inquiry even if you do not complete a fund transfer. We *may* also charge you fees.

Deposit Agreement and Disclosures (Doc. No. 231-4 at 35) (emphasis added).

///

///

19cv264 JM(MSB)

And the accompanying Personal Schedule of Fees sets forth the fees that will be charged to BANA customers for using OON ATMs and provides that:

> Preferred Rewards Platinum customers using a Bank of America Debit or ATM card are not charged the non-Bank of America ATM fee for one withdrawal, transfer and balance inquiry per statement cycle from a non-Bank of America ATM in the U.S., and receive a refund of the ATM operator fee for one withdrawal, transfer and balance inquiry per statement cycle from a non-Bank of America ATM in the U.S.

> Preferred Rewards Platinum Honors customers using a Bank of America Debit or ATM card are not charged the non-Bank of America ATM fee for withdrawals, transfers and balance inquiries from non-Bank of America ATMs in the U.S. and receive a refund of the ATM operator fee for withdrawals, transfers and balance inquiries from non-Bank of America ATMs in the U.S.

Doc. No. 231-5 at 10.

Plaintiffs argue that BANA has read the contract terms as if it had "carte blanche discretion to assess OON Fees anytime an ATM machine or network requested a balance inquiry." (Doc. No. 254 at 24.)   But Plaintiffs are overreaching in their interpretation of BANA's actions and their claim that the terms of the contract do not expressly allow BANA to charge for OON Balance Inquiry Fees under the circumstances they faced, i.e., when Plaintiffs (and putative) class members have not performed a valid balance inquiry by knowingly or affirmatively consenting to it.  As set forth above, when one looks at the evidence as to how the information regarding what buttons are pressed at OON ATMs is transmitted, BANA simply acted on the information provided to it.  For Schertzer, BANA received a notification that she performed one balance inquiry over the Network, and for Covell, BANA received notification that two inquiries were performed.  As far as the card issuing bank, BANA, is concerned, the customer's consent to the balance inquiry occurs when they hit the button and it is transferred through the Network.  There is no other way for this to work when one looks at how the ATM Network System operates.

26

1    Additionally, when one looks at the contract language itself, a common sense read
2    leads to the conclusion that the "may" simply allows for the waiving of different fees
3    depending on the type of account the customer has.  The court finds nothing nefarious in
4    the use of the word "may" that would necessitate the conclusion that "BofA abuses its
5    power and takes advantage of contractual uncertainty by charging OON Fees when it
6    knows, or should know, of the [alleged] systematic deception occurring at FCTI and
7    Cardtronics ATMs resulting in invalid balance inquiries."  (Doc. No. 254 at 25.)

8    Similarly, as set forth above, the "you authorize us to act on the instructions you give
9    us through ATMs" language simply provides authorization to BANA to rely on the ATM
10   selections sent via the ATM Network.  Nothing more or less.  Plaintiffs' attempt to cast
11   BANA's actions in a bad light by brandishing around the words "bad faith" and implying
12   a "kickback" scheme that incentivizes Cardtronics and FCTI to trap customers into
13   unwanted balance inquiries, (Doc. No. 254 at 25), is not supported by the evidence.  Despite
14   Plaintiffs' conclusion to the contrary, no triable issues of fact remain regarding Plaintiffs'
15   breach of the covenant of good faith and fair dealing claim.

16                    *iv.*    ***Failure to follow pre-dispute procedures***

17   BANA contends it is entitled to summary judgment, arguing Plaintiffs failed to
18   comply with the express reporting and pre-dispute notification provisions of the
19   Agreement.  (Doc. No. 231-1 at 27-31.)  Plaintiffs respond that the 60-day notice provision
20   does not apply to their claims and that the provision is unconscionable and unenforceable.
21   (Doc. No. 254 at 26-31.)

22   California law provides "parties may expressly agree that a right or duty is
23   conditional upon the occurrence or non-occurrence of an act or event."  *Orlando v.*
24   *Carolina Cas. Ins. Co.*, No CIV F 07-0092 AWI SMS, 2007 WL 781598, at *4 (E.D. Cal.
25   Mar. 13, 2007) (quoting *Platt Pac., Inc. v. Andelson*, 6 Cal.4th 307, 313 (1993)).  It is not
26   unusual for courts to hold that Plaintiffs must comply and satisfy the reporting and pre-suit
27   notice provisions set forth in the contract before filing suit.  *See e.g., On the House*
28   *Syndication, Inc. v. Fed. Express Corp.*, 79 F. App'x 247, 249 (9th Cir. 2003) (dismissing

claim where "notice of claim provisions … required compliance as prerequisite to suit.");
*Kim v. Shellpoint Partners, LLC*, Case No. 15cv611-LAB(BLM), 2016 WL 1241541, at
\*8 (S.D. Cal. Mar. 30, 2016) (dismissing claim because "plaintiff was obligated to comply
with the notice and cure provision before filing suit.")

The pertinent provision of the Deposit Agreement provides:

> Reporting Problems
>
> If you find that your records and ours disagree, if you suspect any
> problem or unauthorized transaction on your account or you do
> not receive a statement when expected, call us immediately at the
> number for customer service on your statement.  If you fail to
> notify us in a timely manner, your rights may be limited.

Doc. No. 231-4 at 25.

> Problems or unauthorized transactions include: suspected fraud;
> missing deposits; unauthorized electronic transfers; missing,
> stolen, or unauthorized checks or other withdrawal orders;
> checks or other withdrawal orders bearing an unauthorized
> signature, endorsement or alteration; illegible images; encoding
> errors made by you to us; and counterfeit checks.  This is not a
> complete list.

*Id.*  Accountholders agree to review their statements and any accompanying items as soon
as the statement is made available to them and that "60 days after [BANA] send[s] a
statement is the maximum reasonable amount of time for [the account holder] to review
[their] statement or items and report any problem or unauthorized transaction related to a
matter show[n] on the statement or items."  *Id.* at 26.  Further the Agreement provides that
the account holder who fails to notify BANA within the allotted 60-day period "may not
make a claim for unreported problems or unauthorized transactions" and "may not bring
any legal proceeding or action against [BANA] to recover any amount alleged to have been
improperly paid out of [account holder's] account."  *Id.*

BANA argues that this notice requirement applies to the balance inquires at issue in
this case.  During their depositions, both Plaintiffs admitted that they did not follow this

notice requirement, with Ms. Covell initially stating that she viewed the balance inquiry as an unauthorized transaction[9], before clarifying that she did not believe the section applied to her transaction because it did not "encumber fees."[10]  (Doc. No. 231-14 at 17-18.)  In essence, Plaintiffs are claiming that balance inquiry fees do not fall into the type of "problem or unauthorized transaction" that is encompassed by notice requirement.  Indeed, in their opposition they go so far as to suggest that the provision only applies to fraudulent checks and withdrawal orders.  (Doc. No. 254 at 27.)

While neither Plaintiff gave BANA an opportunity to refund the charges about which they complain, and the provision clearly states: "This is not a complete list," BANA could have easily expressly included a reference to ATM transactions, withdrawals or OON balance fees charged in this list.  As the court elucidated at the hearing, the issues listed as "problems" in the notice provisions seem to relate to major issues such as fraud and unauthorized or stolen checks.  (*See* Doc. No. 270 at 14-17.)  They make no mention of

---

[9] Asked about her understanding of reporting requirements Ms. Covell responded:
A: It means, if I see an issue, to report it.  I guess I didn't read this brochure, I guess, I skimmed it, So I definitely didn't read that section.
Q: But you've read it now and, as you sit here now, do you understand that you're contractually obligated to report within 60days any problem or unauthorized transaction that appears on your monthly statement?
A: I understand that sitting here now, yes.
Q: And you already testified that you did not report the $2.50 out-of-network fee that you are now complaining about; is that right?
A: Correct.  Not to Bank of America.
Doc. No. 231-14 at 15.

[10] Q: Ms. Covell you came back from a break and testified that you do not believe your balance inquiry charges, that you are complaining of, do –do not fall within this provision; is that correct?
A: The way I'm interpreting this yes. I – it says unauthorized transactions and I – a balance inquiry is a fee, not a transaction was the $20 I got out of the ATM.  That's my interpretation.
Doc. No. 231-14 at 18.

29

of fees, despite the generally and publicly known controversies over the charging of fees. The court is not persuaded by the argument that such fees would be readily apparent to an account holder's quick perusal of a statement.  Again, if the notice provisions were meant to cover problematic fees, it would have been simple for BANA to include the word, "fees," within this list, rather than presume the account holder would recognize the fee issue as included in reference, "or other problems." Thus, the court declines to find that the alleged errors were untimely reported or that the pre-dispute procedures provide an alternative basis for summary judgment in favor of BANA.

### 3.   *Conclusion Regarding Motion for Summary Judgment*

For the reasons stated above, Defendant's Motion for Summary Judgment brought under Federal Rules of Civil Procedure 56 is **GRANTED**.  (Doc. No. 231.)

## B.   **MOTION FOR CLASS CERTIFICATION**

Plaintiffs seek certification of classes on behalf of BANA customers who were assessed OON fees as a result of invalid balance inquiries that occurred at ATM machines owned and operated by Cardtronics and FCTI.  (Doc. No. 212-1[11].)  BANA opposes, primarily arguing that Plaintiffs' focus on individualized intent dooms class certification as subjective intent is not susceptible to classwide resolution.  (Doc. No. 221 at 16-22.)

### 1.   *Legal Standard for Class Certification*

District courts retain the discretion to determine whether to certify a class.  *Bouman v. Block,* 940 F.2d 1211, 1232 (9th Cir. 1991).  "Parties seeking class certification must satisfy each of the four requirements of [Federal Rule of Civil Procedure] 23(a) . . . and at least one of the requirements of Rule 23(b)."  *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1124 (9th Cir. 2017).  "Rule 23(a) states four threshold requirements applicable to all class actions: (1) numerosity (a class so large that joinder of all members is

---

[11] Because Plaintiffs' original filing contained a number of unnecessary redactions, the court had Plaintiffs refile the motion on the docket.  For ease of reference, the court will cite to the refiled version, not the original motion.

impracticable); (2) commonality (questions of law or fact common to the class); (3) typicality (named parties' claims or defenses are typical of the class); and (4) adequacy of representation (representatives will fairly and adequately protect the interests of the class)." *Amchem Prods, Inc. v. Windsor*, 521 U.S. 591, 613 (1997) (internal quotation marks, brackets, and ellipses omitted).

When considering class certification, district courts must engage in "a rigorous analysis" to determine whether "the prerequisites of Rule 23(a) have been satisfied." *Wal–Mart Stores, Inc., v. Dukes*, 564 U.S. 338, 350-51 (2011) (citing *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 161 (1982)). "[T]he merits of the class members' substantive claims are often highly relevant when determining whether to certify a class." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 981 (9th Cir. 2011). "A court, when asked to certify a class, is merely to decide a suitable method of adjudicating the case and should not turn class certification into a mini-trial on the merits." *Edwards v. First Am. Corp.*, 798 F.3d 1172, 1178 (9th Cir. 2015). In addition, the court must determine whether class counsel is adequate (Fed. R. Civ. P. 23(g)), and whether "the action is maintainable under Rule 23(b)(1), (2), or (3)." *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 462 (9th Cir. 2000) (quoting *Amchem Prod.,* 521 U.S. at 614).

### 2. *Discussion*

Plaintiffs' motion for class certification is asserted against BANA, "the party that actually assess the $2.50 OON Fees to its customers for the invalid balance inquiry transactions, in breach of its customer account agreements," and the implied covenant of good faith and fair dealing, notwithstanding the fact that "Cardtronics and FCTI disseminated [the] deceptive ATM screen prompts." (Doc. No. 212-1 at 7.) Plaintiffs argue: (1) the claims of each proposed class are ideally suited for class treatment; (2) members are easily identifiable; (3) individual damages can be ascertained; and (4) the requirements of Rule 23(a) and 23(b)(3) have been met. (Doc. No. 212-1 at 7.) BANA's opposition focuses on the Rule 23(b)(3) predominance inquiry. (*See generally*, Doc. No. 221.)

In their motion, Plaintiffs have changed the definition from that set forth in the TAC and now seek to certify a class consisting of:

> BofA-Cardtronics Class
>
> All Bank of America, N.A., checking account holders in the United States who since February 5, 2012 were assessed an out-of-network fee for an invalid balance inquiry prior to a cash withdrawal at a Cardtronics, Inc. ATM machine.
>
> BofA-FCTI Class
>
> All Bank of America, N.A., checking account holders in the United States who since May 1, 2018 were assessed two (2) out-of-network fees for a single balance inquiry undertaken at FCTI, Inc.'s ATM machines located in 7-Eleven stores.

Doc. No. 212-1 at 20[12].

### i.    Rule 23(b)(3)'s Requirements

Plaintiffs contend class certification is warranted under Rule 23(b)(3).  (Doc. No. 212 at 24-28.)

"Rule 23(b)(3) permits a party to maintain a class action if . . . the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *Conn. Ret. Plans & Trust Funds v. Amgen Inc.,* 660 F.3d 1170, 1173 (9th Cir. 2011), *aff'd* 133 S. Ct. 1184 (2013) (citing Fed. R. Civ. P. 23(b)(3)).  The "predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Hanlon v. Chry,* 150 F.3d at 1022-23 (quoting *Amchen Prods, Inc.,* 521 U.S. at 623) (*overruled on other grounds by Wal-Mart Stores v. Dukes*, 564 U.S. 338, at 338 (2011)).  An examination

---

[12] Plaintiffs' motion dedicates 10 pages to detailing the wrongdoing of Cardtronics and FCTI and the two companies scheme to design deceptive ATM screen prompts and the importance of the better balance inquiry (BBI) to generating revenue.  (Doc. No.212-1 at 8-18.)

into whether there are "legal or factual questions that qualify each class member's case as a genuine controversy" is required.  *Id.*  The superiority inquiry "requires determination of whether the objectives of a particular class action procedure will be achieved in a particular case."  *Id.* at 123.

Here, Plaintiffs argue that the predominant issue is whether BANA breached its Agreement and the implied covenant of good faith and fair dealing by uniformly assessing OON fees for the invalid balance inquiries that took place as a result of the deceptive screen prompts installed on the Cardtronics and FCTI ATMs.  (Doc. No. 212-1 at 24.) Additionally, Plaintiffs contend that determination of BANA's breach of the implied covenant of good faith and fair dealing involve common questions regarding BANA abusing its contractual discretion because: (1) BANA assessed OON fees even though it failed to exercise its discretion to ensure Plaintiffs and class members had engaged in valid balance inquiries; (2) BANA turned over blanket discretion to FCTI and Cardtronics to communicate when a balance inquiry had occurred[13]; and (3) BANA interpreted and applied the term "balance inquiry" unreasonably to include the types of requests performed by named Plaintiffs.  In sum, Plaintiffs claim "BANA takes advantage of this indefiniteness by charging OON fees when it knows, or should know, of the systematic deception occurring at FCTI and Cardtronics ATMs resulting in invalid balance inquiries."  (Doc. No. 212-1 at 27.)

 BANA makes multiple arguments against predominance.  First, it counters those common issues do not predominate because Plaintiffs' theory is "flush with individualized issues required to determine the fundamental element of breach."  (Doc. No. 221 at 17.)  It argues that Plaintiffs' claims boil down to whether BANA breached its agreements by charging customers OON fees for "invalid" balance inquiries performed at Cardtronics or FCTI ATMs.  (*Id*.)  BANA asserts that determining whether a balance inquiry was

---

[13] As set forth in the motion for summary judgment section, this misrepresents how the ATM Network actually works.

19cv264 JM(MSB)

"invalid" as opposed to "valid" requires examining each cardholder's intent when they were making selections at the ATM.  (*Id.*)  It draws attention to the fact that Plaintiffs have failed to address this issue and have chosen to rely on the standardized contract and presume every customer was deceived.  (*Id.* at 18.)

The court finds BANA's argument to be more persuasive.  Numerous courts have denied certification where individualized inquiries are necessary to determine a class member's intent and/or consent.  *See, e.g.*, *In Re Bank, N.A. Debit Card Overdraft Fee Litig.*, 325 F.R.D. 136 (D.S.C. 2018) ("Determination of which specific overdraft charges were the 'result of' any particular customer's lack of information or understanding, … , or the Bank's failure, would necessarily involve the Court's descent into a veritable quagmire of intricate fact-finding….  Class certification is not an appropriate vehicle to adjudicate a theory of liability that would necessitate thousands of mini-trials."); *see Herskowitz v. Apple, Inc.*, 301 F.R.D. 460, 471 (N.D. Cal. 2014) (holding that common issues did not predominate because "the critical question of assent or non-assent [to valid second purchase under the agreement] turns on an individualized inquiry for each customer.").  *See also Park v. Webloyalty.com, Inc.*, 2019 WL 1227062, at *1 (S.D. Cal. Mar. 15, 2019) (finding that the issue of whether a customer "knowingly enrolled in the [coupon based subscription] program at issue was itself "unknown" and could not "readily be known without individual fact-finding" thus the court rejected plaintiff's assertion "that any authorization consumers gave to charge their cards in the course of such a process must be invalid" and declined to certify the class.).

While Plaintiffs' may wish to minimize what each customer subjectively experienced at Cardtronics and FCTI ATMs, by honing their contention that ATM operators have rendered the OON balance inquiry unclear and ambiguous (*see* Doc. No. 270 at 39-41), the court cannot do the same.  To do so would require the court to: (1) alter the contract to require a "valid" consent element to any balance inquiry; (2) assume every class member who used the OON ATMs found them to be deceptive; and (3) hold BANA

34

accountable for the actions of the independent OON ATM owners, notwithstanding BANA has no control over the ATM Network system or the OON ATM owners and operators.

BANA also raises the valid point, addressed in *Herskowitz*, that Plaintiffs cannot escape the customer-by-customer questions necessary to distinguish the "invalid" transactions they challenge from the "valid" ones they do not.  (Doc. No. 221 at 21.)  Plaintiffs' counsel proposes that the invalidity of the balance inquiry instruction itself renders all balance inquiries performed at Cardtronics and FCTI ATMs invalid.  (*See e.g.,* Doc. No. 270 at 59-60.)  However, the record provides no evidence that every balance inquiry performed at these ATMs was invalid, and without such evidence, the court is unwilling to make such a presumption.  And, as in *Herskowitz*, Plaintiffs have cited "no authority for the proposition that customers' lack of subjective intent" to the transactions at issue, ought to be presumed, and the court cannot find any.  *See, e.g.*, *Herskowitz*, 301 F.R.D. at 471-72 ("Plaintiffs cite no authority for the proposition that customers' subjective intent regarding assent to a contract, or lack thereof, ought to be presumed, and the Court can find none.").  Indeed, as BANA notes, Plaintiffs' own expert concedes that some customers may intentionally check their balances prior to making a cash withdrawal, (Doc. No. 221-16 at 13), meaning not all balance inquiries can be presumed to be invalid.[14]

_____

[14] The parties also disagree whether class membership and damages are ascertainable through a classwide methodology.  Plaintiffs' expert, Mr. Olsen, a data analysis expert, has purportedly "confirmed that each Class member can be identified, and the amount of their damages can be calculated by matching BANA's historical transactional data to historical data provided by FCTI and Cardtronics." (Doc. No. 212-1 at 27.)  Yet, Mr. Olsen, testified that his analysis did not involve speculation about what a customer's intent was.  (Doc. No. 221-16 at 13.)  But what a customer intended to do at the ATM seems to be at the heart of this case.  *See Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013). (A plaintiff must show that "damages are capable of measurement on a classwide basis" meaning "any model supporting a plaintiff's damages case must be consistent with its liability case").  Regardless, in light of the court's ruling on Defendant's motion for summary judgment, the court declines to address the merits of the Defendant's Motion to Exclude the Expert Opinion of Arthur Olsen, filed in support of Plaintiffs' motion for class certification (Doc.

1        Secondarily, BANA argues against predominance/commonality by pointing to the

2 lack of uniformity among the Cardtronics ATM screens, claiming this exacerbates the

3 intent problem and presents additional individualized issues precluding certification.  (Doc.

4 No. 221 at 22-24.)  It maintains that to determine if a class member was tricked into making

5 an invalid balance inquiry, the court would need to undertake a highly individualized

6 analysis of the particular Better Balance Inquiry ("BBI") screen each class member saw.

7 (*Id*.)  Further, BANA notes that not all Cardtronics ATMs display BBI screens, there is no

8 standard BBI screen across the ATM fleet with many variances between prompts, different

9 colors are often used, and warnings are/are not displayed.  (*Id*.)

10        BANA's argument is not without merit.  The declaration of David McCrary, Vice

11 President of Financial Institutions and Retail Solutions at Cardtronics, (Doc. No. 221-21 at

12 ¶¶ 11-61) and the accompany exhibits illustrate the wide variety of potential screens

13 presented to BANA customers during the class period:

14 ///

15 ///

16 ///

17 ///

18 ///

19 ///

20 ///

21 ///

22 ///

23 ///

26 No. 223), finding it unnecessary for purposes of this order.  Accordingly, that motion is

27 **DENIED AS MOOT**.

36



Doc. No. 212-31; Doc. No. 221-24; Doc. No. 221-25; Doc. No. 221-30; Doc. No. 221-31; Doc. No. 221-37; Doc. No. 221-38; Doc. No. 221-42; Doc. No. 221-44; Doc. No 221-45. Thus, to suggest that Cardtronics has only deployed one or two default BBI ATM screens at the company's 70,000+ ATMs vastly oversimplifies Cardtronics' business model and branding partnerships.  Rather, the evidence before the court demonstrates that BANA customers would have been presented with a number of screen variations associated with the balance inquiry process that differed from the screens described by Plaintiffs Schertzer

and Covell.  Yet Plaintiffs' expert offers no methodology to account for this and Plaintiffs seemingly ignore these differences in their papers.  *See Herskowitz*, 301 F.R.D. at 472 ("Ignoring for the time being whether Plaintiffs could ever prove non-assent …, the Court can say with confidence that the question of assent would be analyzed very differently for customers who saw this pop-up versus those who did not.  However, Plaintiffs propose no classwide method of distinguishing between customers for whom a pop-up disclaimer appeared and those for whom the pop-up did not appear, and the Court cannot think of any method to distinguish between these customers except through individualized inquiry."); *In re Facebook, Inc., PPC Adver. Litig*, 282 F.R.D. 446, 459 (N.D. Cal. Apr. 13, 2012) (predominance not met in breach of contract class action where plaintiffs failed to offer a sufficient methodology for distinguishing advertising clicks that were actionable (and amounted to injury) from those that were not actionable).

Third, BANA maintains that the new class definitions put forth by Plaintiffs have created additional problems.  (Doc. No. 221 at 24-26.)  In regard to the BANA Cardtronics class, BANA notes that membership is limited to those who conducted an "invalid" balance inquiry, which itself would require the court to determine what Cardtronics ATM screen each member saw, whether it was a BBI screen, whether the screen contained the deceptive factors complained of, and "whether customers understood they were checking their balance and intended to do so."  (*Id.* at 25.)  This point is well taken and further underscores that individual issues would necessarily predominate.  *See, e.g.*, *Valenzuela v. Union Pac. R.R. Co*., No. CV-15-01092-PHX-DGC, 2012 WL 679095, at *16 (D. Ariz. Feb 21, 2017) (a property interest/right-of-way case where court denied class certification for multiple reasons, including the fact a review of the claims made clear that individual issues would overwhelm the litigation.)  Plaintiffs reply that "an invalid balance inquiry is a balance inquiry procured through BBI prompts," and that "there is no need to engage in the futile act of determining which, if any, customers may have actually wanted to conduct a balance inquiry."  (Doc. No. 234 at 9-10.)  But again, Plaintiffs' proposition requires the court to assume that not a single customer purposefully chose to make a balance inquiry, and from

38

19cv264 JM(MSB)

1    there, further assume, that every single OON balance inquiry fee charged by BANA
2    violated the Agreement – something the court is not willing to do.[15]

3        Finally, citing *Mazza v. American Honda Motor Company, Inc.*, 666 F.3d 581, 596
4    (9th Cir. 2012), BANA argues that the certification of a nationwide class is inappropriate
5    where "variances in state law overwhelm common issues and preclude predominance."
6    (Doc. No. 221 at 26-30).   First, BANA makes numerous well-made points regarding the
7    variations in state law regarding latent ambiguities and extrinsic evidence rules (*Id.* at 27-
8    30.)   The Ninth Circuit has explained that: "[w]here the applicable law derives from the
9    law of the 50 states, as opposed to a unitary federal cause of action, differences in state law
10   will compound the disparities among class members from the different states." *Zinser v.*
11   *Accufix Research Inst., Inc.,* 253 F.3d 1180, 1189 (9th Cir. 2001) (internal alterations,
12   quotation marks, and citation omitted).   Plaintiffs bear "the burden of demonstrating a
13   suitable and realistic plan for trial of the class claims."   (*Id.*)   Plaintiffs have not met this
14   burden here.  Also, BANA has submitted a chart that lays out the key differences regarding
15   the admissibility of extrinsic evidence[16] (Doc. No. 221-18).   As the Ninth Circuit has
16   noted: "[i]n contrast to many other states, California has a liberal parol evidence rule: It
17   permits consideration of extrinsic evidence to explain the meaning of the terms of a
18   contract even when the meaning appears unambiguous." *Foad Consulting Grp. Inc. v.*
19   *Azzalino,* 270 F.3d 821, 826 (9th Cir.2001).   In contrast, other states, such as Arizona and
20   New York, allow extrinsic evidence only where there is contractual ambiguity. *See,*
21   *e.g., Isbell v. Ed Ball Const. Co., Inc.,* 310 Ark. 81, 85, 833 S.W.2d 370, 372 (1992) ("Only

___

22

23
24   [15] As to the FCTI class, BANA argues that determining membership of the class, requires
     the court to first make a determination of liability, and thus the class should not be certified.
25   (Doc. No. 221 at 25-26.)  This argument is not without merit because class membership
26   really does hinge on whether or not the printing of the receipt qualified as a second balance
     inquiry that warranted payment of the second OON fee.

27
28   [16]  The importance of the extrinsic evidence to the motion to summary judgment illustrates
     this point.

19cv264 JM(MSB)

1  when ambiguity exists and the meaning of a contract becomes a question of fact is parol

2  evidence admissible."); *Osprey Partners, LLC v. Bank of N.Y. Mellon Corp.*, 115 A.D. 3d

3  561, 562, 982 N.Y.S. 2d 119, 120 (Mar. 20, 2014) ("where the terms of a contract are clear

4  and unambiguous, the intent of the parties must be found within the four corners of the

5  document and extrinsic evidence is not to be considered.") (internal quotation marks and

6  citations omitted).  These very real conflicts provide further grounds for denying class

7  certification.  *See, e.g.*, *Gustafuson v. BAC Home Loans Servicing, LP*, 294 F.R.D. 529,

8  544 (C.D. Cal. Nov. 4, 2013) (finding the differences among states' breach of contract laws

9  material as they could greatly affect how the relevant provisions of the agreements are

10  interpreted and ultimately whether there was a breach of those provisions);  *Jim Ball*

11  *Pontiac–Buick–GMC, Inc. v. DHL Exp. (USA), Inc.,* No. 08–CV–761C, 2011 WL 815209,

12  at *7 (W.D.N.Y. Mar. 2, 2011) ("plaintiff has failed to establish that common questions of

13  law and fact predominate, as individualized inquiries will be required for each potential

14  class member.  Additionally, given the different standards of admissibility of extrinsic

15  evidence, plaintiff has failed to show that the class action is the superior method with which

16  to resolve this action.").

17      In sum, these issues surrounding predominance weigh against certifying the class

18  under Rule 23(b)(3).

19         **3.    *Conclusion Regarding Motion for Class Certification***

20      All of the predominance issues highlighted provide compelling reasons why these

21  proposed classes should not be certified under Rule 23(b)(3).  In light of this, the court will

22  refrain from performing the usual Rule 23(a) or 23(g) analysis.  Accordingly, the court

23  **DENIES** Plaintiffs' motion for class certification.[17]  (Doc. No. 198.)

24

25

26  [17]  In the TAC, Covell asserted putative class claims against FCTI for restitution yet

27  declined to pursue these in her motion for class certification.  Since Plaintiff has not
    pursued these claims, FCTI's request that the court issue an order expressly stating that

28  Covell has not established that the FCTI claims asserted in the TAC meet the Rule 23

**V.    CONCLUSION**

In accordance with the foregoing, Defendant's Motion for Summary Judgment (Doc No. 231) is **GRANTED** and Plaintiffs' Motion for Class Certification (Doc. No. 198) is **DENIED.**  Defendant BANA is dismissed from this litigation.

Since the only remaining claims in this action are Covell's individual claims against FCTI, the court sets a status conference on <u>**April 11, 2022**</u> at <u>**11:00 a.m.**</u>, in Courtroom 5D.  Counsel for FCTI and Covell are ordered to appear in person.

**IT IS SO ORDERED.**

DATED: April 4, 2022

JEFFREY T. MILLER
United States District Judge

---

criteria and are not suitable for class treatment is, therefore, **MOOT**.  (*See generally*, Doc. No. 220; Doc. No. 270 at 80.)

19cv264 JM(MSB)